**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>    Plaintiff,<br><br>  v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY *et al.*,<br><br>    Defendants. | No. 18-cv-2473 |

**<ins>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</ins>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iv

INTRODUCTION ..................................................................................1

STATUTORY AND REGULATORY FRAMEWORK ...................................3

    I.    Federal Records Act .....................................................3

    II.    Statutory Scheme Requiring Transfer of Unaccompanied Alien Children to HHS ...........................................................................6

FACTUAL BACKGROUND ..................................................................8

    I.    Relevant DHS Records Management Policies and Systems .....................8

    II.    Executive Order 13841 .................................................10

    III.    *Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.)...................................11

    IV.    Procedural History .....................................................14

ARGUMENT .................................................................................15

    I.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A MANDATORY PRELIMINARY INJUNCTION WITH RESPECT TO COUNT 2...................................................................................15

        A.    Emergency Injunctive Relief Should Be Denied Because Plaintiffs Do Not Seek To Preserve the Status Quo ...................16

        B.    Plaintiffs Are Unlikely To Succeed on the Merits of Count 2.......17

            1.  Count 2 Does Not Fit Within the Narrow Scope of Claimed FRA Violations that Courts Have Allowed Under the APA ..18

            2.  Plaintiffs' Description of the Scope of Records Required Under 44 U.S.C. § 3101 Is Flawed .........................................21

        C.    Plaintiffs Fail to Establish Irreparable Harm ...............................25

            1.    Plaintiffs' Delay in Seeking a Preliminary Injunction Weighs Against Emergency Relief ...................................26

            2.    In Light of Changes to DHS Systems and Ongoing Monitoring in Ms. L., Plaintiffs Fail to Identify an Imminent Injury in Need of Redress with Respect to

Future Separations of Alien Parents and Children ............29

3.      RAICES Fails to Establish that DHS Recordkeeping
        Practices Present a Direct Conflict to its Mission that
        Could Be Redressed Through Emergency Relief ............30

4.      RAICES Cannot Establish Irreparable Harm by
        Claiming Third-Party Injury on Behalf of Unknown
        Future Clients ...................................................................32

5.      CREW Fails to Demonstrate an Informational Injury that
        Could Be Redressed Through Emergency Relief ............32

D.      The Balance of Hardships and Public Interest Do Not Favor
        Emergency Injunctive Relief .........................................35

III.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS IN
        THEIR ENTIRETY ........................................................................36

A.      Standard of Review .......................................................36

B.      Count 1 Should Be Dismissed .......................................38

C.      Count 3 Should Be Dismissed .......................................40

CONCLUSION ...........................................................................................42

## **TABLE OF AUTHORITIES**

### **Cases**

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ....................................37

*Accrediting Council v. DeVos*, 303 F. Supp. 3d 77 (D.D.C. 2018) ................................22

*Adamski v. McHugh*, 304 F. Supp. 3d 227 (D.D.C. 2015) .................................................40

*Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29 (D.C. Cir. 1983) ................................4

*Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ....................32

*Archdiocese v. Wash. Metro Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018) ............16

*Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011) ......................................36

*Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815 (D.C. Cir. 2009) ....................17

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*")  .............4, 18, 20, 38

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015)  ...............................................................41

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................37, 41

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................37

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) .....15, 25

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ..................3

*Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)  .....................................................15

*Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 215 (D.D.C. 2015) .....................................15

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy*, 82 F. Supp. 3d 228 (D.D.C. 2015),
    *rev'd on other grounds*, 827 F.3d 145 (D.C. Cir. 2016).  ...............................38, 39

*CREW v.  Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009)  ...................................................34

*CREW v. EOP*, 587 F. Supp. 2d 48 (D.D.C. 2008) ...........................................................34

*CREW v. Pruitt* ("*CREW I*"), 319 F. Supp. 3d 252 (D.D.C. 2018) ......................18, 19, 20

*CREW v. SEC*, 858 F. Supp. 2d 51 (D.D.C. 2012)  ..........................................................34

*CREW v. Wheeler ("CREW II"), 352 F. Supp. 3d 1 (D.D.C. 2019) .......19, 20, 28, 29, 42

Dorfmann v. Boozer, 414 F.2d 1168 (D.C. Cir. 1969) ...................................................16

Elec. Privacy Info. Ctr. v. DOJ, 15 F. Supp. 3d 32 (D.D.C. 2014) ...................................16

Elec. Privacy Info. Ctr. v. FTC, 844 F. Supp. 2d 98 (D.D.C. 2012) ................................17

Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,
    878 F.3d 371 (D.C. Cir. 2017) ..............................................................................33

English v. Trump, 279 F. Supp. 3d 307 (D.D.C. 2018) ...................................................16

Feng Wang v. Pompeo, 354 F. Supp. 3d 13 (D.D.C. 2018) ..............................................16

Friends of Animals v. Jewell, 828 F.3d 989 (D.C. Cir. 2016) ..........................................33

Grand Lodge of the Fraternal Order of Police v. Ashcroft,
    185 F. Supp. 2d 9 (D.D.C. 2001) ..........................................................................36

Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192 (D.C. Cir. 1992) ................................36

In re Navy Chaplaincy, 738 F.3d 425 (D.C. Cir. 2013) ..............................................15, 25

John Doe Co. v. Consumer Fin. Prot. Bureau, 235 F. Supp. 3d 194 (D.D.C. 2017) .......15

Judicial Watch, Inc. v. Kerry, 844 F.3d 952 (D.C. Cir. 2016) ....................................18, 19

Kingman Park Civic Ass'n v. Williams, 348 F.3d 1033 (D.C. Cir. 2003) .......................37

Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136 (1980) ..............18

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375 (1994) .................................36

Kowalski v. Tesmer, 543 U.S. 125 (2004) ......................................................................32

League of Women Voters v. Newby, 838 F.3d 1 (D.C. Cir. 2016) ...................................31

*Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990) .......................................................19

Mexichem Specialty Resins, Inc. v. EPA, 787 F.3d 544 (D.C. Cir. 2015) .......................32

Morales v. Sec'y, U.S. Dep't of State, 220 F. Supp. 3d 1 (D.D.C. 2016) ........................25

Ms. L. v. ICE, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) ...................................................11

*N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116 (D.D.C. 2010) ..........................15

*Nat'l Fair Hous. Alliance v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018) .......................31

*Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233 (D.D.C. 2012) ................................34

*Navajo Nation v. Azar*, 292 F. Supp. 3d 508 (D.D.C. 2018) ............................................25

*Newark Pre-Sch. Council, Inc. v. HHS,* 201 F. Supp. 3d 72 (D.D.C. 2016) ...................16

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005) .....................................................26

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................15, 35

*\*Norton v. SUWA*, 542 U.S. 55 (2004) ....................................................................19, 20

*Open Top Sightseeing USA v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87 (D.D.C. 2014) .26

*Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) ..........................................41

*Penny v. U.S. Dep't of Justice*, 662 F. Supp. 2d 53 (D.D.C. 2009) .................................40

*Pub. Citizen v. Carlin*, 184 F.3d 900 (D.C. Cir. 1999) .......................................................3

*Ramirez v. ICE*, 338 F. Supp. 3d 1 (D.D.C. 2018) ..........................................................19

*Shibeshi v. United States*, 920 F. Supp. 2d 105 (D.D.C. 2013) ........................................37

*Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142 (D.D.C. 2011) ......................26

*Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016) ........................................................15

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000) ................................36

*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) .....................................37

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ..............................................16, 17

*Wagdy v. Sullivan*, 316 F. Supp. 3d 257 (D.D.C. 2018), *aff'd sub nom. Wagdy v. Pompeo*,
    No. 18-5244, 2019 WL 479845 (D.C. Cir. Jan. 31, 2019) ..................................19

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ....................................................35

*Weinberger v. Salfi*, 422 U.S. 749 (1975) .......................................................................40

*Williams v. Lew*, 819 F.3d 466 (D.C. Cir. 2016) ................................................................41

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................15, 25

*Wisc. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) (per curiam) ......................25, 32

## **Statutes**

Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, § 462,
    116 Stat. 2135, 2205 (codified at 6 U.S.C. § 279) ..............................................2, 6

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (2008) (codified in relevant part at
    8 U.S.C. § 1232) ..............................................................................................2, 7

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 ...................................................24

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 .........................................2

5 U.S.C. § 704 ...................................................................................................................19

5 U.S.C. § 706 .............................................................................................................18, 38

6 U.S.C. § 279 ....................................................................................................2, 6, 7, 24

8 U.S.C. § 1229a ................................................................................................................24

8 U.S.C. § 1232 ......................................................................................................2, 7, 24

Federal Records Act ("FRA"), 44 U.S.C. §§ 2101-20, 2901-11, 3101-07, 3301-14 *passim*

44 U.S.C. § 2902 .................................................................................................................4

44 U.S.C. § 2904 .................................................................................................................5

44 U.S.C. § 2906 .................................................................................................................5

44 U.S.C. § 3101 ....................................................................................4, 18, 19, 21, 24, 25, 28

44 U.S.C. § 3102 .................................................................................................................5

44 U.S.C. § 3106 ...............................................................................................................18

44 U.S.C. § 3301 .................................................................................................................4

**<u>Regulations</u>**

36 C.F.R. § 1222.22 ................................................................6, 18, 21

36 C.F.R. § 1223.2 ...................................................................6, 22

36 C.F.R. § 1239.20 ......................................................................6

36 C.F.R. § 1239.24 ......................................................................6

36 C.F.R. § 1239.26 .................................................................6, 40

**<u>Legislative Materials</u>**

S. Rep. No. 1326, 94th Cong., 2d Sess. 2 (1976) ..............................4

154 Cong. Rec. S10886, S10886-87 (daily ed. Dec. 10, 2008).........................................24

**<u>Executive Materials</u>**

E.O. 13841, 83 Fed. Reg. 29,435 (June 20, 2019) ......................................10, 11

## INTRODUCTION

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW"), a self-styled non-partisan watchdog entity, and Refugee and Immigrant Center for Education and Legal Services ("RAICES"), a legal services organization, seek preliminary injunctive relief against Defendants the U.S. Department of Homeland Security ("DHS") and Secretary of Homeland Security Kirstjen Nielsen, based on a claimed violation of the Federal Records Act ("FRA"). Plaintiffs assert that DHS fails to create adequate records documenting the separation of alien children from accompanying adults with whom they were apprehended upon entering the United States, so as to allow such children to be linked to those adults for the duration of their immigration proceedings.

Plaintiffs' request for a preliminary injunction should be denied, and the three claims in their Amended Complaint—all variations on the same theme—should be dismissed. Plaintiffs attempt to use the FRA as a vehicle to address issues that, in large part, are already being litigated and addressed in another case, *Ms. L. v. U.S. Immigration and Customs Enforcement*, in the Southern District of California, where the court has issued a preliminary injunction halting the separation of class member parents from their children except in limited circumstances, and has continued to oversee developments related to the process of family reunification as well as changes to Government electronic information systems where records regarding aliens encountered at the border are made. Given the ongoing litigation in *Ms. L.*, as well as the changes that have already occurred, among other reasons, Plaintiffs fail to show that a preliminary injunction is warranted here, particularly a mandatory injunction that would change the status quo, requiring DHS to implement additional changes to its electronic information systems before a final decision on the merits of Plaintiffs' claims.

Plaintiffs are unlikely to succeed on the merits of the FRA claim at issue in their PI motion because any such claim must be brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and decisions in this Circuit make clear that, in order to satisfy the APA's "agency action" requirement, a plaintiff can challenge only the agency's records creation policy. Moreover, the only remedy a court can provide in such a challenge is to require an FRA-compliant policy. Yet, Plaintiffs instead focus on asserted specific failures to create records, while urging the Court to engage in pervasive oversight over DHS's day-to-day recordkeeping practices when encountering aliens at the border. Plaintiffs' claim falls well outside the permissible scope of an APA FRA claim. In addition, DHS has already made changes in its electronic information systems that directly refute the asserted recordkeeping violations that Plaintiffs allege with respect to children and parents, and Plaintiffs fail to identify any basis in law for their assertions that DHS recordkeeping must also take into account alien children's potential links to *non-parent* adults to protect the children's rights. In fact, governing law, including the Homeland Security Act of 2002 and the Trafficking Victims Protection Reauthorization Act of 2008, affirmatively defines alien children with no lawful immigration status, and apprehended only with non-parent adults, to be "unaccompanied," and requires such children to be transferred to the care and custody of the Department of Health and Human Services ("HHS") for their own safety and security.

Plaintiffs also fail to show irreparable harm. Again, there is no reason to conclude that DHS's current records creation policies with respect to alien children and their parents are deficient, much less that a preliminary injunction is needed to remedy any asserted deficiency. Indeed, Plaintiffs do not identify any instance of inadequate recordkeeping with respect to any alien child and her parent apprehended after the *Ms. L.* preliminary injunction went into effect. RAICES fails to show an organizational injury fairly traceable to asserted DHS actions, nor that

those actions directly conflict with RAICES's mission, which RAICES continues to carry out. While RAICES attempts to assert an injury on behalf of its clients, it cannot establish standing or irreparable injury on behalf of future clients that are not yet known. Nor is it clear that RAICES's injury could be redressed by the requested injunction, as RAICES fails to explain how it would gain access to the records Plaintiffs assert DHS must create. CREW's asserted informational injury also relies on the unlikely assumption that it could somehow gain access to the information at issue—which is information about specific individuals—if DHS were to create records containing that information. Plaintiffs' asserted irreparable injuries are insufficient for a preliminary injunction, and indeed, they fail to establish Plaintiffs' standing.

Finally, the balance of hardships weighs against a preliminary injunction, when the requested injunction would require DHS and its component agencies to change records creation policies and practices, including their electronic information systems, in a manner not required by any substantive law, and would also require DHS to navigate between and attempt to reconcile potentially inconsistent requirements by different courts. It would be in the public interest to allow the court in *Ms. L.* to continue handling issues related to family separations at the border, including records-related issues. Because the same or similar reasons also compel the conclusion that Plaintiffs lack standing to pursue any of their claims, and that they fail to state a claim upon which relief can be granted, the Court should deny their Motion for Preliminary Injunction and dismiss this action in its entirety.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    Federal Records Act

The FRA is "a collection of statutes governing the creation, management, and disposal of records by federal agencies." *Pub. Citizen v. Carlin*, 184 F.3d 900, 902 (D.C. Cir. 1999); *see* 44

U.S.C. §§ 2101-20, 2901-11, 3101-07, 3301-14. These statutory provisions "establish a unified system for handling the 'life cycle' of federal records—covering their creation, maintenance and use, and eventually their disposal by either destruction or deposit for preservation." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 36 (D.C. Cir. 1983).

While most FRA litigation has involved attempts to enjoin the destruction of records, Plaintiffs here seek to compel DHS to create and maintain certain records. The FRA addresses the creation and maintenance of records in general terms, reflecting Congress's intent to "strike a balance 'between developing efficient and effective records management, and the substantive need for Federal records.'" *Armstrong v. Bush*, 924 F.2d 282, 292 (D.C. Cir. 1991) ("*Armstrong I*") (quoting S. Rep. No. 1326, 94th Cong., 2d Sess. 2 (1976)). Among the "goals" identified in the statute are the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," while establishing and maintaining control mechanisms that would both "prevent the creation of unnecessary records" and facilitate "the effective and economical operations of an agency." 44 U.S.C. § 2902(1), (3).

The FRA broadly requires agency heads to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101.[1] Agency heads must also "establish and maintain an active,

---

[1] The FRA defines "records" to include "all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A). The Archivist's decision on whether recorded information is a record under this definition is "binding on all Federal agencies." *Id.* § 3301(b).

continuing program for the economical and efficient management of the records of the agency." *Id.* § 3102. At the same time, the FRA vests the Archivist of the United States ("the Archivist") with the responsibility to provide guidance and assistance to Federal agencies in carrying out these obligations. *Id.* § 2904(a)(1)-(2); *see also id.* § 3102(3) (requiring agency records management programs to cooperate with the Archivist). The FRA also directs the Archivist to "promulgate standards, procedures, and guidelines with respect to records management," *id.* § 2904(c)(1), while, in addition, authorizing the Archivist to inspect an agency's records or records management practices and programs "for the purpose of rendering recommendations for the improvement of records management practices and programs," *id.* § 2906; *see also id.* § 2904(c)(7). The Archivist must report at least annually to appropriate committees of Congress and to the Director of the Office of Management and Budget regarding the results of any inspections, and "on evaluations of responses by Federal agencies to any recommendations resulting from inspections." *Id.* § 2904(c)(8)(A)-(B).

Pursuant to Congress's direction in the FRA, the National Archives and Records Administration ("NARA") has promulgated regulations setting forth more detailed descriptions of the records that an agency must create and maintain. In particular, in order "[t]o meet their obligation for adequate and proper documentation, agencies must prescribe the creation and maintenance of records that:

(a) Document the persons, places, things, or matters dealt with by the agency.
(b) Facilitate action by agency officials and their successors in office.
(c) Make possible a proper scrutiny by the Congress or other duly authorized agencies of the Government.
(d) Protect the financial, legal, and other rights of the Government and of persons directly affected by the Government's actions.
(e) Document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitments reached orally (person-to-person, by telecommunications, or in conference) or electronically.
(f) Document important board, committee, or staff meetings.

36 C.F.R. § 1222.22. NARA regulations also provide examples of records "essential to protect the legal and financial rights of the Government and of the individuals directly affected by its activities," which "include accounts receivable records, social security records, payroll records, retirement records, and insurance records." *Id.* § 1223.2.

NARA regulations also set forth the circumstances under which NARA will undertake an inspection of an agency's records management program, *id.* § 1239.20, as well as the procedure for such an inspection, *id*. § 1239.24. The regulations also provide that, following an inspection, an agency "must submit a plan of corrective action that specifies how the agency will address each inspection report recommendation." *Id.* § 1239.26. Once NARA and the agency agree on the plan, the agency "must submit progress reports to NARA until all actions are completed." *Id.*

## II.    Statutory Scheme Requiring Transfer of Unaccompanied Alien Children to HHS

Also relevant here is the statutory framework within which DHS generally is required to transfer unaccompanied alien children ("UACs") to HHS. Congress first vested HHS with responsibility for the care of UACs "who are in Federal custody by reason of their immigration status" in the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, § 462(a), (b)(1)(A), 116 Stat. 2135 (codified at 6 U.S.C. § 279(a), (b)(1)(A)). The HSA defines an "unaccompanied alien child" as:

> a child who-
> (A) has no lawful immigration status in the United States;
> (B) has not attained 18 years of age; and
> (C) with respect to whom--
>     (i) there is no parent or legal guardian in the United States; or
>     (ii) no parent or legal guardian in the United States is available
>     to provide care and physical custody.

6 U.S.C. § 279(g)(2). The HSA also vested in HHS the responsibility for making all placement decisions for UACs, and required HHS to coordinate these placement decisions with DHS. Finally,

the HSA prohibited HHS from releasing UACs on their own recognizance. *See* 6 U.S.C.
§ 279(b)(l)(C), (D), (b)(2).

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (2008) (codified in relevant part at 8 U.S.C>
§ 1232), took further steps to ensure that UACs are not victims of human trafficking. Through the
TVPRA, Congress intended to protect children from trafficking while also allowing for family
reunification in a manner that protects the best interests of the child. *See* 154 Cong. Rec. S10887
(daily ed. Dec. 2008) (statement of Sen. Feinstein). The TVPRA thus made clear that HHS, and
not DHS or its components, is responsible for the care and custody of all UACs, as well as all
placement decisions for UACs in HHS custody. The statute provides that "the care and custody of
all unaccompanied alien children, including responsibility for their detention, where appropriate,
shall be the responsibility of" HHS. 8 U.S.C. § 1232(b)(1). It also requires that:

> Except in the case of exceptional circumstances, any department or agency
> of the Federal Government that has an unaccompanied alien child in custody
> shall transfer the custody of such child to the Secretary of Health and
> Human Services not later than 72 hours after determining that such child is
> an unaccompanied alien child.

*Id.* § 1232(b)(3). It also provides guidelines for HHS's release of UACs from HHS custody to
sponsors, including dictating the requirements for HHS to evaluate the suitability of any sponsor.

*Id.* § 1232(c)(3). The TVPRA states that the UAC may not be

> placed with a person or entity unless [HHS] makes a determination that the
> proposed custodian is capable of providing for the child's physical and mental well-
> being. Such determination shall, at a minimum, include verification of the
> custodian's identity and relationship to the child, if any, as well as an independent
> finding that the individual has not engaged in any activity that would indicate a
> potential risk to the child.

*Id.* § 1232(c)(3)(A).

## FACTUAL BACKGROUND

I.    **Relevant DHS Records Management Policies and Systems**

DHS Directive 141-01 requires all DHS employees to "[c]reate, receive, and maintain official records providing adequate and proper documentation in support of DHS activities." DHS Dir. No. 141-01(V)(A), *attached to* Declaration of Paul Johnson ("Johnson Decl."), attached hereto; *see also* DHS Instruction No. 141-01-001(V)(J)(1) (directing DHS employees to "[p]roperly identify, capture, retain, file, and dispose of or transfer records . . . in accordance with Title 44 U.S.C. Chapter 31; NARA regulations, 36 CFR Chapter XII, Subpart B; and DHS records policy"), *attached to* Johnson Decl. Directive 141-01 further requires DHS employees to "[m]aintain records according to a designated DHS file plan, which allows for retrieval across the varied DHS missions." Dir. 141-01(V)(D). In addition, it requires that employees receive training, when hired and annually thereafter, "to ensure awareness of their responsibilities to maintain and safeguard DHS records." *Id.* 141-01(V)(E).

DHS's components utilize various electronic information systems to create and maintain information necessary to the execution of its homeland security and border security missions. For example, U.S. Customs and Border Protection ("CBP"), through its operational offices the U.S. Border Patrol and the Office of Field Operations ("OFO"), uses electronic systems to collect and maintain information about individuals it encounters at the U.S. border. Similarly, U.S. Immigration and Customs Enforcement ("ICE") uses electronic systems to document information about aliens encountered, detained, and removed from the United States.

Within CBP, the U.S. Border Patrol, which patrols the border between official ports of entry and thus is responsible for apprehending aliens who illegally enter the country between ports, uses an electronic portal, called the e3 portal, to collect biographical and biometric data about apprehended individuals, as well as information regarding where, and the circumstances in which,

such individuals were apprehended.[2] e3 PIA, at 1. The e3 portal is the Border Patrol's portal to ICE's Enforcement Integrated Database ("EID") as well as the DHS Automated Biometric Identification System ("IDENT"). *Id.* Information entered into e3 is directly transmitted to EID and to IDENT. *See id.*

CBP's OFO conducts inspections of all individuals entering the United States through official ports of entry. During the inspection process, OFO collects various types of information and records it in various databases, including a database called SIGMA, which can be accessed through an information-sharing platform called TECS.[3] *See* 2016 TECS PIA, at 2-4, 40. In addition, if a traveler is referred to secondary inspection, or if an alien is found to be inadmissible to the United States, further information is recorded in CBP systems. *See id.* at 4-6. When ICE takes custody of inadmissible aliens who were encountered at the border, it documents all relevant information in its EID system, which captures and maintains information related to the investigation, arrest, booking, detention, and removal of persons encountered during immigration and law enforcement investigations and operations conducted by ICE and CBP.[4] In addition, ICE maintains the Online Detainee Locator System ("ODLS"), a public system available at http://www.ice.gov/locator, which allows family members, legal representatives, and members of

---

[2] The Border Patrol's e3 system is described in a privacy impact assessment ("PIA"), DHS/CBP/PIA-012(a) CBP Portal (E3) to EID/IDENT (Aug. 2017) ("e3 PIA"), *available at* https://www.dhs.gov/publication/cbp-portal-e3-enforceident, as well as a systems of records notice ("SORN"), 81 Fed. Reg. 72601-01 (Oct. 20, 2016).

[3] TECS PIAs are available at https://www.dhs.gov/sites/default/files/publications/DHS-PIA-ALL-021%20TECS%20System%20Platform.pdf ("2016 TECS PIA") and https://www.dhs.gov/sites/default/files/publications/privacy-pia-cbp-tecs-december2010_0.pdf ("2010 TECS PIA"). *See also* TECS SORN, 73 Fed. Reg. 77778-01 (Dec. 19, 2008).

[4] EID PIAs are available at https://www.dhs.gov/publication/dhsicepia-015h-enforcement-integrated-database-eid-criminal-history-information-sharing. *See also* EID SORN, 81 FR 72080-01 (Oct. 19, 2016).

the public to locate immigration detainees who are in ICE detention.[5]

As of April 19, 2018, the Border Patrol's e3 system includes a yes/no check box allowing agents to indicate that a child was separated from a parent. GAO, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border*, GAO-19-163 (Oct. 2018) ("GAO Rpt.") (Pl. ex.2) [ECF 14-4] at 17 & n.45. OFO also "modified its [SIGMA] data system and issued guidance to its officers on June 29, 2018, to track children separated from their parents." *Id.* at 17 (footnote omitted). On July 6, 2018, HHS added a "check box for indicating that a child was separated from his or her parents" to its UAC Portal—a separate HHS system for receiving information about children transferred to HHS. *Id.* at 18. Both ICE and Border Patrol have direct access to the UAC Portal, and OFO also sends relevant information about UACs requiring placement to HHS. *Id.* at 16 n.43. On July 5, 2018, the Border Patrol issued guidance, "directing its agents to use the new indicator for separated children in the UAC Portal and provide the parent's alien number in the UAC Portal when making referrals to [HHS's Office of Refugee Resettlement ("ORR")] as of July 6, 2018." *Id.*

## II.    Executive Order 13841

On June 20, 2018, the President issued Executive Order ("E.O.") 13841, stating that it is "the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." E.O. 13841 § 1, 83 Fed. Reg. 29,435. The E.O. further directs DHS, "to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members," unless "there is a

---

[5] The ODLS PIA is available at
https://www.dhs.gov/sites/default/files/publications/privacy_pia_19_ice_odls.pdf.

concern that detention of an alien child with the child's alien parent would pose a risk to the child's welfare." *Id.* § 3(a)-(b). The E.O. defines "alien family" to mean an alien who entered the country illegally with an alien child or alien children and was detained, together with that person's alien child or alien children. *Id.* § 2.

### III.    *Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.)

On June 26, 2018, following the President's issuance of E.O. 13841, the court in *Ms. L. v. ICE*, a putative class action already underway in the Southern District of California, certified a class and issued a preliminary injunction that, among other things, prohibits DHS from detaining class member parents in DHS custody "without and apart from their minor children absent a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody." *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018). The class certified in *Ms. L.* consists of "[a]ll adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the [DHS], and (2) have a minor child who is or will be separated from them by DHS and detained . . . absent a determination that the parent is unfit or presents a danger to the child." *Id.* at 1139 n.5.[6] The certified class excludes parents with a criminal history or communicable disease, those apprehended in the interior of the United States, or those subject to E.O. 13841. *Id.*

Since entry of the preliminary injunction, the court in *Ms. L.* has convened frequent status

---

[6] Originally, the Government interpreted the class as limited to parents whose children were detained on the date the preliminary injunction was issued. Order of Mar. 8, 2019 [ECF 386], at 3, *Ms. L.*, (S.D. Cal.). On March 8, 2019, the court in *Ms. L.* modified the class definition to include all parents who entered the United States at or between designated ports of entry on or after July 1, 2017, "who (1) have been, are, or will be detained in immigration custody by DHS, and (2) have a minor child who has been, is or will be separated from them by DHS and detained . . . absent a determination that the parent is unfit or presents a danger to the child." *Id.* at 13-14.

conferences. Among other things, the court has required periodic updates from the Government regarding the information technology ("IT") systems of DHS and HHS, and how information about alien parents and children is gathered and maintained. *See, e.g.*, Order Setting Further Status Conference [ECF 331], *Ms. L.* (S.D. Cal. Dec. 3, 2018). In responding to these orders in *Ms L.*, the Government has provided information regarding DHS IT systems and the communication of information between DHS and HHS. For example:

- In the parties' November 29, 2018 joint status report ("JSR"), the Government explained:

  U.S. Customs and Border Protection's U.S. Border Patrol (USBP) and U.S. Immigration and Customs Enforcement (ICE) are responsible for the majority of referrals of Unaccompanied Alien Children (UAC) to ORR. ORR maintains information on UACs in its UAC Portal. The USBP record database is able to push referral information on UACs directly into the UAC Portal's referral page. ICE also has access to the UAC Portal referral page and directly enters UAC information into the system.

  In the summer of 2018, ORR added a checkbox to the UAC Portal's referral page to indicate whether a child has been separated from family. The referral page also has a "notes" section where USBP and ICE can type in the name and other information of the separated family member, including their alien number. Additionally, USBP and ICE can enter this information into the parent/relative information section of the referral.

  *See* JSR [ECF 329], at 11, *Ms. L.* (S.D. Cal. filed Nov. 29, 2018).

- In the December 12, 2018 JSR, the Government explained:

  Starting in April 2018, CBP enhanced data fields within its own electronic systems of record to better account for separations of family units. Specifically, if a family unit must be separated, agents and officers will indicate that fact, as well as the reason for the separation, into the electronic system of record. In other words, if a child who was originally encountered as part of a family unit is separated, the fact of that separation and the reasons for the separation will be documented in the electronic system of record, for both the parent and the child. ICE has access to information entered into CBP's electronic systems of record. Additionally, as explained in the last JSR, both ICE and CBP's U.S. Border Patrol have direct access to HHS' UAC Portal, and so information from those systems will be transferred directly to HHS at the time of a referral to HHS. CBP's Office of Field Operations also provides relevant information about a separated child and his or her parent when referring the child to HHS. In addition, CBP generally provides HHS with both the child's A-number and the separated parent's A-number at the time of referral.

  ORR maintains information on UACs in its UAC Portal. The USBP record database is able

to push referral information on UACs directly into the UAC Portal's referral page. ICE also has access to the UAC Portal referral page and directly enters UAC information into the system. In the summer of 2018, ORR added a checkbox to the UAC Portal's referral page to indicate whether a child has been separated from family. The referral page also has a "notes" section where USBP and ICE can type in the name and other information of the separated family member, including their alien number. Additionally, USBP and ICE can enter this information into the parent/relative information section of the referral. ORR also has a data team responsible for maintaining information on children of potential class members. ORR's data team receives data from ICE weekly on potential class members in ICE custody with children in ORR care, including the location of the parent.

*See* JSR [ECF 334], at 16-17, *Ms. L.* (S.D. Cal. filed Dec. 12, 2018) ("Dec. 12 JSR").

- In the February 20, 2019 JSR, the Government set forth an "Outline of Processes and Procedures," which "memorializes the processes, procedures, tracking, and communication between the agencies that have been adopted by the agencies since June 26, 2018, in accordance with the requirements of the Court's preliminary injunction order." *See* JSR [ECF 360], at 13-17, *Ms. L.* (S.D. Cal. filed Feb. 20, 2019) ("Feb. 20 JSR").

  Specifically, the Government described the circumstances under which DHS initiates separation, which are "based on a parent's: 1) criminal history; 2) communicable disease; 3) unfitness or dangerousness (including hospitalizations); or 4) some other criteria that do not automatically exclude the parent from being treated as a Ms. L class member at a later point in time (i.e., referral for criminal prosecution of as a material witness)," and the procedures for considering reunification. *Id.* at 14-17. The outline indicates that "DHS will, if appropriate, relay the basis for separation to the adult, or to the adult's attorney, upon request," but that "CBP will not generally provide reasons to the adult if doing so would create a risk to the child's safety or would not otherwise be in the child's best interests, and will not do so in situations in which CBP suspects fraud, smuggling, and/or trafficking." *Id.* at 14. DHS will also communicate the reasons for separation to HHS, and "HHS will ensure that information about the separation is communicated to the field so that attorneys representing the children can obtain information about the separations from the FFS or case managers." *Id.*

- In the March 6, 2019 JSR, the Government explained that it had "provided Plaintiffs with a report containing information regarding families separated since the Court's June 26, 2018 preliminary-injunction order. Defendants intend to provide updated reporting to Plaintiffs on a regular basis." In addition:

  In the last [JSR], Defendant submitted a summary outline memorializing the processes, procedures, tracking, and communication between the agencies that have been adopted by the agencies since June 26, 2018. The outline also provided an overview of the options for separated parents and children to obtain information and assess their options for reunification. Since the last joint status report, as requested by the Court at the February 21, 2019 status conference, counsel for Defendants has also reached out to representatives for the Bureau of Prisons and the U.S. Marshals Service to ensure that those entities are included in further discussions regarding these processes and procedures.

On March 4, 2019, Plaintiffs and lawyers for the children's service providers sent comments and questions in response to the government's proposals. Defendants are reviewing those comments and questions, and will continue to meet and confer with Plaintiffs on these issues.

*See* JSR [ECF 382], at 11-12, *Ms. L.* (S.D. Cal. filed Mar. 6, 2019).

## IV.    Procedural History

Plaintiff CREW filed a Complaint on October 26, 2018. [ECF 1.] Plaintiffs CREW and RAICES filed an Amended Complaint ("Am. Compl.") on December 14, 2018, asserting three counts. [ECF 7.] Count 1 claims that DHS "has failed to establish and maintain a sufficient agency-wide records management program in compliance with the FRA and its implementing regulations." Am. Compl. ¶ 65. Count 2 asserts that "DHS has repeatedly failed, and continues to fail, to create records sufficient to link alien children with adult companions with whom they were apprehended at the border, including not only parents, but other adult family members and caretakers." *Id.* ¶ 74. Count 3 asserts that "DHS has failed to create adequate records documenting 'the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitments reached orally (person-to-person, by telecommunications, or in conference) or electronically' in connection with its implementation and rollback of the Zero Tolerance Policy." *Id.* ¶ 84.

On March 8, 2019, Plaintiffs filed a Motion for Preliminary Injunction with respect to Count 2 of their Amended Complaint. [ECF 14.] The Motion asks the Court to issue a preliminary injunction requiring DHS to create "on a forward-going basis, pending final disposition of this case, records that (1) document every separation of a alien child from an adult companion with whom the child is apprehended at the border; (2) include data sufficient to ensure that the child and adult can be linked together and tracked through the duration of their immigration proceedings; and (3) adequately describe the circumstances of and reasons for any separation of a parent or legal

guardian from a child." Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction ("PI Mem."), at 43.

## ARGUMENT

### I.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A MANDATORY PRELIMINARY INJUNCTION WITH RESPECT TO COUNT 2

Plaintiffs seek a preliminary injunction in connection with Count 2 of their Amended Complaint. "Preliminary injunctive relief is an 'extraordinary remedy never awarded as of right.'" *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 121 (D.D.C. 2010) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The party seeking relief must "by a clear showing, carr[y] the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A court should grant a preliminary injunction "only when the moving party shows '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 201 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The third and fourth factors "'merge when the Government is the opposing party.'" *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 215, 220-21 (D.D.C. 2015) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[7]

Plaintiffs have not demonstrated that any of these factors weigh in favor of a preliminary injunction in this case. Moreover, a preliminary injunction has a "limited purpose"—to preserve

---

[7] "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions. . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2007)." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted). In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

the status quo until the court can adjudicate the underlying dispute. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Because the preliminary injunction that Plaintiffs seek would be mandatory in nature—meaning that its terms would alter rather than preserve the status quo—the Court should deny their motion.

## A.    Emergency Injunctive Relief Should Be Denied Because Plaintiffs Do Not Seek To Preserve the Status Quo

The D.C. Circuit "has expressly cautioned that '[t]he power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised,'" *Newark Pre-Sch. Council, Inc. v. HHS,* 201 F. Supp. 3d 72, 78 (D.D.C. 2016) (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969)), and has characterized the standard for a mandatory preliminary injunction as "demanding." *Archdiocese v. Wash. Metro Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018). Heeding these warnings, courts in this Circuit have held that a party seeking a preliminary injunction bears a "significantly heightened" burden when, as here, "a plaintiff requests affirmative injunctive relief" that would change the status quo rather than merely preserving it. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018); *accord English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018). This heightened burden is warranted because, at its core, "'[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties'" while the Court decides the merits of a plaintiff's claim. *Newark Pre-Sch. Council, Inc.*, 201 F. Supp. 3d at 78 (quoting *Univ. of Tex.*, 451 U.S. at 395). Courts thus have held that a party seeking a mandatory injunction must "clearly" show that "he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases).

Here, Plaintiffs' request for "preliminary" injunctive relief is one and the same as the ultimate relief they seek in connection with Count 2 of their Amended Complaint—an order

affirmatively directing DHS "to create on a forward-going basis" records that "(1) document every separation of a alien child from an adult companion with whom the child is apprehended at the border, (2) include data sufficient to ensure that the child and adult can be linked together and tracked throughout the duration of their immigration proceedings; and (3) adequately describe the circumstances of and reasons for any separation of a parent or legal guardian from a child." PI Mem. at 43; *cf.* Am. Compl. ¶ 74 (asserting DHS has failed "to create records sufficient to link alien children with adult companions with whom they were apprehended at the border, including not only parents, but other adult family members and caretakers"), *id*. at 33 (requesting "injunctive relief compelling DHS to make and preserve records" that plaintiffs contend are required). Plaintiffs' motion thus inverts the fundamental purpose of preliminary injunctive relief, to preserve the status quo. *See Univ. of Tex.*, 451 U.S. at 395. Preliminary emergency relief is plainly unwarranted in these circumstances.

### B.    Plaintiffs Are Unlikely To Succeed on the Merits of Count 2

The preliminary injunction factors also weigh against emergency relief in this case. "The likelihood of success requirement is the most important of these factors." *Elec. Privacy Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101 (D.D.C. 2012). "When [a] plaintiff has failed to show a likelihood of success on the merits, the 'court need not proceed to review the other three preliminary injunction factors.'" *Id.* (quoting *Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009)). Here, Plaintiffs fail to show that they are likely to succeed in their Count 2 claim seeking injunctive and declaratory relief with respect to DHS's alleged failure to "create records sufficient to link alien children with adult companions with whom they were apprehended at the border." *See* Am. Compl. ¶ 74.

**1.    Count 2 Does Not Fit Within the Narrow Scope of Claimed FRA Violations that Courts Have Allowed Under the APA**

First and foremost, Count 2 does not present a proper APA claim. The FRA "does not contain an express or implied private right of action." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016) (citing *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 148-50 (1980)). Accordingly, any claim asserting a violation of the FRA necessarily arises under the APA. Acknowledging as much, Plaintiffs style their Count 2 as an APA claim, presenting challenges, in the alternative, under either 5 U.S.C. § 706(1) or (2)(A). Plaintiffs also rely heavily on *CREW v. Pruitt* ("*CREW I*"), 319 F. Supp. 3d 252 (D.D.C. 2018), arguing that the Court in *Crew I* authorized an APA claim for "failure to create records required by 44 U.S.C. § 3101 and 36 C.F.R. § 1222.22." Am. Compl. ¶ 22; *cf.* PI Mem. at 6, 21-22.

However, the holding in *CREW I* was far more circumscribed than Plaintiffs suggest and indeed requires the rejection of Plaintiffs' purported APA claims here. As the Court in *CREW I* explained, the D.C. Circuit has identified two types of agency action amenable to challenge under the APA as allegedly in violation of the FRA: (1) the agency's alleged failure to employ adequate "recordkeeping guidelines and directives"; and (2) the agency head's or Archivist's failure to seek the initiation of an enforcement action by the Attorney General under 44 U.S.C. § 3106 "to prevent the destruction or removal of records" in contravention of agency guidelines and directives. *Armstrong*, 924 F.2d at 293, 295; *see CREW I*, 319 F. Supp. 3d at 257-58. A claim that "agency employees were not complying with such guidelines," however, "was barred from judicial review." *Id.* (citing *Armstrong*, 924 F.2d at 291).

Judge Boasberg applied the reasoning of *Armstrong* to extend its holding in one narrow respect. The Court held that, in addition to the two claims that the D.C. Circuit had identified in Armstrong, a plaintiff may also challenge an agency's alleged failure to establish "policies and

regulations regarding what records an agency must create" that comply with 44 U.S.C. § 3101. *See CREW I*, 319 F. Supp. 3d at 260; *accord CREW v. Wheeler* ("*CREW II*"), 352 F. Supp. 3d 1, 5 (D.D.C. 2019) ("D.C. Circuit law permitted plaintiffs to use the [APA] to enforce compliance with the FRA in a narrow circumstance: when plaintiffs challenge an 'agency policy—formal or otherwise—that refuses to make' or preserve 'records in accordance with the FRA.'"). The Court emphasized, however, that a plaintiff could not "demand judicial review of isolated acts allegedly in violation of § 3101," nor could it require the Court to exercise "pervasive oversight" over an agency's compliance with the FRA. *CREW I*, 319 F. Supp. 3d at 260. Such claims are barred because they fail to adhere to the APA's "final agency action" requirement in 5 U.S.C. § 704.[8] *See id.* In particular, the agency action requirement precludes "broad programmatic attacks" on agency behavior, *Norton v. SUWA*, 542 U.S. 55, 67 (2004), or efforts to seek "wholesale improvement of [an agency] program by court decree," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). *Cf. Ramirez v. ICE*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018).

Plaintiff CREW had asserted in *CREW I* that the EPA Administrator had adopted a "practice of refusing to create records of substantive decisions," contrary to § 3101—the same FRA provision at issue here. *CREW I*, 319 F. Supp. 3d at 258. But the Court ultimately dismissed the claim as moot because, following the EPA Administrator's departure, EPA provided evidence showing it had "implemented a new policy" that complied with the FRA. *CREW II*, 352 F. Supp.

---

[8] The D.C. Circuit generally applies the APA's "agency action" requirement in the context of FRA cases. *See Judicial Watch, Inc.*, 844 F.3d at 954 (recognizing an APA claim asserting that the Archivist or agency head had failed to take required enforcement action in regard to an agency's destruction of records fell within the "agency action" limitation); *Wagdy v. Sullivan*, 316 F. Supp. 3d 257 (D.D.C. 2018) (rejecting APA claim alleging FRA violation because "[a]n agency's decision to collect and store information in a government database, without more, is clearly not ['agency action' within the meaning of the APA]."), *aff'd sub nom. Wagdy v. Pompeo*, No. 18-5244, 2019 WL 479845 (D.C. Cir. Jan. 31, 2019).

3d at 5. The Court rejected CREW's position that a compliant policy was "not enough," as well as its request that the Court issue an order "compelling [EPA] to make and preserve as federal records all records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures and essential transactions of the agency." *Id.* Such an order, the Court again emphasized, would contravene the APA's "final agency action" requirement, and would instead call for "pervasive oversight of an agency's compliance with the FRA," which the APA does not allow. *Id.* (citing *SUWA*, 542 U.S. at 67).

Plaintiffs here inexplicably request precisely the kind of order—one that would compel the creation of specific records on an ongoing basis—that Judge Boasberg rejected in *CREW I* and *II*. *See* Am. Compl. ¶ 80 & p.33 (seeking an order "compelling DHS to make and preserve records"); PI Mem. at 43 (seeking preliminary injunction that would "requir[e] DHS to create [records] on a forward-going basis").[9] This Court should reject Plaintiffs' request for the same reasons that Judge Boasberg did: Such an order would insert the Court into the day-to-day recordkeeping practices of DHS personnel, amounting to pervasive oversight of DHS's ongoing collection of information with respect to every alien adult apprehended at the border with a child. *See CREW II*, 352 F. Supp. 3d at 6 ("A single and isolated act of failing to create such a record could run afoul of such an order."). Such an order clearly would be inappropriate when "isolated acts" of noncompliance with a policy are not subject to judicial review in the first place. *CREW I*, 319 F. Supp. 3d at 260; *cf. Armstrong*, 924 F.2d at 291.[10] Count 2 thus is unlikely to succeed, and should be dismissed,

---

[9] Indeed, Plaintiffs fail to cite Judge Boasberg's January 10, 2019 decision in *CREW II* even though Plaintiff CREW was a party to that case.

[10] Plaintiffs' invitation to this Court to engage in such oversight is not only contrary to the APA but also ignores the fact that another District Court, in *Ms. L.*—a case that raises claims outside the APA context and thus is not bound by the "agency action" limitation—is already deeply involved in issues surrounding the separation of alien parents and children, including DHS's

because it is not a proper challenge to agency action.

### 2.     Plaintiffs' Description of the Scope of Records Required Under 44 U.S.C. § 3101 Is Flawed

Plaintiffs are also unlikely to succeed in Count 2 because their theory that 44 U.S.C. § 3101 requires DHS to create records linking alien children to *any* adults with whom they were apprehended at the border, regardless of whether the adults are the children's parents, is flawed. *See* Am. Compl. ¶ 74 (asserting DHS has violated § 3101 and 36 C.F.R. § 1222.22 by failing "to create records sufficient to link alien children with adult companions with whom they were apprehended at the border, including not only parents, but other adult family members and caretakers"). The language of § 3101 on which Plaintiffs rely is broad, requiring an agency to make records with "adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency" in a manner that is "designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. NARA's implementing regulation is similarly broad, simply repeating, in relevant part, that an agency must create records that "[d]ocument the persons, places, things, or matters dealt with by the agency," and "[p]rotect the financial, legal, and other rights of the Government and of persons directly affected by the Government's actions." 36 C.F.R. § 1222.22(a), (d).[11] The only examples that NARA provides of

___

tracking procedures, and is monitoring the efforts of both DHS and HHS to ensure that their electronic records systems adequately link alien children to their parents. *See Ms. L.*, Dec. 12 JSR.

[11] Plaintiffs also assert violations of § 1222.22(b) and (c), which require creation of records that "[f]acilitate action by agency officials and their successors in office" and "[m]ake possible a proper scrutiny by the Congress or other duly authorized agencies of the Government." PI Mem. at 3, 26-28. However, Plaintiffs cannot identify any concrete, particularized injury to themselves stemming from allegedly inadequate information provided to agency officials or Congress. They therefore plainly lack standing to assert such violations. Nor would it be appropriate for the Court to determine, based merely on Plaintiffs' assertions, what agency officials or Congress require.

such records—"accounts receivable records, social security records, payroll records, retirement records, and insurance records," *id.* § 1232.2—seem focused on benefits or financial interests that an individual might have vis-à-vis an agency, and thus are far removed from what Plaintiffs argue are required here. Aside from those examples, agencies themselves are best positioned to identify the information necessary for their own operations, as well as to adequately document transactions between the agency and others, and this language vests agencies with broad discretion to do just that. The only judicially manageable standards that a court could apply to these requirements are therefore those found in other sources of law. *Cf. Accrediting Council v. DeVos*, 303 F. Supp. 3d 77, 97 (D.D.C. 2018) (concluding that "other provisions of the [statute at issue] provide standards that the Court can apply"). That is particularly clear in regard to the reference in both the statute and the regulation to persons' "financial, legal, and other rights."

In regard to the rights of alien parents and children, Plaintiffs invoke the Due Process Clause, asserting that in light of parents' "fundamental liberty interest in family integrity," DHS "must, at minimum, take the basic step of creating records necessary to ensure that any family it separates can eventually be reunified." PI Mem. at 24. However, regardless of the merits of this argument, Plaintiffs concede that "DHS and HHS 'made changes to their data systems' between 'April and August 2018' to 'help notate in their records when children are separated from parents.'" PI Mem. at 17 (quoting GAO, *Unaccompanied Children: Agency Efforts to Identify and Reunify Children Separated from Parents at the Border*, GAO-19-368T (Feb. 7, 2019) ("GAO Testimony") (Pl. ex.8) [ECF 14-10], at 9). Moreover, as explained above, the court in *Ms. L.* continues to monitor DHS's current IT recordkeeping practices, among other things. Indeed,

---

Rather, Congress and agencies themselves are best able to seek changes in the information they are provided, should they find deficiencies.

Plaintiffs do not identify any instance since June 26, 2018, when the court in *Ms. L.* issued a preliminary injunction, where DHS separated an alien parent and child and was unable to reunify them later due to failures in recordkeeping.

To the contrary, the two examples that Plaintiffs present regarding parents and children apprehended after June 26, 2018 do not identify any problems in recordkeeping that prevented or delayed reunification; rather, Plaintiffs' complaint with respect to those examples appears to be that the parents were not told why they were separated. *See, e.g.*, Declaration of Kathrine Russell ("Russell Decl.") [ECF 14-20] ¶¶ 9-10. Again, however, *Ms. L.* filings indicate that, as of April 2018, CBP *is* recording reasons for separation. *Ms. L.*, Dec. 12 JSR, at 16.[12] Even under Plaintiffs' theory of due process, they thus fail to show that DHS policies need require anything more, in regard to recordkeeping with respect to alien parents and children, than they already do.

With respect to alien children and non-parent adults, Plaintiffs make no attempt to rely on a due process interest in family integrity, an apparent concession that no such interest is at stake. Rather, their argument in regard to non-parent adults is that alien children's "rights in connection with their immigration proceedings" require DHS to create "proper records" regarding any adults with whom they were apprehended at the border. *See* PI Mem. at 25; Declaration of Bianca Aguilera ("Aguilera Decl.") [ECF 14-18] ¶¶ 7-8. Plaintiffs do not explain precisely what records they believe would be sufficient to protect such rights, or what the terms of their proposed DHS policy would be. Most importantly, they do not identify the source or scope of these vaguely-asserted rights. Indeed, while Plaintiffs' theory appears to rely on an asserted right of access to

---

[12] DHS's outline of processes and procedures governing information-sharing between DHS and HHS indicate that parents will not always be told the reason for separation even though the reason has been recorded. *See Ms. L.*, Feb. 20 JSR. The question of a parent's access to this information in a particular instance is outside the scope of Plaintiffs' asserted FRA violation.

information, they fail to indicate on what basis they, or alien children, would be able to access the information they seek to compel DHS to collect.[13]

Meanwhile, Plaintiffs ignore that Congress, in the TVPRA, *intended* that alien children encountered with a non-parent, who is not a legal guardian, be separated from that adult and transferred to HHS. 6 U.S.C. § 279(g)(2) (defining "unaccompanied alien child" to mean a child with no parent or legal guardian who can provide care and custody); 8 U.S.C. § 1232 (requiring UACs to be transferred to HHS). And for good reason. The TVPRA was designed to protect children from trafficking while also allowing for family reunification in a manner that protects the best interest of the child. *See* 154 Cong. Rec. S10886, S10886-87 (daily ed. Dec. 10, 2008) (Statement of Sen. Feinstein). While the statute makes special accommodation for the rights of a parent or legal guardian, *see id.* (the statute "does not interfere with the custodial rights of a parent or guardian in situations where a parent or guardian seeks to establish custody"), the statute purposely does not give any similar rights to any other adult or to any other family relationships. Nothing in the governing statutory framework thus suggests that, when it comes to any asserted connection between alien children and non-parent adults, there are "rights," within the meaning of § 3101, that must be protected. Indeed, requiring DHS to facilitate links between alien children and non-parent adults, on a mere claim that a family member or purported family member has close ties to a child, would allow the TVPRA to be circumvented by the very people against whom Congress intended children to be protected. If the Court reaches the issue, it should reject

---

[13]Under 8 U.S.C. 1229a(c)(2)(B), an attorney representing a alien child in a section 240 removal proceeding may gain access to the child's "visa or other entry document, if any, and any other records and entry documents, not considered by the Attorney General to be confidential, pertaining to the alien's admission or presence in the United States." However, nothing in this statute provides a mechanism to obtain information about third parties. Any response to a FOIA request for the child's A file would also likely redact identifying information about third parties for privacy reasons pursuant to 5 U.S.C. § 552(b)(6) or (7)(C).

Plaintiffs' argument that § 3101 mandates a DHS policy requiring creation of records connecting alien children with non-parent adults.

### C.    Plaintiffs Fail to Establish Irreparable Harm

Plaintiffs' request for emergency injunctive relief should also be denied because Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. "[T]he failure to show a likelihood of irreparable harms remains, standing alone, sufficient to defeat [a preliminary injunction] motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit[s] such relief."). The D.C. Circuit "has set a high standard for irreparable injury," *In re Navy Chaplaincy*, 534 F.3d at 766—even higher here because Plaintiffs request a mandatory injunction that would alter the status quo—requiring a two-fold showing by Plaintiffs. First, because an irreparable injury "must be both certain and great," Plaintiffs "must show 'the injury complained of is of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)); *see Wisc. Gas Co.*, 758 F.2d at 674 (citing the "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief). And second, "the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

In addition, a plaintiff cannot establish irreparable harm where there is "no clear causal connection" between the asserted harm and the action or inaction that would be targeted by the requested injunction. *See Morales v. Sec'y, U.S. Dep't of State*, 220 F. Supp. 3d 1, 5 (D.D.C. 2016)

(rejecting assertion of irreparable harm where plaintiff could not demonstrate that an injunction allowing him to obtain his immigration records would remedy his asserted injury—not being allowed entry into the United States); *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) ("It would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm.").

### 1.    Plaintiffs' Delay in Seeking a Preliminary Injunction Weighs Against Emergency Relief

As a threshold matter, Plaintiffs' claim for a preliminary injunction should fail because of their delay in seeking relief. "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)). Here, Plaintiff CREW filed a complaint on October 26, 2018, and Plaintiffs filed the Amended Complaint on December 14, 2018. They did not seek emergency preliminary relief, however, until nearly three months later, on March 8, 2019.

Plaintiffs attempt to explain the need for emergency relief now by pointing to a report issued nearly two months ago by the HHS Office of Inspector General ("OIG"), HHS OIG, *Separated Children Placed in Office of Refugee Resettlement Care* (Jan. 2019) ("HHS OIG Rpt.") (Pl. ex.4) [ECF 14-6], as well as the February 20 JSR in *Ms. L.*, which identified 245 alien children separated from their parents since the *Ms. L.* preliminary injunction issued in June 2018—all of them for the reasons contemplated by the preliminary injunction. *See Ms. L.*, Feb. 20 JSR, at 11-12. However, the HHS OIG report indicated HHS's assessment that "ORR's processes for identifying and tracking newly separated children 'are effective and continuing to improve,' citing changes to ORR's online case management system and its case management process," including

the fact that "ICE and CBP staff can now directly enter information about a child into ORR"s online case management system when referring the child to ORR, including marking a 'checkbox' to indicate that a child has been separated." HHS OIG Rpt. at 14.

Plaintiffs' explanation also makes little sense in light of the other information included in the February 20 JSR, which clearly shows that, by that time, DHS and HHS already had procedures in place for sharing information about an alien child separated from his or her parent that remedied deficiencies noted in the HHS OIG report. Thus, while Plaintiffs emphasize statements in the HHS OIG report indicating that DHS had, in the past, provided only limited information about reasons for separations, *see* PI Mem. at 16, the February 20 JSR clearly states that "DHS will communicate the basis for separation to HHS, and will, as soon as practicable, provide HHS with available and appropriate information about the reason for the separation (taking into account any restrictions on the sharing of such information)." *Ms. L.*, Feb. 20 JSR, at 14.  Indeed, if anything, the HHS OIG report, together with the February 20 JSR, show that, to the extent any recordkeeping issues remain, they are being identified and worked out by DHS through the *Ms. L.* litigation as well as through existing intragovernmental processes.

In addition, Plaintiffs cite a statement in GAO testimony provided to a House committee on February 7, 2019, that Border Patrol agents are not required to include, on the referral form they send to HHS, information on whether a child had been separated. PI Mem. at 18 (citing GAO Testimony, at 9). But, as Plaintiffs concede, the next page of the testimony indicates that Border Patrol agents have been directed to indicate separations directly on HHS's UAC Portal. GAO Testimony, at 10. Moreover, most information in the GAO testimony came from GAO's October 2018 report, and thus not only was available to Plaintiffs several months ago, but is also out of date. *See id.* at 1; GAO Rpt. The more current information in the February 20 JSR indicates that

DHS policy now requires agents to communicate not only the fact of separation, but also the reason for separation, to HHS. *See Ms. L.*, Feb. 20 JSR, at 14.

Significantly, a number of the other issues that Plaintiffs identify to justify a newly-identified need for emergency relief are not issues that could be addressed through a preliminary injunction in this FRA case, where, as described above, the scope of any challenge alleging a violation of § 3101 is limited to challenging an agency's records creation policy. *See CREW II*, 352 F. Supp. 3d at 5. For example, Plaintiffs point to a statement in the GAO testimony that, according to what HHS had told GAO in September 2018, DHS agents were not yet utilizing the new check box in the UAC Portal consistently. PI Mem. at 18. But even if that were still true, Plaintiffs cannot challenge isolated acts of noncompliance with recordkeeping requirements through an APA claim, nor could the Court issue a preliminary injunction prohibiting such isolated acts. *See CREW II*, 352 F. Supp. 3d at 6.

Similarly, Plaintiffs identify the continued absence of a "centralized database" as warranting their belated filing. PI Mem. at 18. However, even under Plaintiffs' flawed theory of their APA claim, the Court could not compel DHS to establish a "centralized database" as a remedy for a violation of § 3101—and it certainly could not compel other agencies, such as HHS (which is not a party to this case), to cooperate in such an effort. Indeed, the preliminary injunction that Plaintiffs seek makes no mention of a centralized database, an acknowledgement that whatever the FRA might require, its focus is on recordkeeping policies, not the structure of specific IT systems.

Finally, Plaintiffs point to the HHS OIG report's mention of additional separated children who were released from HHS custody before the June 2018 preliminary injunction in *Ms. L.* PI Mem. at 19. Plaintiffs note that, as of the date they filed their motion, those children's parents were not yet part of the *Ms. L.* class. *See id.* Now, however, the court in *Ms. L.* has modified the class to

include all who entered the United States on or after July 1, 2017. *See* Order Granting Pl. Mot. to Modify Class Definition [ECF 386], *Ms. L.* (S.D. Cal. Mar. 8, 2019). Thus, any legal issues raised by this modified class of parents are now squarely before the court in *Ms. L.* Moreover, the additional children identified by the HHS OIG were, according to the report, separated from their parents in the summer of 2017, prior to the *Ms. L.* preliminary injunction or any of the subsequent modifications to DHS and HHS electronic information systems. *Id.* at 4-5. Thus, while the information about the additional separations might be new to Plaintiffs, it is difficult to see how it could have any bearing on any FRA violation properly at issue in this case, which would necessarily be limited to DHS's *current* recordkeeping policies.

### 2. In Light of Changes to DHS Systems and Ongoing Monitoring in *Ms. L.*, Plaintiffs Fail to Identify an Imminent Injury in Need of Redress with Respect to Future Separations of Alien Parents and Children

Aside from Plaintiffs' failure to justify the delay in their filing, they fail to identify an injury that would be redressed by a preliminary injunction. For one thing, as discussed above, DHS has already implemented certain changes to its recordkeeping practices in regard to separated alien children, including in the information conveyed to HHS, and further steps in that regard are being overseen by the court in *Ms. L.* Given those developments, Plaintiffs can identify no imminent injury caused by DHS's current recordkeeping policies with respect to alien children separated from their parents, nor would their requested injunction serve any purpose. *See CREW II*, 352 F. Supp. 3d at 5 (dismissing as moot a claimed FRA violation when the defendant agency had already adopted a policy in compliance with the FRA). Plaintiffs thus fail to show irreparable harm with respect to future separations—which are the only separations that a preliminary injunction would address—of alien parents and children.

* * *

In regard to Plaintiffs' asserted injuries with respect to DHS's creation of records relating to alien children apprehended with *non-parent* adults, Plaintiffs fail to establish that such injuries would be redressed by their requested injunction. In this regard, Plaintiffs first attempt to show that they have standing to raise claims regarding DHS records about alien children apprehended with non-parent adults, and then attempt to show that the same asserted injury that they allege affords them standing also qualifies as irreparable harm. *See* PI Opp. at 29, 36, 38. However, as discussed below, Plaintiffs fail in both efforts.

>   3.   **RAICES Fails to Establish that DHS Recordkeeping Practices Present a Direct Conflict to its Mission that Could Be Redressed Through Emergency Relief**

RAICES' effort to establish standing and irreparable injury on its own behalf fails. RAICES asserts that it has diverted resources in order to compensate for failing to receive from DHS information linking alien children to non-parent adults with whom they were apprehended. *Id.* at 33. However, RAICES' assertions regarding the amount of resources diverted are vague, and much of RAICES' claimed expenditure of resources appears to be the result of an increase in its caseload due to an asserted increase in the numbers of detained UACs, an independent cause that is not clearly tied to any DHS recordkeeping policy. *See* Aguilera Decl. ¶ 4 (asserting "Zero Tolerance Policy" "had a dramatic effect on RAICES and its clients" and resulted in RAICES providing legal representation and services to "hundreds of migrant families"); Declaration of Jonathan Ryan ("Ryan Decl.") [ECF 14-19] ¶ 7 (RAICES created six new attorney positions and three new legal assistant positions to handle increased caseload). Significantly, in accord with the HSA and the TVPRA, DHS has treated alien children apprehended with an adult who is not a parent or legal guardian as UACs, and transferred them to HHS, since at least 2008. RAICES thus cannot ascribe its diversion of resources to any purported *change* in DHS recordkeeping practices related to these UACs.

At most, RAICES describes possible difficulties in obtaining certain information relevant to the immigration claims of some alien children. Plaintiffs cite cases that, they assert, have held similar difficulties sufficient to satisfy the first prong of organizational injury. *See* PI Mem. at 34 (citing cases). However, as a recent case explains, it is not enough to show that some aspects of an organization's activities are more difficult when, for the most part, the organization can continue providing services unabated. *See Nat'l Fair Hous. Alliance v. Carson*, 330 F. Supp. 3d 14, 46-48 (D.D.C. 2018). In *Nat'l Fair Housing Alliance*, the Court held that an organizational plaintiff failed to establish standing because, despite some impacts of the challenged rule on its activities, the organization's "daily operations" were not "tangibly different in kind to those occurring before" the challenged action went into effect. *Id.* at 48. Similarly here, while RAICES cites instances where certain additional information might have been helpful, it is undeniably able to continue providing legal services to alien children.

In addition, beyond diversion of resources, an organization "must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). In *Newby*, the D.C. Circuit held that state laws requiring proof of citizenship as a prerequisite to voter registration directly conflicted with the mission of the League of Women Voters, to register voters. *See id.* at 9. DHS's alleged failure to create records containing information RAICES might find useful does not present a similar "direct conflict" with RAICES' mission to provide legal services—which, again, RAICES continues to do.[14]

---

[14] As noted above, RAICES also has failed to explain how an injunction requiring DHS to *create* certain records would in turn allow RAICES to *access* those records and obtain personal identifying information about these non-parent adults, nor that this identifying information would actually yield information crucial to a child's representation. RAICES therefore also fails to establish the causation and redressability prongs of standing.

Moreover, even if RAICES' described injuries were sufficient to establish standing, they would not qualify as irreparable harm. The diversion of resources RAICES describes is essentially an economic injury. However, "it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas Co.*, 758 F.2d at 674). RAICES "fail[s] to show any specific, identifiable cost [it] will incur" absent a preliminary injunction. *Id.* Indeed, to the extent RAICES has already put in place new tools and systems to counteract the difficulties it claims to face, *see* Ryan Decl. ¶¶ 10-12, an injunction would not redress those past expenditures.

### 4.     RAICES Cannot Establish Irreparable Harm by Claiming Third-Party Injury on Behalf of Unknown Future Clients

RAICES alternatively asserts irreparable harm on behalf of its clients. However, that effort fails because the requested injunction could not possibly affect the situation of any known, current clients. Rather, the injunction would only apply to alien children apprehended in the future. The Supreme Court has squarely rejected the notion that attorneys can assert third-party standing on behalf of hypothetical, unknown future clients. *Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004). The D.C. Circuit has also rejected a lawyers' association's attempt to invoke third-party standing on behalf of potential clients in a context similar to the one here. *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1364 (D.C. Cir. 2000) (rejecting plaintiff organization's standing to raise claims on behalf of aliens facing possible expedited removal). As in that case, RAICES fails to establish that third-party standing is justified due to any hindrance in its clients bringing suit themselves. Indeed, the *Ms. L.* case shows that similarly-situated alien parents who were separated from their children have, with the assistance of counsel, brought claims on their own behalf.

### 5.     CREW Fails to Demonstrate an Informational Injury that Could Be Redressed through Emergency Relief

CREW's attempt to establish standing and irreparable injury relies on an asserted

informational injury. In some circumstances, "a denial of access to information" can "work an 'injury in fact' for standing purposes." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), 878 F.3d 371, 378 (D.C. Cir. 2017), *cert. denied*, No. 18-267, 2019 WL 113530 (U.S. Jan. 7, 2019). However, a plaintiff must demonstrate a "sufficiently concrete and particularized informational injury" by showing that "'(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Id.* (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)). In *EPIC*, the Court of Appeals held that the plaintiff failed to establish an informational injury that could support its claim, under § 208 of the E-Government Act, that a privacy impact assessment was required before the Government could collect voter roll data from States. *See id.* The court explained that § 208 was "intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information," but EPIC "is not a voter and is therefore not the type of plaintiff the Congress had in mind." *Id.* Moreover, while EPIC asserted harm in the form of "an inability to 'ensure public oversight of record systems,'" § 208 was "directed at individual *privacy*, which is not at stake for EPIC." *Id.*

The situation here is similar. CREW is not the type of plaintiff that could claim entitlement under the FRA to the type of information Plaintiffs' Count 2 asserts that DHS must collect and maintain. CREW asserts that DHS is failing to meet its obligation under the FRA to collect information that will "[p]rotect the financial, legal, and other rights" of alien children and adults with whom they are apprehended at the border by linking alien children to non-parent adults from whom, pursuant to the HSA and TVPRA, they were separated. Am. Compl. ¶¶ 15-16, 36-40; PI

Mem. at 11-14. However, CREW fails to show that it—an organization seeking "to promote transparency in government activities and decision making, highlight industry influence over agency decisions, and combat ethics violations," PI Mem. at 23—would be entitled under the FRA to such tracking information about specific alien children, nor that Congress intended the FRA to protect access by organizations like CREW to such information.[15]

It appears that CREW has attempted to manufacture an informational injury by submitting FOIA requests that do not seek information about specific alien children or adults, but instead seek various statistics about separated and reunited alien children. PI Mem. at 40. As an initial matter, "the D.C. Circuit has not yet addressed the issue of whether a party's impaired access to documents sought under FOIA constitutes sufficient injury under the FRA." *CREW v. SEC*, 858 F. Supp. 2d 51, 59-61 (D.D.C. 2012).[16] Moreover, Plaintiffs rely on cases where CREW had requested the very materials that, it claimed, the agency destroyed or was about to destroy. *See, e.g.*, *CREW v. SEC*, 858 F. Supp. 2d at 59 ("CREW has at least one pending FOIA request that involves exactly the type of preliminary investigatory materials that likely have been destroyed."); *CREW v. EOP*, 587 F. Supp. 2d 48, 60-61 (D.D.C. 2008) ("CREW . . . allege[s] that [it] ha[s] FOIA requests for e-mails"—the very e-mails it sought to recover and preserve—"currently pending with the EOP and OA . . . ."); *see also CREW v. Cheney*, 593 F. Supp. 2d 194, 227 (D.D.C. 2009) (plaintiff professor

---

[15] CREW's claims here regarding an alleged failure to create records tracking certain information related to individuals are thus quite different from the situation in *CREW I*, where CREW claimed that the EPA administrator failed to create records documenting agency decisions—the very type of records that CREW professed an interest in obtaining. *See CREW I*, 319 F. Supp. 3d at 255. CREW's standing was not addressed in *CREW I*; however, the court ultimately dismissed the case as moot following the EPA Administrator's resignation and subsequent policy changes. *CREW II*, 352 F. Supp. 3d at 6.

[16] The assertion of an informational injury based on the failure to obtain, through FOIA, a record that never existed, as opposed to one that is threatened with destruction, is all the more dubious because "FOIA imposes no duty on the agency to create records." *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 269 (D.D.C. 2012).

"has sought [Presidential Records Act] records in the past and unambiguously intends to do so again in the future").

Unlike those cases, the statistical information that CREW sought through the FOIA requests it cites here is not the same as the specific information that CREW asserts DHS must collect under the FRA. Moreover, CREW cannot plausibly claim its access to information has been "impaired" simply because DHS failed to respond to certain FOIA requests as of the date of Plaintiffs' Motion, particularly when the periodic status reports filed in the *Ms. L.* case already provide similar statistics. CREW thus cannot demonstrate an informational injury, or irreparable harm, that would be redressed through emergency injunctive relief.

### D. The Balance of Hardships and Public Interest Do Not Favor Emergency Injunctive Relief

The remaining factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—also weigh against emergency relief here. These factors merge when the Government is the opposing party, *Nken*, 556 U.S. at 435, and courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982). Plaintiffs discount any burden to the Government in changing its information collection practices—to the extent it is not already collecting the information at issue. However, Plaintiffs have requested a mandatory injunction that would require the Government to implement new requirements for its electronic systems, in order to create new records, prior to any determination that such records are required under the FRA. By its nature, such a mandatory injunction would plainly burden the agency. Moreover, tailoring temporary changes to conform to Plaintiffs' view of what the FRA requires would necessarily use resources that DHS might otherwise employ to improve or change its electronic systems on a permanent basis. Implementing an emergency injunction in this case, while

continuing efforts to balance obligations in the ongoing *Ms. L.* case, which already is engaged in determining the contours of the rights to family integrity that Plaintiffs here claim is at issue, PI Mem. at 43, would also result in overlapping efforts that could cause confusion and impede progress on any single front. Given the potential for such disruptive effects, a preliminary injunction in this case would not be in the public interest. The Court therefore should reject Plaintiffs' request for a preliminary injunction.

## II.     THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS IN THEIR ENTIRETY

For the same reasons explained above, the Court should dismiss Count 2 of Plaintiffs' Amended Complaint for lack of standing and failure to state a claim upon which relief can be granted. In addition, the claims Plaintiffs assert in Count 1 and Count 3 of their Amended Complaint should also be dismissed.

### A.     Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) asserts that the Court lacks subject matter jurisdiction. The Court is presumed to lack jurisdiction until the plaintiff establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A plaintiff's claims of jurisdiction should be closely scrutinized because a court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). "Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). When

evaluating a motion to dismiss for lack of subject matter jurisdiction, the Court may look to matters outside the complaint. *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.").

A motion to dismiss under Federal Rule 12(b)(6) focuses on "the legal sufficiency of the complaint." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

In evaluating a motion under either Rule 12(b)(1) or Rule 12(b)(6), a court need not accept as true "'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set forth in the Complaint." *Shibeshi v. United States*, 920 F. Supp. 2d 105, 106 (D.D.C. 2013) (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555, 557) (alterations in original).

**B.     Count 1 Should Be Dismissed**

In Count 1 of their Amended Complaint, Plaintiffs assert that DHS "has failed to establish and maintain a sufficient agency-wide records management program in compliance with the FRA and its implementing regulations." In support of that claim, they point to two things. First, they cite reports that NARA issued in January 11, 2016, and July 16, 2018, based on NARA's inspection of DHS and CBP records management systems. Am. Compl. ¶ 65 (citing ¶¶ 23-25). Second, they cite the same recordkeeping issues regarding family separations that are the focus of Count 2, discussed in detail above. *Id.* ¶ 65 (citing ¶¶ 36-49). In other words, this Count seeks to piggyback off of deficiencies already identified during the administrative process that Congress established, ignoring that this administrative process also includes remedial steps that, according to NARA regulations, must follow the issuance of a NARA report; as well as specific issues regarding family separations that were already identified during the *Ms. L.* litigation and are being addressed in the course of that litigation.

As an initial matter, Count 1 suffers from the same deficiency in stating a claim under the APA as that discussed above in Count 2. Namely, Count 1 fails to identify a final agency action that it seeks to challenge under 5 U.S.C. § 706(2)(A), nor does it identify a discrete agency action that DHS is required to take, for purposes of a challenge under § 706(1). To the contrary, by its own terms Count 1 seeks to challenge DHS's entire "agency-wide" records management program, which would extend not only to DHS itself but also its components, such as CBP and ICE. Such a claim is far broader than a challenge to "the adequacy of an agency's record-keeping guidelines" that the D.C. Circuit allowed in *Armstrong. See Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy*, 82 F. Supp. 3d 228, 234 (D.D.C. 2015) (citing *Armstrong*, 924 F.2d at 291-93), *rev'd on other grounds*, 827 F.3d 145 (D.C. Cir. 2016). For example, Plaintiffs cite findings in the 2018

NARA report regarding CBP failures to conduct inventories, staffing issues, inadequate training, and inadequate evaluations, among other things. Am. Compl. ¶ 24. Thus, once again, Plaintiffs invite the Court to engage in pervasive oversight, this time of DHS's entire records management program.

Tellingly, Plaintiffs make no effort to cite or discuss any DHS guideline or directive that they claim is deficient, other than the asserted recordkeeping flaws that they allege were to blame for the time it took to reunify parents and children in the *Ms. L.* litigation. Rather, they essentially assert that, because NARA identified flaws, DHS's program is *per se* inadequate; their claim thus amounts to nothing but a "'legal conclusion couched as a factual allegation' and is accordingly, 'not entitled to the assumption of truth.'" *See Competitive Enter. Inst.*, 82 F. Supp. 3d at 235. Moreover, by simply repeating flaws asserted in NARA reports, with no factual assertions at all regarding concrete, particularized harms that any of these alleged flaws has caused Plaintiffs (aside from Plaintiffs' asserted injuries in regard to recordkeeping with respect to family separations, none of which appear to have anything to do with the flaws identified by NARA), Plaintiffs fail to establish standing to raise this challenge. Indeed, Plaintiffs' claim regarding DHS's records management program as a whole appears to be largely window dressing for the issue with which they are truly concerned—family separations. Count 1 should be treated as indistinguishable from Count 2 and should be dismissed for the same reasons discussed above.

Aside from Plaintiffs' lack of standing to challenge DHS's records management program as a whole, and the fact that such a broad challenge does not fit within the limitations of an APA claim, the Court should also dismiss Count 1 on prudential grounds. While they rely on NARA's reports, Plaintiffs fail to acknowledge that NARA's regulations already provide a mechanism to resolve any deficiencies found during a NARA inspection. In response to an inspection report, an

agency is supposed to "submit a plan of corrective action that specifies how the agency will address each inspection report recommendation, including a timeline for completion, and proposed progress reporting dates." 36 C.F.R. § 1239.26. Once NARA and the agency agree on a plan, the agency "must submit progress reports to NARA until all actions are completed." *Id.* As a prudential matter, the Court may decline to exercise judicial review when doing so would "'prevent[] premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.'" *Penny v. U.S. Dep't of Justice*, 662 F. Supp. 2d 53, 55 (D.D.C. 2009) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975)). Here, given that Plaintiffs relied entirely on NARA's reports to raise these issues to begin with, the Court should allow the issues to be resolved through the administrative process in which they were identified. *See Adamski v. McHugh*, 304 F. Supp. 3d 227, 237–38 (D.D.C. 2015) (recognizing that "sound judicial discretion" governs whether to allow for administrative exhaustion even where Congress has not required it). For all these reasons, Count 1 of the Amended Complaint should be dismissed.

### C.    Count 3 Should Be Dismissed

Count 3 of Plaintiffs' Amended Complaint asserts that DHS failed to create adequate records documenting the formulation and execution of policies and decisions "in connection with its implementation and rollback of the Zero Tolerance Policy." Am. Compl. ¶ 84. This claim also fails for lack of standing and failure to identify an agency action as the subject of their APA challenge.

In regard to standing, Plaintiffs seek injunctive and declaratory relief. They therefore must demonstrate "an ongoing or future injury that is 'certainly impending'; [they] may not rest on past

injury." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). Yet the injuries they assert relate only to alleged failures to create records in the past, regarding the past implementation and rollback of a specific policy. In particular, Plaintiffs assert that DHS "did not issue written, formalized guidance to agency employees providing detailed instructions on how to implement the Zero Tolerance Policy," but that instead, "Border Patrol Sector Chiefs worked out these details on an ad hoc basis, through conversations and conference calls." Am. Compl. ¶ 42. Plaintiff CREW attempts to circumvent this problem by suggesting it has been deprived of "present and future access to documents." *Id.* ¶ 85. However, any such injury cannot be redressed by injunctive relief because, even assuming for purposes of this motion that Plaintiffs' factual assertions are true, DHS could not retroactively document the "formulation and execution of policies and decisions" that have already been formulated and executed.

In addition, Plaintiffs' focus on isolated failures to document policies and decisions again falls outside the scope of a proper APA claim because it does not identify a final agency action as the subject of Plaintiffs' challenge. Moreover, to the extent Plaintiffs seek to allege an unwritten DHS policy of failing to document policies and decisions, they fail to set forth facts that state a plausible claim. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) ("A complaint can establish a facially plausible claim only if it sets forth 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged'" (quoting *Iqbal*, 556 U.S. at 678)). As described above, DHS policy *does* require all DHS employees to "[c]reate, receive, and maintain official records providing adequate and proper documentation in support of DHS activities." DHS Dir. No. 141-01(V)(A). Moreover, by Plaintiffs' own account, the Zero Tolerance Policy was announced in April 2018 "without advance notice to agency

officials or pre-planning by those officials." Am. Compl. ¶ 28. This description strongly suggests that any failures in documenting policies and decisions during this period at most amounted to "isolated acts" of noncompliance with DHS policy, as a result of this lack of notice, and did not reflect an affirmative DHS policy against such documentation. *Cf. CREW II*, 352 F. Supp. 3d at 7 ("the law in this Circuit does not permit a plaintiff to challenge such limited instances of noncompliance with the FRA"). Plaintiffs' vague reference to "an overall agency culture of resisting memorializing policy decisions and guidance into written records," and their bald citation, without elaboration, of prior instances where "CBP's policymakers rebuked prior efforts . . . to issue employees meaningful guidance on completing screening forms for [unaccompanied alien children]," or failed to issue "official policy guidance concerning the classification of same-sex couples," Am. Compl. ¶ 43, do nothing to lend their claim plausibility. *See CREW II*, 352 F. Supp. 3d at 7 (rejecting similar arguments). The Court therefore should dismiss Count 3.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction and dismiss Plaintiffs' claims in their entirety.

Dated:  March 20, 2019                              Respectfully submitted,

                                                    JOSEPH H. HUNT
                                                    Assistant Attorney General
                                                    MARCIA BERMAN
                                                    Assistant Director, Federal Programs Branch

                                                    */s/ Kathryn L. Wyer*
                                                    KATHRYN L. WYER
                                                    Federal Programs Branch
                                                    U.S. Department of Justice, Civil Division
                                                    1100 L Street, N.W., Room 12014
                                                    Washington, DC  20005
                                                    Tel. (202) 616-8475 / Fax (202) 616-8470
                                                    kathryn.wyer@usdoj.gov
                                                    *Attorneys for Defendants*