# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, *et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-2473 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 14, 19 |
| | : | | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION;
GRANTING DEFENDANTS' MOTION TO DISMISS**

## I. INTRODUCTION

On April 6, 2018, the administration of President Donald J. Trump began implementing the so-called "zero tolerance policy" on unauthorized immigration. Under the new policy, the administration ended its earlier practice of funneling most aliens apprehended at the border through civil immigration proceedings, and instead started systematically detaining and criminally prosecuting suspected illegal immigrants for unlawful entry into the country. Because minor children could not be held in criminal custody with adults, component agencies of the Department of Homeland Security ("DHS") also began systematically separating families apprehended together when attempting to enter the country. While adult family members were sent to criminal custody, DHS placed the minor children in the custody of the Department of Health and Human Services ("HHS"), in a poorly-documented interagency process that often had the practical result of parents and family members being completely cut off from, and unable to communicate with, their separated children, for weeks—sometimes months—at a time.

The significant public backlash in response to the zero tolerance policy, and particularly to the thousands of family separations the Trump administration conducted in just a few months, eventually led President Trump to issue an executive order on June 20, 2018, directing DHS to stop separating families apprehended at the border. In response to a class-action lawsuit by parents of separated children, the U.S. District Court for the Southern District of California entered a preliminary injunction the same month ordering the administration to reunite currently separated children with their alien parents. But the fallout from the zero tolerance policy did not stop there. Reports prepared by the U.S. Government Accountability Office ("GAO") and DHS's Office of Inspector General ("OIG") following the end of mandatory separations brought to light a wide range of deficiencies in DHS's implementation of the policy, including in the agency's recordkeeping practices associated with family separations.

Although they spend much of the amended complaint and of their briefs discussing the botched implementation and consequences of the zero tolerance policy, it is those recordkeeping practices that Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") challenge in this suit. Plaintiffs bring three claims against DHS and the Secretary of Homeland Security for declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. Plaintiffs allege that DHS violates the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101–20, 2901–11, 3101–07, 3301–14, by 1) maintaining a deficient records management program, 2) failing to create records sufficient to link migrant children to adult companions with whom they are apprehended at the border, and 3) failing to create records of agency policy and decisions. Plaintiffs have moved for a preliminary injunction as to claim two, while Defendants have moved to dismiss this case for lack of subject matter jurisdiction and failure to state a claim.

As detailed below, the Court denies Plaintiffs' motion for a preliminary injunction and grants Defendants' motion to dismiss. The Court is sensitive to the significant harms Plaintiffs allege families apprehended at the border faced—and still face—as a result of the zero tolerance policy. But it does not believe that Plaintiffs' FRA claims, as pled, are a proper vehicle for challenging those harms. First, the Court determines that it only has subject matter jurisdiction over claims one and two. And second, while CREW and RAICES point to a number of individual failures in DHS's recordkeeping procedures, and make arguments for changes to the agency's recordkeeping they contend are required by the FRA, none of their claims point to a final agency action pursuant to the APA. Independently of standing, all three claims therefore fail to state a claim under the APA.

## II. BACKGROUND[1]

### A. Records Creation and Preservation Requirements Under the FRA

The Federal Records Act is a collection of scattered statutes that together "govern[] the creation, management and disposal of federal records." *Armstrong v. Bush*, 924 F.2d 282, 284 (D.C. Cir. 1991). Pursuant to the FRA, agencies are required to "establish[] standards and procedures to assure efficient and effective records management," in order to ensure the proper creation and preservation of records pertaining to the "policies and transactions of the Federal Government." 44 U.S.C. § 2902. This requires every agency to "maintain an active, continuing program for the . . . management of the records of the agency" that provides for, *inter alia*,

---

[1] On a motion to dismiss for failure to state a claim, the Court accepts as true the factual allegations in the complaint and construes them liberally in the Plaintiff's favor. *See, e.g., United States v. Philip Morris, Inc.*, 116 F.Supp.2d 131, 135 (D.D.C. 2000). The Court may also consider documents attached to or incorporated in the complaint, *see EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 624 (D.C. Cir. 1997), and it therefore considers the various government reports and news media sources Plaintiffs link to in their amended complaint.

controls over the creation, maintenance, and use of records; and cooperation with the Archivist of the United States, the head of the National Archives and Records Administration ("NARA"), in managing preserved records.  *Id.* § 3102.  The FRA charges the Archivist with promulgating "standards, procedures, and guidelines with respect to records management," *id.* § 2904(c)(1), and, among the Archivist's oversight responsibilities, provides that "the Archivist shall have the responsibility . . . to conduct inspections or surveys of the records and the records management programs and practices" of federal agencies, *id.* § 2904(c)(7).

With respect to the creation of records, the FRA requires that each agency "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal . . . rights of . . . persons directly affected by the agency's activities."  44 U.S.C. § 3101.  Under the FRA's implementing regulations, agencies must prescribe the creation of records that "document the persons, places, things, or matters dealt with by the agency," 36 C.F.R. § 1222.22(a), "facilitate action by agency officials and their successors in office," *id.* § 1222.22(b), "[m]ake possible a proper scrutiny by the Congress or other . . . agencies of the Government," *id.* § 1222.22(c), "[p]rotect the . . . legal . . . rights of . . . persons directly affected by the Government's actions," *id.* § 1222.22(d), and "document the formulation and execution of basic policies and decisions and the taking of necessary actions," *id.* § 1222.22(e).

## B.  The January 2017 and July 2018 NARA Inspection Reports

On January 11, 2017, following an inspection conducted pursuant to 44 U.S.C. § 2904(c)(7), NARA issued a records management inspection report on DHS's records management program.  *See* Am. Compl. ¶ 23, ECF No. 7; Nat'l Archives & Records Admin.,

Department of Homeland Security Records Management Program: Management Inspection Report ("NARA DHS Inspection Report") (2017), https://www.archives.gov/files/records-mgmt/resources/dhs-2016-inspection.pdf.[2]  The report identified a number of deficiencies in DHS's records management program and practices, including that "DHS records management policies, procedures, and strategic plans ha[d] been in draft form for several years" and that DHS lacked a "Department-wide strategy for retention scheduling for email records."  Am. Compl. ¶ 23 (alteration in original) (quoting NARA DHS Inspection Report ii).  The report also found that "DHS email use and storage strategies d[id] not allow for effective retention and retrieval of email."  *Id.* (quoting NARA DHS Inspection Report iii).

And on July 16, 2018, NARA issued another report following an inspection of the records management program of U.S. Customs and Border Protection ("CBP"), a component agency of DHS.  Am. Compl. ¶ 24; Nat'l Archives & Records Admin., U.S. Customs and Border Protection Records Management Program: Records Management Inspection Report ("NARA CBP Inspection Report") (2018), Pls.' Mot. Prelim. Inj. Ex. 1., ECF No. 14-3.  The CBP inspection report was "highly critical," identifying significant deficiencies in CBP's records management practices.  Am. Compl. ¶ 24.  NARA noted at the onset that "[i]n its current state, the records management program at CBP [was] substantially non-compliant with Federal statutes

---

[2] In the amended complaint, Plaintiffs allege that the NARA DHS Inspection Report was issued on January 11, 2016.  *See* Am. Compl. ¶ 23.  The report Plaintiffs link to also appears to be dated January 11, 2016.  *See* NARA DHS Inspection Report.  However, the file name for the report provides a date of January 11, 2017.  *See id.*  And while the report Plaintiffs link is not available on NARA's website, NARA has made publicly available a DHS inspection report that is completely identical, with the exception that it is dated January 11, 2017.  *See* Nat'l Archives & Records Admin., Department of Homeland Security Records Management Program: Management Inspection Report (2017), https://www.archives.gov/files/records-mgmt/resources/dhs-2017-inspection.pdf.  Both reports refer to events that occurred after January 11, 2016.  *E.g.* NARA DHS Inspection Report 13 (noting that results of a DHS project "were presented . . . in September 2016 for . . . consideration and comment").

and regulations . . . and DHS Records and Information Management policies." NARA CBP Inspection Report 2; *see* Am. Compl. ¶ 24. NARA found that CBP's "directives establishing program objectives, responsibilities, and authorities for the creation, maintenance, and disposition of agency records" were "out of date or in draft form." Am. Compl. ¶ 24 (quoting NARA CBP Inspection Report 3). The agency's structure for ensuring documentation of its work was "not adequately implemented throughout each program to ensure incorporation of recordkeeping requirements and records maintenance." *Id.* (quoting NARA CBP Inspection Report 4). CBP "d[id] not integrate records management and recordkeeping requirements in the design, development, and implementation of its electronic systems," *id.* (quoting NARA CBP Inspection Report 5), and failed to provide training or provided inadequate training on records management to its staff, *see* NARA CBP Inspection Report 6. And the agency "d[id] not conduct regular records management evaluations of agency components." Am. Compl. ¶ 24 (quoting NARA CBP Inspection Report 7). NARA concluded that CBP's records management program "lack[ed] numerous basic elements of a compliant records management program," and would "require careful strategic planning" as well as CBP fostering "a culture that includes records management in the regular and routine practices of all [the agency's] program functions" in order to become effective. NARA CBP Inspection Report 11.

### C. The Zero Tolerance Policy and Subsequent *Ms. L.* Litigation

On April 6, 2018, then-Attorney General Jeff Sessions began implementation of the "zero tolerance policy," directing federal prosecutors along the United States' southwest border "to work with DHS 'to adopt immediately a zero-tolerance policy' requiring that all improper entry offenses be referred for criminal prosecution 'to the extent practicable.'" Dep't of Homeland Sec. Office of the Inspector Gen., Special Review – Initial Observations Regarding Family

Separation Issues Under the Zero Tolerance Policy ("DHS OIG Report") 2 (2018), Pls.' Mot. Prelim. Inj. Ex. 3, ECF No. 14-5.

When combined with the Trump administration's decision to end the prior practice of releasing certain types of undocumented immigrants pending resolution of their immigration or criminal cases, *see id.*, the zero tolerance policy had a dramatic impact on families apprehended by DHS component agencies. Prior to the implementation of zero tolerance, "when CBP apprehended a migrant family unit attempting to enter the United States illegally, it usually placed the adult in civil immigration proceedings." Am. Compl. ¶ 30. And "CBP only separated apprehended parents from children in limited circumstances, such as where the adult had a criminal history or outstanding warrant." *Id.* "Accordingly, in most instances, family units either remained together in family detention centers . . . or . . . were released into the United States with an order to appear in immigration court." DHS OIG Report 2. By contrast, "[b]ecause minor children cannot be held in criminal custody with an adult," the zero tolerance policy required DHS to systematically separate adults from children when apprehending families. *Id.* at 3. With the adults placed in criminal custody, "DHS then deemed [the children] to be unaccompanied alien children," and "held [them] in DHS custody until they could be transferred to the U.S. Department of Health and Human Services (HHS) Office of Refugee Resettlement." *Id.*

In the two or so months the policy was in place, the government separated thousands of children from their parents. Am. Compl. ¶ 31. "Faced with resource limitations and other challenges," DHS's implementation of the zero tolerance policy was, by all accounts, a disaster. DHS OIG Report 1; *see* Am. Compl. ¶ 26. CBP "held alien children separated from their parents for extended periods in facilities intended solely for short-term detention," DHS OIG Report 1,

generating widespread media attention. DHS "struggled to identify, track, and reunify families."

*Id.* And because of DHS's communication and information failures, alien parents separated from

their children were unable to communicate with their children after separation. *Id.* One former

DHS official in the agency's Office for Civil Rights and Civil Liberties, Scott Shuchart, has

since noted in several media appearances that his office had tried to raise the alarm regarding

DHS's recordkeeping failures, only to be ignored. *See* Scott Shuchart, *Careless Cruelty: Civil*

*Servants Said Separating Families Was Illegal. The Administration Ignored Us*, Washington

Post (Oct. 25, 2018), https://www.washingtonpost.com/news/posteverything/wp/2018/10/25/

feature/civil-servants-said-separating-families-was-illegal-the-administration-ignored-us/; Scott

Pelley, *The Chaos Behind Donald Trump's Policy of Family Separation at the Border*, 60

Minutes (Nov. 26, 2018), https://www.cbsnews.com/news/trump-family-separation-policy-

mexican-border-60-minutes-investigation-greater-in-number-than-trump-administration-admits/.

Shuchart and his colleagues "push[ed] for record-keeping, communication and other policies,"

and "tried to ring the alarm" after noticing that "CBP and ICE weren't providing HHS with

proper records to allow families to be reunited or pursue their immigration cases jointly."

Shuchart, *Careless Cruelty*; Am. Compl. ¶ 38. His warnings were ignored. Am. Compl. ¶¶ 38–

39. The agency itself conceded that it "was not fully prepared to implement" the policy "or to

deal with some of its after-effects"—somewhat of an understatement, in light of the significant

failures identified in subsequent reports at all levels of the implementation process. DHS OIG

Report 1. After "massive public outcry," President Trump halted systematic family separations

on June 20, 2018. Am. Compl. ¶ 32.

    At the same time as the Trump administration was implementing the zero tolerance

policy, it was fighting in court a lawsuit by a class of parents detained—or at risk of being

detained—by DHS in immigration custody and separated from their children. *See generally* Docket, *Ms. L. v. U.S. Immigration & Customs Enforcement*, No. 18-cv-428 (S.D. Cal.). On June 26, 2018, the court in that case issued a preliminary injunction requiring DHS to stop detaining parents and children separately (outside of limited circumstances), to immediately begin facilitating regular communication between detained classmembers and their separated children, and to reunite the detained classmembers with their children within 30 days. *Ms. L. v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018). DHS was unable to comply with the court's order within 30 days. Am. Compl. ¶ 34. In fact, by December 2018, DHS had still not fully complied with the order. *Id.*

### D. Government Review of Zero Tolerance's Implementation

After the significant public attention generated by the zero tolerance policy and the *Ms. L.* litigation, two government reports discussing DHS's family separation procedures were issued. First, the DHS OIG issued a report entitled "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy" on September 27, 2018. *See generally* DHS OIG Report. The report "reveal[ed] numerous records management failings by DHS" in its implementation of the zero tolerance policy. Am. Compl. ¶ 36. Among others, DHS "lack[ed] complete and adequate records documenting basic details concerning migrant family separations and reunifications." *Id.* In the course of its review, OIG had "requested a list of every migrant child separated from an adult since April 19, 2018, as well as basic information about each child." *Id.* (quoting DHS OIG Report 11). "It took DHS many weeks to provide the requested data, . . . [and] the data DHS eventually supplied was incomplete and inconsistent." *Id.* (quoting DHS OIG Report 11). As for family separations that had occurred before April 19,

2018, the report noted that CBP had been unable to identify any separated children, "indicating that the agency failed altogether to create records documenting that information." *Id.*

The OIG also found that neither CBP nor Immigration and Customs Enforcement ("ICE")—a DHS component that processes alien removals—had "an adequate, uniform system for creating or retrieving records" of, respectively, "unaccompanied minors at the border" or "detainees in [ICE] custody who have been separated from a child." *Id.* Instead, CBP officers "manually enter[ed] information into a Microsoft Word document, which they then sen[t] to HHS," creating opportunities for human error in tracking separated children. *Id.* (quoting DHS OIG Report 10). And while CBP "enter[ed] 'family separation data into certain fields within its own system,'" ICE did not have access to those fields and "treated separated adults the same as other detainees," making "no additional effort to identify and reunite families prior to removal." *Id.* (quoting DHS OIG Report 10). Finally, the report found that "CBP d[id] not create adequate records of its transmissions to HHS of information regarding minors transferred from DHS to HHS custody." *Id.* (quoting DHS OIG Report 10 n.21).

In October 2018, the Government Accountability Office ("GAO") issued its own report on the government's efforts to reunify separated families in the wake of the *Ms. L.* litigation. *See* Government Accountability Office, Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border ("GAO Report") (2018), Pls.' Mot. Prelim. Inj. Ex. 2, ECF No. 14-4. The GAO Report also identified "several records management deficiencies concerning DHS's implementation of the Zero Tolerance Policy." Am. Compl. ¶ 37. Among others, although DHS and HHS adjusted their systems by August 2018 "'to help notate . . . when children are separated from parents,' these changes were ineffective" because information added on CBP systems was not necessarily shared with HHS upon the transfer of separated children.

*Id.* (quoting GAO Report 16). The GAO Report also found that DHS components were not properly or consistently utilizing newly implemented changes intended to better track the separation of parents from their children. *Id.* And the report found that there was "no single database with easily extractable, reliable information on family separations." *Id.* (quoting GAO Report 23).

### E. Procedural Background

CREW filed suit on October 26, 2018. Compl., ECF No. 1. On December 14, 2018, CREW and RAICES filed an amended complaint against DHS and then-Secretary of Homeland Security Kirstjen Nielsen. *See* Am. Compl. Plaintiffs bring three APA claims for DHS's alleged failures to comply with the FRA, alleging that DHS's overall records management program is deficient; that, even after the *Ms. L.* litigation, DHS still fails to create records sufficient to link separated children with adults they were apprehended with at the border; and that DHS failed to document its policies and decisions during the agency's implementation and rollback of zero tolerance. *See id.* ¶¶ 62–87.

On March 8, 2019, Plaintiffs filed a motion for a preliminary injunction on their second claim. Pls.' Mot. Prelim. Inj., ECF No. 14. Defendants filed their opposition and motion to dismiss the entire amended complaint on March 20, 2019. Defs.' Mot. Dismiss, ECF No. 19. Plaintiffs filed their reply and opposition to the motion to dismiss on March 29, 2019, Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 21, and Defendants filed their reply on April 5, 2019, Defs.' Reply, ECF No. 22. The Court heard oral argument on Plaintiffs' motion for preliminary injunction on April 11, 2019. Both the motion to dismiss and the motion for preliminary injunction are ripe for review.

### III.  LEGAL STANDARD

#### A.  Motion for a Preliminary Injunction

Under the familiar preliminary injunction framework, "[a] party seeking a preliminary injunction must make a 'clear showing that four factors, taken together warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 550, 505 (D.C. Cir. 2016)).  Likelihood of success on the merits "is the most important of these factors," *Elec. Privacy Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101 (D.D.C. 2012) (citing *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 159 (D.D.C. 2006)), and "[w]hen [a] plaintiff has failed to show a likelihood of success on the merits, the 'court need not proceed to review the other three preliminary injunction factors,'" *id.* (quoting *Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009)).

#### B.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of an action for lack of subject matter jurisdiction.  Federal courts are courts of limited jurisdiction, and it is generally presumed that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Accordingly, it is imperative that this Court "begin, and end," with an examination of its jurisdiction.  *Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004).

It is the plaintiff's burden to establish that the court has subject matter jurisdiction over his or her claims.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  In determining whether the plaintiff has met this burden, a court must accept "the allegations of the complaint as true,"

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), and "construe the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged[,]" *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (internal quotation marks omitted). However, "the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001).

### C. Motion to Dismiss for Failure to State a Claim

To prevail on a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a plaintiff need only provide a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam) (omission in original) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in

fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

## IV.  ANALYSIS

As discussed above, Plaintiffs bring three separate claims for FRA violations. Plaintiffs first allege that DHS failed to establish and maintain an FRA-compliant records management program. Am. Compl. ¶¶ 62–70. Plaintiffs' second claim is that DHS is violating the FRA by failing to create records sufficient to link separated children from adults with whom they were apprehended. *Id.* ¶¶ 71–80. And finally, Plaintiffs claim that DHS failed to create records of agency policy and decisions in connection with the implementation and rollback of the zero tolerance policy. *Id.* ¶¶ 81–87. Plaintiffs have moved for a preliminary injunction on their second claim, while Defendants have moved to dismiss all three claims for lack of standing and failure to state a claim under the APA.

Because Plaintiffs can only establish a likelihood of success on the merits of their second claim if that claim survives the motion to dismiss, and their entitlement to a preliminary injunction hinges on defeating that motion, the Court addresses it first. The Court first reviews whether Plaintiffs have standing to bring their claims. It concludes that, at the very least, RAICES has standing as to claims one and two, but that neither RAICES nor CREW has standing as to claim three. Next, the Court reviews the motion to dismiss the complaint for failure to state a claim. Because it finds that Plaintiffs do not challenge a final agency action on any of their claims—a prerequisite for an APA claim—the Court concludes that Plaintiffs have

failed to state a claim under the APA. The Court accordingly denies Plaintiffs' motion for a preliminary injunction and grants Defendants' motion to dismiss the amended complaint in its entirety.

### A. Plaintiffs Only Have Standing to Bring Claims One and Two

The Court first reviews whether it has subject matter jurisdiction to review Plaintiffs' claims. In their motion to dismiss, Defendants argue that Plaintiffs lack standing on all three claims. *See* Defs.' Mem. Supp. Mot. Dismiss 30–35, 39–42, ECF No. 19-1. The Court agrees in part and disagrees in part. It finds that, at the very least, RAICES has standing as to claims one and two. However, it also finds that Plaintiffs lack standing as to claim three.

"To establish standing, the plaintiff must show (1) it has suffered a 'concrete and particularized' injury (2) that is 'fairly traceable to the challenged action of the defendant' and (3) that is 'likely' to be 'redressed by a favorable decision,' i.e., a decision granting the plaintiff the relief it seeks." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (quoting *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017)). "To establish jurisdiction, the court need only find one plaintiff who has standing." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (citing *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009)). And because standing is a jurisdictional issue, the court "may consider evidence outside the complaint" when deciding a motion to dismiss based on standing. *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015).

Here, Defendants argue that Plaintiffs have not established that they have suffered the required injury on any of their claims, as well as that RAICES has not established causation or redressability as to claim two. *See* Defs.' Mem. Supp. 30–35, 39–42. Focusing on RAICES's standing, the Court first reviews claim two, then claim one, and finally claim three.

1.  Claim Two

Defendants argue that RAICES has not established standing as to claim two for two reasons. First, they contend that DHS's alleged failure to create sufficient records in connection with separations at the border has not caused RAICES to suffer an organizational injury. Defs.' Mem. Supp. 30–32. And second, they argue that RAICES has not adequately shown how injunctive relief would remedy an injury that can be traced to DHS's recordkeeping failures, rather than to the zero tolerance policy more generally. *See id.* at 31 n.14. The Court finds neither argument persuasive.

First, the Court finds that RAICES has sufficiently established that it suffered an organizational injury with respect to claim two. To establish that it suffered a harm that satisfies the injury prong of standing, RAICES must satisfy a two part test. First, it must show that "the actions taken by [the defendant] have perceptibly impaired the [organization's] programs." *Newby*, 838 F.3d at 8 (alterations in original) (internal quotation marks omitted) (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). And second, "the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). Both elements are met here.

With respect to the perceptible impairment element, the complaint points to a number of instances where DHS's alleged recordkeeping failures have harmed RAICES's ability "to provide effective, free and low-cost legal services to underserved immigrant children, families, and refugees in Texas," Am. Compl. ¶ 53. *See id.* ¶¶ 53–61. Plaintiffs represent that DHS's inability to link unaccompanied children to family members from whom they were separated results in increased detention times for unaccompanied children, which impairs RAICES's

ability to provide advice to and consult with its clients, as well as renders removal proceedings more difficult for the organization to handle. *Id.* ¶¶ 57–58. The lack of records also "impair[s] RAICES's ability to prepare applications for relief or obtain evidence for [unaccompanied children] in removal proceedings," because "[m]igrant children apprehended at the border often lack information" relevant to their immigration proceedings, information that is "[t]ypically . . . maintained by the adult companion." *Id.* ¶ 60. As a result, RAICES has been forced to "divert substantial resources to counteract that harm," *id.* ¶ 56, including by increasing its staff size, creating tools to match and track separated children and family members, and scaling up its litigation efforts relating to separations, *id.* ¶ 61. And RAICES's declarations filed in support of the motion for a preliminary injunction provide further detail about the harm the organization has suffered as a result of DHS's alleged recordkeeping failures. *See generally* Decl. of Bianca Aguilera, ECF No. 14-18; Decl. of Jonathan Ryan, ECF No. 14-19; Decl. of Kathrine Russell, ECF No. 14-20.

In the motion to dismiss, Defendants argue that this alleged harm is insufficient because while "certain additional information might have been helpful, [RAICES] is undeniably able to continue providing legal services to alien children." Defs.' Mem. Supp. 31. But as Plaintiffs point out, all RAICES needs to show to satisfy the first prong is that it suffered harm that "unquestionably make[s] it more difficult . . . to accomplish [its] primary mission." Pls.' Mem. Supp. Prelim. Inj. 29, ECF No. 14-1 (quoting *Newby*, 838 F.3d at 9). Defendants also argue that RAICES improperly relies "on an indirect alleged 'ripple effect' that, it suggests, is caused by DHS's failure to create records" to establish their injury. Defs.' Reply 18. But Defendants do not meaningfully challenge the factual allegations in the amended complaint, other than to

express doubt in their briefs that those allegations are accurate. Here, the Court is satisfied that RAICES has shown a perceptible impairment of its programs.

Defendants also argue that any impairment caused by its alleged recordkeeping deficiencies does not directly conflict with RAICES's mission, again because RAICES continues to provide legal services in spite of the alleged harm. Defs.' Mem. Supp. 31. In their reply, Defendants further suggest that organizational injury can only be established "when an organization has a mission focused on a particular policy goal . . . and challenges an action that directly conflicts with that mission." Defs.' Reply 18. Defendants do not offer any legal authority to support this assertion that organizational injury is restricted to organizations that have a narrow policy goal.[3] In any event, RAICES alleges that its primary goal is to provide legal representation to immigrants, *see* Am. Compl. ¶ 53, and that DHS's failure to create records sufficient to "[p]rotect the . . . *legal . . . rights* of . . . persons directly affected by the Government's actions," 36 C.F.R. § 1222.22(d) (emphasis added), impairs its ability to pursue that mission, *see* Am. Compl. ¶¶ 53–61. The Court finds that this is a sufficiently direct conflict with a specific organizational mission under *Newby* to satisfy the second prong of the organizational injury requirement.

Second, Defendants briefly argue that RAICES cannot establish causation or redressability because it has not explained "how an injunction requiring DHS to *create* certain records would in turn allow RAICES to *access* those records and obtain personal identifying

---

[3] Defendants also accuse Plaintiffs of conflating the second requirement of organizational injury with the first. *See* Defs.' Reply 17. But, as Plaintiffs point out, Defendants themselves appear to conflate the two requirements. *See* Pls.' Mem. Opp'n 29 (noting that *National Fair Housing Alliance v. Carson*, 330 F. Supp. 3d 14 (D.D.C. 2018), a case relied on by Defendants to argue that Plaintiffs do not satisfy the second prong of organizational injury, primarily dealt with the first prong of the organizational injury test).

information about . . . non-parent adults, nor that this identifying information would actually yield information crucial to a child's representation." Defs.' Mem. Supp. 31 n.14. The Court finds this argument unpersuasive. As Plaintiffs point out in their opposition, they need only show that there is "a causal connection between the injury and [DHS's] conduct," and that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Pls.' Mem. Opp'n 34 (quoting *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros.*, 317 F.3d 334, 338 (D.C. Cir. 2003)). As to causation, it is true that Plaintiffs point to an attenuated link between DHS's alleged recordkeeping failures and RAICES's alleged increased difficulties in providing legal representation—as it is true that the zero tolerance policy likely itself led to increased constraints on RAICES's ability to pursue its mission. *Cf.* Defs.' Reply 20. But simply because RAICES's alleged harm may in part be caused by the zero tolerance policy does not mean that it cannot be also caused in part by DHS's recordkeeping failures. Plaintiffs have alleged facts in the amended complaint that point to harm specifically caused by the failure to *link* separated children to family members, rather than by an increase in workload generally. *See* Am. Compl. ¶¶ 57, 60. And as to redressability, Defendants do not respond to Plaintiffs' argument that RAICES would in fact be able to access information relating to third parties from whom the unaccompanied children are separated. *See* Pls.' Mem. Opp'n 36 (citing 8 U.S.C. § 1229a(c)(2)(B)). The Court finds both the causation and redressability elements of standing met, and therefore concludes that RAICES has standing to bring claim two.

### 2. Claim One

As to claim one, Defendants argue that Plaintiffs have made "no factual assertions . . . regarding concrete, particularized harms" caused by the alleged overall failure of DHS's records management program, "aside from Plaintiffs' asserted injuries in regard to recordkeeping with

respect to family separations." Defs.' Mem. Supp. 39. The Court disagrees that these asserted injuries are insufficient to establish standing as to claim one. The Complaint identifies multiple deficiencies existing in DHS's records management program prior to the implementation of the zero tolerance policy, and alleges that the harms caused by improper documentation as part of the implementation of the policy were linked to the records management program's overall deficiencies. Am. Compl. ¶¶ 64–65; *see also id.* ¶ 23 (noting DHSs "history of failing to comply with . . . statutory records management obligations" and pointing to the NARA DHS Inspection Report); *id.* ¶ 26 ("DHS's culture of non-compliance with its FRA obligations manifested acutely, with disastrous results, in its implementation and rollback of the Zero Tolerance Policy."); *id.* ¶¶ 36–40 (noting continued, systemic failure to record documents in multiple DHS component agencies even after the end of zero tolerance). The Court sees no reason why the concrete injury RAICES alleges it suffered because of DHS's improper recordkeeping in connection with family separations, which the Court found sufficient to establish standing as to claim two, is not also sufficient to establish standing as to claim one. It accordingly finds that RAICES has standing to bring claim one.

### 3. Claim Three

Finally, the Court reviews Defendants' arguments as to claim three, the claim challenging DHS's creation of records of agency policy and decisions during the implementation and rollback of zero tolerance. Defendants argue that Plaintiffs do not have standing to seek injunctive and declaratory relief when their claim centers around injuries allegedly caused in the past, with no allegations of *ongoing* or *future* injury. *See* Defs.' Mem. Supp. 40–41. Plaintiffs retort that claim three is not just directed at recordkeeping failures during the implementation of the zero tolerance policy, but rather at an overall DHS practice of failing to document agency

policy and decisions.  *See* Pls.' Mem. Opp'n 45.  Here, the Court must part with Plaintiffs.  On

the basis of the allegations in the Complaint, it agrees with Defendants that Plaintiffs do not

point to an ongoing injury and therefore lack standing to bring their third claim.

As a general rule, "where the plaintiffs seek declaratory and injunctive relief, past injuries

alone are insufficient to establish standing."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir.

2011).  Instead, Plaintiffs must "establish an ongoing or future injury that is 'certainly

impending.'"  *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016) (quoting *Arpaio v. Obama*,

797 F.3d 11, 19 (D.C. Cir. 2015)).  Here, Plaintiffs contend that they have alleged an ongoing

injury because one paragraph in the amended complaint alleges that the agency has a "culture of

resisting memorializing policy decisions and guidance into written records," Pls.' Mem. Opp'n

45 (quoting Am. Compl. ¶ 43), and identifies two examples where CBP failed to memorialize

guidance "[a]s manifestations of this culture," *id.*  The Court cannot agree.  The amended

complaint only alleges as support for claim three that "DHS has failed to create adequate records

. . . *in connection with its implementation and rollback of the Zero Tolerance Policy*."  Am.

Compl. ¶ 84 (emphasis added).  And the examples Plaintiffs provide, even when taking all

inferences in their favor, do not actually indicate that DHS failed to memorialize policy decisions

or guidance.  Rather, they appear to suggest that the agency refused to issue guidance in the first

place.  *See id.* ¶ 43 (noting that "CBP's policymakers rebuked prior efforts by its . . . policy

office . . . to issue employees . . . guidance" on two issues).  As alleged, the Court finds that

claim three does not point to an ongoing or future injury and therefore that Plaintiffs lack

standing to bring that claim.

## B. All of Plaintiffs' Claims Fail to State a Claim Under the APA

The Court next reviews Defendants' motion to dismiss the entire complaint for failure to state a claim. Defendants argue that none of Plaintiffs' claims challenge an agency action, and therefore that they do not state a claim under the APA. The Court agrees. Reviewing claims two, one, and three (assuming, *arguendo*, that Plaintiffs had standing) in turn, it finds that none of the claims challenge a reviewable agency action.

### 1. Claim Two

In claim two, Plaintiffs allege that HS "has repeatedly failed, and continues to fail, to create records sufficient to link migrant children with adult companions with whom they were apprehended at the border." *Id.* ¶ 74. Plaintiffs contend that DHS has therefore unlawfully withheld agency action pursuant to 5 U.S.C. § 706(1) "by failing to take actions required by FRA and its implementing regulations," *id.* ¶ 76, and that the agency's actions violate 5 U.S.C. § 706(2)(A) "insofar as they violate FRA and its implementing regulations." *Id.* ¶¶ 75–76. In their motion to dismiss, Defendants argue, *inter alia*, that Plaintiffs have not stated a claim under the APA because they do not actually challenge an agency action. The Court agrees. The Court first reviews what constitutes a reviewable agency action under the APA, before addressing the parties' arguments. Because Plaintiffs do not identify a discrete agency action undertaken by DHS, the Court grants the motion to dismiss claim two and denies Plaintiffs' motion for a preliminary injunction.[4]

---

[4] Having found that Plaintiffs do not identify a reviewable agency action and thus fail to state a claim under the APA, the Court does not address Defendants' other arguments for dismissal.

### a. Reviewable "Agency Action" Under the APA

First, the Court briefly reviews the framework for what constitutes a reviewable agency action under the APA. The statute itself defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2) (noting that "agency action" has the same meaning for purposes of the APA as that given by 5 U.S.C. § 551). The five listed categories—and their equivalent or the denial thereof—all "involve circumscribed, discrete agency actions, as their definitions make clear." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 62 (2004). And the Supreme Court has explained that "failure to act" is "properly understood as a failure to take an *agency action*—that is, a failure to take one of these agency actions . . . earlier defined." *Id.*

As a result, when challenging the failure to take an agency action under 5 U.S.C. § 706(1) or § 706(2)(A), a plaintiff must challenge a "discrete agency action" and cannot make "a broad programmatic attack" on an agency's compliance with a statutory scheme. *SUWA*, 542 U.S. at 64 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)). In *Lujan*, the Court had "considered a challenge to [the Bureau of Land Management's (BLM's)]] land withdrawal review program, couched as unlawful agency 'action' that the plaintiffs wished to have 'set aside' under § 706(2)." *Id.* The plaintiff "allege[d] that violation of the law [was] rampant within this program" and, rather than challenging individual determinations, claimed that the whole program was unlawful. *Lujan*, 497 U.S. at 891. The Supreme Court rejected the challenge, noting that the plaintiff could not "seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.* (emphasis in original). Instead, the

plaintiff had to "direct its attack against some particular 'agency action' that cause[d] it harm." *Id.*

In reviewing a § 706(1) claim in *SUWA*, the Supreme Court further clarified the discrete agency action requirement. The *SUWA* plaintiffs claimed that BLM's failure to prohibit the use of off-road vehicles ("ORVs") on protected federal lands violated its mandate to "continue to manage [the land] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness." *SUWA*, 542 U.S. at 65 (omission in original) (quoting 43 U.S.C. § 1782(c)). The Court explained that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," *id.* at 64 (emphasis in original), and found that the plaintiffs had not challenged an action the agency was required to take because the statute "assuredly d[id] not mandate, with the clarity necessary to support judicial action under § 706(1), the total exclusion of ORV use." *Id.* at 66. In finding against the plaintiffs, the Court also made clear that failure to comply with the broad, "required" statutory mandate of 43 U.S.C. § 1782 was not sufficiently discrete in itself to constitute an agency action. While the plaintiffs argued that "§ 1782 contain[s] a categorical imperative, namely the command to comply with the nonimpairment mandate," the Court explained that "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action." *Id.* The Court accordingly rejected the argument that it could "simply enter a general order compelling compliance with that mandate, without suggesting any particular manner of compliance." *Id.*

The Supreme Court went on to note that the purpose of APA reviewability limitations was "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements." *Id.* "If courts were empowered to

enter general orders compelling compliance with broad statutory mandates, . . . it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id.* at 66–67. The Court concluded that "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with [broad congressional mandates] is not contemplated by the APA." *Id.* at 67.

      *b. DHS's Alleged Failure to Create Records Was Not a Discrete Agency Action*

      With these general principles in mind, the Court turns to Plaintiffs' claim in this case that DHS violated the FRA by failing to create records sufficient to link separated children to adults with whom they were apprehended. Defendants argue that the claim "does not present a proper APA claim," Defs.' Mem. Supp. 18, because it does not challenge an agency action amenable to APA review, *id.* at 19. Relying on *Lujan*, *SUWA*, and two recent district court decisions addressing FRA records creation claims, *Citizens for Responsibility & Ethics in Washington v. Pruitt* ("*CREW I*"), 319 F. Supp. 3d 252 (D.D.C. 2018), and *Citizens for Ethics & Responsibility in Washington v. Wheeler* ("*CREW II*"), 352 F. Supp. 3d 1 (D.D.C. 2019), Defendants argue that Plaintiffs' claim is improper because it asks the Court to "insert [itself] into the day-to-day recordkeeping practices of DHS personnel" to review "'isolated acts' of noncompliance." Defs.' Mem. Supp. 20 (quoting *CREW I*, 319 F. Supp. 3d at 260). Plaintiffs retort that DHS misinterprets *CREW I* and *CREW II*, *see* Pls.' Mem. Opp'n 5–11, and that they have alleged a valid APA claim based on DHS's aggregate practice of failing to create sufficient records in violation of the FRA, Pls.' Mem. Opp'n 12.

      As an initial matter, while the parties devote most of their arguments on the issue to whether the claim is of the type recognized as viable in *CREW I*, the Court is not bound by either

*CREW I* or *CREW II*, which are decisions of a sister district court. Plaintiffs contend that *CREW I*'s "clear holding" dictates that their claim is available under the APA. Pls.' Mem. Supp. 7. The Court disagrees. The Court ultimately finds that Plaintiffs do not challenge a discrete agency action but rather are seeking to force compliance with a broad statutory mandate, a prospect which is outside the purview of the APA.

Plaintiffs allege that DHS undertook a reviewable agency action by failing to create records in violation of both § 3101 of the FRA and the FRA's implementing regulations. *See* Am. Compl. ¶¶ 74–76; *see also* Pls.' Mem. Supp. 22 ("Following the reasoning of both *Armstrong* and *CREW v. Pruitt*, . . . Plaintiffs may pursue an APA claim here challenging DHS's failure to create records in violation of § 3101"); Pls.' Mem. Opp'n 12 (characterizing claim as a challenge to DHS's "[a]ggregate [p]ractice of [f]ailing to [c]reate [r]ecords" in violation of § 3101 and its implementing regulations). They contend that DHS's failure to create records linking separated children to adults with whom they were apprehended violates § 3101's mandate to make and preserve records generally. *See* Compl. ¶¶ 75–76. And they contend that it violates the regulations' requirement that DHS prescribe the creation and maintenance of records that 1) "[d]ocument the persons . . . or matters dealt with by the agency," 2) "[f]acilitate action by agency officials and their successors in office," 3) "[m]ake possible a proper scrutiny by the Congress or other duly authorized agencies of the government," and finally 4) "[p]rotect the . . . legal . . . rights . . . of persons directly affected by the Government's actions." 36 C.F.R. § 1222.22(a)–(d); *see* Am. Compl. ¶ 74.

Unfortunately for Plaintiffs, neither the FRA statutory provision they rely on nor its implementing regulations provide anything more than a "broad statutory mandate" for DHS to follow. *SUWA*, 542 U.S. at 67. The *SUWA* Court made clear that courts are not empowered "to

26

enter general orders compelling compliance with broad statutory mandates" and that "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action." *Id.* at 66; *see also Cobell v. Kempthorne*, 455 F.3d 301, 305 (D.C. Cir. 2006) (noting that "under the APA, courts may only review specific agency action . . . ; courts cannot order 'programmatic improvements,' or 'compel[] compliance with broad statutory mandates'" (alteration in original) (quoting *Cobell v. Norton*, 392 F.3d 461, 472 (D.C. Cir. 2004)).

But this is exactly what Plaintiffs attempt to do here. The FRA and its implementing regulations provide general commands to agencies to prescribe the creation of records that "[d]ocument the persons" they deal with, "[f]acilitate action" by government officials, "[m]ake possible a proper scrutiny" of agency activities, and "[p]rotect the . . . legal . . . rights" of persons affected by their actions. 36 C.F.R. § 1222.22(a)–(d); *see also* § 44 U.S.C. 3101. Just like the failure to prohibit ORV use violating 43 U.S.C. § 1782(c)'s "categorical imperative" in *SUWA*, DHS's alleged failure to comply with § 3101 or its implementing regulations' general requirements is a "deficienc[y] in compliance" with a broad statutory mandate that "lack[s] the specificity requisite for agency action." 542 U.S. at 66; *see also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014) (noting that language of statute mandating that "'the Secretary shall comply with tribal laws' . . . contain[ed] only a general follow-the-law directive" and "flunk[ed] *SUWA*'s discreteness test" (quoting 25 U.S.C. § 3712(b))). As the Court noted in *SUWA*, recognizing Plaintiffs' claim here would necessarily "mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the [FRA], injecting the judge into day-to-day agency management." 542 U.S. at 66–67. This Court

would be empowered to decide just how much detail is necessary for every form prepared by DHS to comply with the FRA.[5]  The APA does not contemplate such oversight.[6]

Plaintiffs retort that their claim is authorized by *CREW I* and *CREW II*.  As both parties recognize, the Supreme Court in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980), made clear that there is no private right of action under the FRA itself.  *Id.* at 148.  The D.C. Circuit has since held that a plaintiff can challenge an agency's recordkeeping guidelines pursuant to the APA, but cannot challenge the destruction of records in violation of those guidelines and of the FRA.  *See Armstrong v. Bush*, 924 F.2d 282, 292–95 (D.C. Cir. 1991).  The *CREW I* and *CREW II* cases addressed a situation more analogous to the one here, where a plaintiff challenged the failure to *create* records rather than the destruction of records.

In *CREW I*, the court dealt with a motion to dismiss a claim pursuant to the APA that the Environmental Protection Agency ("EPA") was violating § 3101 of the FRA.  *CREW I*, 319 F. Supp. 3d at 258.  According to the plaintiffs, the EPA's new administrator, Scott Pruitt, had "ushered in a culture of secrecy" at the agency by instructing EPA staff not to create written

---

[5] Lest there be any doubt about how pervasive Plaintiffs expect the Court's oversight to be, a RAICES attorney identified in a declaration attached to Plaintiffs' motion for a preliminary injunction "critical data points" that "include, *without limitation*" over fifteen categories of data for both children and adults that are at "a critical need for DHS to document."  Aguilera Decl. ¶ 17 (emphasis added).  Plaintiffs indicated at oral argument that they were not asking for an order directing DHS to make records regarding those specific data points.  *See* Hearing Tr. 8:11–16, ECF No. 23.  Yet the motion did ask that the Court order DHS to "adequately describe the circumstances of and reasons for any separation," pointing to the Aguilera Declaration as "outlin[ing] specific data points concerning child separations that there is a critical need for DHS to document."  Pls.' Mem. Supp. 43 & n.8.  Presumably, if the Court found that DHS violated the FRA and DHS failed to change the information it records to sufficiently match the data points Plaintiffs identified, Plaintiffs would come back before this Court to ask for continued supervision of the agency.  This is not the role of a supervising court under the APA.

[6] This does not mean that Plaintiffs are left without recourse in the face of a failure to create records protecting the rights of specific individuals—or categories of individuals.  As the *Ms. L* litigation illustrates, there are other avenues for such individuals to remedy these violations.

records of major substantive matters, prohibiting staffers from using phones or taking notes at meetings, and himself avoiding the use of e-mails and using non-work phones to make important calls to avoid records of these calls appearing on his call log. *Id.* at 255. The plaintiffs alleged that these actions violated § 3101's requirement that agencies "make and preserve records containing adequate and proper documentation of the organization, function, policies, decisions, procedures, and essential transactions of the agency." *Id.* at 258 (quoting 44 U.S.C § 3101). The EPA defendants argued that under *Armstrong*, plaintiffs could challenge the adequacy of the EPA's guidelines regarding FRA compliance, but not the failure to create records. *Id.*

In rejecting the defendants' argument, the court found that nothing in the FRA precluded judicial review of agency violations of § 3101, and that § 3101's mandate was not committed to agency discretion by law. *Id.* at 260. The Court concluded that "[a]n agency policy—formal or otherwise—that refuses to 'make . . . records' in accordance with the FRA is reviewable." *Id.* (quoting 44 U.S.C. § 3101). However, the Court warned that "[w]hile future plaintiffs may challenge the EPA's actions, in the aggregate, of refusing to create certain records, they may not demand judicial review of isolated acts allegedly in violation of § 3101." *Id.* (citing *Ramirez v. ICE*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018). And it pointed to *SUWA*'s admonition that "[t]he prospect of pervasive oversight by federal courts over the manner . . . of agency compliance with such congressional directives is not contemplated by the APA." *Id.* (omission in original) (quoting *SUWA*, 542 U.S. at 67).

A few months later in *CREW II*, the court found that the case had been mooted by Pruitt's departure from the EPA. 352 F. Supp. 3d at 8–13. The Court explained that it had "relied on [the plaintiffs'] references to Pruitt's actions to conclude that [p]laintiffs had sufficiently alleged a 'policy' or 'practice' of failing to create records." *Id.* at 9 (citing *CREW I*, 319 F. Supp. 3d at

259–60). With Pruitt gone, the complaint did not provide any allegations to suggest that the practice would continue. *Id.* In response to the plaintiffs' arguments that their allegations went beyond Pruitt's conduct, and that they were seeking to have the court compel the agency to comply with § 3101 and make certain types of records, the court made clear that such a claim exceeded the scope of APA review. *Id.* at 11. Again pointing to *SUWA*, it explained that "[t]he APA does not grant federal courts the authority to engage in pervasive oversight of an agency's compliance with the FRA." *Id.* (citing *SUWA*, 542 U.S. at 67).

Plaintiffs' arguments notwithstanding, the Court's conclusion here is consistent with both *CREW I* and *CREW II*. As Defendants point out, a logical reading of *CREW I* and *CREW II* taken together is that the court there recognized only a challenge to the EPA's unofficial policy of refusing to create records. Defs.' Mem. Supp. 18–19; *see CREW I*, 319 F. Supp. 3d at 260 (contrasting plaintiffs' allowed claim stemming from "[a]n agency policy—formal or otherwise—that refuses to 'make . . . records' in accordance with the FRA" with disallowed claim for "judicial review of isolated acts allegedly in violation of § 3101" (quoting 44 U.S.C. § 3101)); *CREW II*, 352 F. Supp. 3d at 11 (characterizing *CREW I* as solely authorizing a claim challenging "an 'agency policy—formal or otherwise—that refuses to make' or preserve 'records in accordance with the FRA'" (quoting *CREW I*, 319 F. Supp. 3d at 260)). The *CREW I* decision "applied the reasoning of *Armstrong* to extend its holding in one narrow respect," Defs.' Mem. Supp. 18, to allow review not just of an agency's formal recordkeeping guidelines but also of an agency's unofficial, *de facto* policy of refusing to create records, *see CREW I*, 319 F. Supp. 3d at 260. This is not what Plaintiffs challenge here.[7] Plaintiffs do not challenge a DHS policy,

---

[7] Plaintiffs argue that *CREW II* addressed issues of remedy and mootness rather than whether a cause of action exists under the APA. Pls.' Mem. Opp'n 9. And they contend that, even should the Court find itself unable to compel DHS's creation of particular records, it could

official or unofficial, setting agency-wide compliance with the FRA; instead, they challenge

DHS's deficient compliance with § 3101 with regards to some of the records the agency creates.[8]

The Court must therefore grant the motion to dismiss claim two, and deny Plaintiffs' motion for

a preliminary injunction.

## 2. Claim One

Next, the Court addresses Plaintiffs' first claim, that DHS "has failed to establish and

maintain a sufficient agency-wide records management program in compliance with the FRA

and its implementing regulations." Am. Compl. ¶ 65. DHS argues that this claim is "far broader

than a challenge to 'the adequacy of an agency's record-keeping guidelines' that the DC Circuit

allowed in *Armstrong*," and fails to identify a reviewable agency action. Defs.' Mem. Supp. 38

(quoting *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 82 F. Supp. 3d 228, 234

(D.D.C. 2015)). The Court agrees.

---

provide for a different remedy, such as "order[ing] DHS to adopt a records management policy mandating the creation of records adequately documenting child separations, rather than directly ordering creation of the records themselves." *Id.* at 10. The Court disagrees. While the court in *CREW II* acknowledged its authority to order the agency to promulgate a revised policy mandating records creation, it did so in response to claims challenging the agency's formal and informal policies regarding records creation. *See CREW II*, 352 F. Supp. 3d at 10. Plaintiffs here, by contrast, do not challenge DHS's records management policies.

[8] To the extent *CREW I* can be interpreted to allow claims challenging an agency's failure to create records required by § 3101, rather than an agency's recordkeeping policies, that case addressed the extreme circumstance where the agency was allegedly altogether refusing to comply with the statutory requirement. *See CREW I*, 319 F. Supp. 3d at 260 (pointing out that "future plaintiffs may challenge the EPA's actions, in the aggregate, of refusing to create certain records"). *CREW I* thus did not involve "deficiencies in compliance," *SUWA*, 542 U.S. at 66, so much as allegations of an outright refusal to comply with the FRA. By contrast, Plaintiffs here do not contend that DHS is refusing or altogether failing to create any records. It is undisputed that DHS creates records of aliens apprehended at the border—including, though "incomplete and inconsistent," Am. Compl. ¶ 36 (quoting DHS OIG Report 11), records that have allowed the agency to match unaccompanied children with adults they were separated from at the border. Rather, Plaintiffs allege that DHS's compliance is deficient because it fails to record *sufficient* information about apprehended aliens to comply with the FRA. The claim recognized in *CREW I* is therefore inapposite to the situation here.

As discussed above for claim two, Plaintiffs can only challenge an agency action, as that term is understood under the APA. In the amended complaint, Plaintiffs challenge DHS's failure "to establish and maintain a sufficient agency-wide records management program in compliance with the FRA and its implementing regulations." Am. Compl. ¶ 65. Plaintiffs explain that "[t]hese failures are detailed in NARA reports . . . and manifested in DHS's recent actions with respect to migrant children apprehended at the border." *Id.* And they seek a declaration that DHS is violating its obligations under the FRA, and an order compelling DHS to comply with the FRA. *Id.* ¶ 70. By its own terms, the Court agrees that this claim is nothing more than a "'broad programmatic attack,' and attempt to direct 'wholesale improvement of [DHS's] program by court degree,'" which is "exactly what the Supreme Court has repeatedly identified as impermissible." Defs.' Reply 2 (citing *SUWA*, 542 U.S. at 67; *Lujan*, 497 U.S. at 891). The Supreme Court explained in *Lujan* that a plaintiff cannot simply assert "that violation of the law is rampant within [a] program" in order to obtain agency-wide programmatic improvement; "[u]nder the terms of the APA, [a plaintiff] must direct its attack against some particular 'agency action' that causes harm." 497 U.S. at 891. Plaintiffs here are challenging the entirety of DHS's records management under the FRA, a claim that the Court simply cannot consider under the APA.

In their opposition, Plaintiffs attempt to recharacterize their claim by suggesting that the amended complaint's reference to DHS's inadequate records management program was really a reference to DHS's inadequate *recordkeeping guidelines and directives*. *See* Pls.' Mem. Opp'n 43. As such, Plaintiffs contend, claim one is essentially the same type of claim challenging an agency's recordkeeping guidelines as the claim authorized in *Armstrong*. *See id.* The problem for Plaintiffs is that the amended complaint never mentions DHS's recordkeeping guidelines or

directives.  *See generally* Am. Compl.  Instead, the allegations in support of claim one, discussed above, clearly indicate that it is a challenge to the sufficiency of DHS's "agency-wide records management program," *id.* ¶ 65—in contrast to *Armstrong*, which specifically involved a claim that the agency at issue in the case had deficient guidelines, *see Armstrong*, 924 F.2d at 291 (noting the plaintiffs' claim that the agency "recordkeeping guidelines and directives are inadequate because they fail to provide [agency] staff with sufficient guidance about what material constitutes 'records'").  "[A] plaintiff cannot amend its complaint by the briefs in opposition to a motion to dismiss."  *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 121 (D.D.C. 2018) (quoting *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014)).  The Court accordingly grants the motion to dismiss claim one.

### 3.  Claim Three

Finally, the Court reviews Plaintiffs' third claim, that DHS violated § 3101 and 36 C.F.R. § 1222.22(e) by failing to adequately document its decisionmaking process in connection with the implementation and rollback of the zero tolerance policy.  *See* Am. Compl. ¶¶ 83–84, 87. Even assuming, *arguendo*, that Plaintiffs had standing to bring claim three, the Court would still dismiss it because, as with claims one and two, it does not challenge a reviewable agency action.

Again, as discussed above in part IV.B.1.a., the APA only authorizes courts to review challenges to agency action, as defined in the APA.  And because "'failure to act' is . . . properly understood as a failure to take an *agency action*," *SUWA*, 542 U.S. at 62, a plaintiff challenging an agency's failure to act under 5 U.S.C. § 706(1) or § 706(2)(A) must "assert[] that an agency failed to take a *discrete* agency action," *id.* at 64.  This, in turn, "precludes [both] the kind of broad programmatic attack [the Supreme Court] rejected in *Lujan*," *id.*, and challenges to

"[g]eneral deficiencies in compliance" with a broad statutory scheme, which "lack the specificity requisite for agency action," *id.* at 66.

Here, as with claims one and two, Plaintiffs do not challenge a discrete agency action. Plaintiffs challenge DHS's failure to "create adequate records" complying with 44 U.S.C. § 3101 and 36 C.F.R. § 1222.22 "in connection with [the agency's] implementation and rollback of the Zero Tolerance Policy." Am. Compl. ¶ 84. This does not constitute a discrete agency action under *SUWA*; rather, it is a challenge to the agency's past "deficiencies in compliance" with a broad statutory mandate. 542 U.S. at 66. Even more so than with claim two, where Plaintiffs were at least alleging ongoing deficient compliance with the FRA, the Court is not empowered to review such a challenge to a past isolated act of noncompliance under the APA.

Plaintiffs argue that their claim goes beyond the agency's implementation of the zero tolerance policy, and rather "alleges that DHS has an ongoing 'agency culture of resisting memorializing policy decisions and guidance into written records.'" Pls.' Mem. Opp'n 45 (quoting Am. Compl. ¶ 43). Given the allegations supporting the third claim, *see* Am. Compl. ¶¶ 81–87, the Court is inclined to agree with Defendants that Plaintiffs "attempt to amend their pleading through their brief," Defs.' Reply 22. As discussed above in part IV.A.3., the additional allegations Plaintiffs point to fall short of stating a claim that DHS has adopted a policy of refusing to document agency decisions. Plaintiffs point to a single paragraph in the amended complaint alleging that DHS's failures during its implementation of the zero tolerance policy was "consistent with [its] overall agency culture." Am. Compl. ¶ 43. That same paragraph identifies two instances where "CBP's policymakers rebuked prior efforts by its own policy office and the Office for Civil Rights and Civil Liberties to issue employees meaningful guidance" on two issues. *Id.* But the fact that CBP refused to "issue employees meaningful

guidance," *id.*, does not mean that unwritten oral guidance already existed that the agency refused to put in writing. And the Court agrees with Defendants that, irrespective of standing, the amended complaint's one-paragraph reference to an "overall agency culture of resist[ance]," *id.*, supported by two examples of purported bad conduct by a subcomponent agency, is "too vague and conclusory to plausibly assert a . . . claim," Defs.' Reply 22. The Court therefore dismisses claim three.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (ECF No. 14) is **DENIED**. Defendants' motion to dismiss (ECF No. 19) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 24, 2019                                      RUDOLPH CONTRERAS
                                                                       United States District Judge