## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

              Plaintiff,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY *et al.*,

            Defendants.

No. 18-cv-2473

## **DEFENDANTS' MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ....................................................................... 1

STATUTORY AND REGULATORY FRAMEWORK .................................... 3

      I.     Federal Records Act ........................................... 3

      II.    NARA Regulations ........................................... 4

PROCEDURAL HISTORY ............................................................ 6

      I.     Plaintiffs' First Amended Complaint and Defendants'
            Motion to Dismiss .......................................... 6

      II.    The Court's Dismissal and Plaintiffs' Motion to Amend ........... 8

      III.   Plaintiffs' Second Amended Complaint ...................... 9

STANDARD OF REVIEW ............................................................ 10

ARGUMENT ......................................................................... 12

      I.     THE COURT SHOULD DISMISS PLAINTIFFS' CLAIM .................... 12

            A.    Under D.C. Circuit Authority, the Permissible Scope of an APA
                 Challenge Alleging an FRA Violation Has Been Carefully
                 Circumscribed ........................................ 13

            B.    The DHS Policies Are Adequate Because They Require
                 Compliance with the FRA and NARA Regulations ............ 18

            C.    Plaintiffs' Attempt to Challenge the Totality of DHS
                 Recordkeeping Guidance Should Be Rejected .............. 26

      II.    PLAINTIFFS' REQUESTED RELIEF EXCEEDS THE SCOPE OF
            RELIEF PERMISSIBLE FOR A § 706(2)(A) CLAIM ................... 28

CONCLUSION ....................................................................... 29

## **TABLE OF AUTHORITIES**

### **Cases**

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ......................................12

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    No. 18-5154, 2019 WL 3917605 (D.C. Cir. Aug. 20, 2019) ..............................28

*Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29 (D.C. Cir. 1983) ................................3

*Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1 (D.D.C. 2019) ......................................28–29

*Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011) ......................................11

*Armstrong v. Bush*, 721 F. Supp. 343 (D.D.C. 1989) ......................................14

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*") ...................*passim*

*Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993) ("*Armstrong II*") ........................15, 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................12, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................12

*Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013) ................................................29

*Comcast Corp. v. FCC*, 526 F.3d 763 (D.C. Cir. 2008) ...................................................15

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Policy*, 82 F. Supp. 3d 228 (D.D.C. 2015),
    *rev'd on other grounds*, 827 F.3d 145 (D.C. Cir. 2016). .........................15, 16, 25

*CREW v. DHS* ("*CREW I*"), 387 F. Supp. 3d 33 (D.D.C. 2019) ............................ *passim*

*CREW v. Pruitt* ("*Pruitt*"), 319 F. Supp. 3d 252 (D.D.C. 2018) .....................9, 16, 17, 25

*CREW v. Wheeler*, 352 F. Supp. 3d 1 (D.D.C. 2019) ......................................................16

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) ...............................................................................20

*Flaherty v. Pritzker*, 17 F. Supp. 3d 52 (D.D.C. 2014) ...................................................29

*Grand Lodge of the Fraternal Order of Police v. Ashcroft*,
    185 F. Supp. 2d 9 (D.D.C. 2001) ...........................................................................11

*Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) ................................12

*Judicial Watch, Inc. v. Kerry*, 844 F.3d 952 (D.C. Cir. 2016) ...........................................13

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003) .......................12

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) ................................................11

*\*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ...........................................13, 18, 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................................18

*\*Norton v. SUWA*, 542 U.S. 55 (2004) ....................................................................13, 26

*Pub. Citizen v. Carlin*, 184 F.3d 900 (D.C. Cir. 1999) .........................................................3

*Shibeshi v. United States*, 920 F. Supp. 2d 105 (D.D.C. 2013) .........................................12

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000) ................................12

*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) ....................................12

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ............28

### **Statutes**

Federal Records Management Amendments of 1976, Pub. L. 94-575, 90 Stat. 2723 ......17

Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135 ............22

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 ..........................................1

5 U.S.C. § 706 ............................................................................................10, 13, 26, 28

Federal Records Act ("FRA"),
    44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314 .................. *passim*

44 U.S.C. § 2902 ...............................................................................................................4

44 U.S.C. § 2904 ...........................................................................................................4, 5

44 U.S.C. § 2906 ...............................................................................................................5

44 U.S.C. § 3101 ...........................................................................4, 10, 20, 21, 24

44 U.S.C. § 3102 ............................................................................................4, 5, 21

44 U.S.C. § 3301 ..................................................................................................4

## **Regulations**

36 C.F.R. § 1222.22 ................................................................5, 10, 17, 18, 21

36 C.F.R. § 1222.24 ......................................................................................6, 10

36 C.F.R. § 1222.26 ......................................................................................6, 10

36 C.F.R. § 1222.28 ......................................................................................6, 11

36 C.F.R. § 1223.2 .............................................................................................6

## **Legislative Materials**

S. Rep. 81-2140, 1950 U.S.C.C.A.N. 3547 ...................................................17

S. Rep. 94-1326, 1976 U.S.C.C.A.N. 6150, 6157 .......................................4, 17

## INTRODUCTION

In their Second Amended Complaint, Citizens for Responsibility and Ethics in Washington ("CREW") and Refugee and Immigrant Center for Education and Legal Services ("RAICES") (collectively, "Plaintiffs") raise a single claim, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, against the U.S. Department of Homeland Security ("DHS") and Acting Secretary of Homeland Security Kevin K. McAleenan (collectively, "Defendants"), alleging that DHS's recordkeeping guidelines do not conform to Federal Records Act ("FRA") requirements regarding the creation of adequate documentation. Like their earlier claims, which this Court dismissed, *see CREW v. DHS* ("*CREW I*"), 387 F. Supp. 3d 33 (D.D.C. 2019), Plaintiffs' latest allegation falls outside the scope of the claim found permissible in the D.C. Circuit's decision in *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*"). While *Armstrong* recognized that a court might review the adequacy of an agency's "recordkeeping guidelines and directives" that are allegedly responsible for recordkeeping violations, *id.* at 293, it did not suggest that a recordkeeping guideline could be facially deficient in the abstract, nor that this limited vehicle, which must comport with the APA's "agency action" restriction, could be used as a proxy to challenge an agency's records management program as a whole. Plaintiffs' attempts on each of these fronts thus are fatally flawed.

Although Plaintiffs initially style their claim as a challenge to two specific DHS policies, a directive and an instruction, they make no attempt to link the supposed inadequacies that they identify to alleged failures in recordkeeping, or to their claimed injuries, which they continue to allege stem from the actions of two DHS components, U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), when encountering alien children and accompanying adults at the border. Instead, they suggest that the policies are

inadequate *per se* simply because they fail to parrot statutory and regulatory language, or to list every category of record in existence throughout the agency. Such a claim does not comport with *Armstrong*.

Moreover, these two policies, which set forth general records management guidance for DHS as a whole, are not arbitrary or capricious, nor are they contrary to law. The policies cannot be deemed inconsistent with the FRA when they make clear the obligation of all DHS employees to follow FRA requirements. The fact that they authorize DHS components to supplement their general guidance with more specific internal policies and procedures is entirely reasonable and consistent with the FRA, given the broad array of functions and activities undertaken by each of DHS's components—which include not only CBP and ICE, but also the U.S. Coast Guard, the U.S. Secret Service, and the Federal Emergency Management Agency, among others. And DHS has now revised the challenged instruction in order to remove any doubt that its policies do require full compliance with the FRA, including its records creation requirements. *See* DHS Instruction 141-01-001 Revision 00.1, ex.A to Second Declaration of Paul Johnson ("Second Johnson Decl."), attached hereto. Even if the FRA could be read to require agencies to quote in full specific regulatory language regarding the creation of adequate documentation (which it cannot), DHS's policies now pass that fictive test.

Plaintiffs' claim becomes even more untenable when they seek to parlay their supposedly limited challenge to two specific policies into an assault on the totality of recordkeeping guidance across the entire agency, including its various components. In so doing, they make clear their continued desire to mount a broad programmatic attack on DHS's entire recordkeeping program— exactly what the APA does not permit, as this Court recognized when it dismissed just such a claim earlier in this case. *See CREW I*, 387 F. Supp. 3d at 54. Nor do Plaintiffs' factual assertions

plausibly justify any such attack. Indeed, even if the Court were to re-write Plaintiffs' claim to focus only on recordkeeping guidelines related to aliens encountered at the border, the notion that CBP or ICE guidelines fail to require the creation of records in such circumstances is entirely implausible in light of publicly available information that Defendants previously identified—which includes information about the electronic systems in which those records are created, and the public filings in another case, *Ms. L. v. U.S. Immigration and Customs Enforcement*, in the Southern District of California, which describe current procedures for collecting and sharing information about unaccompanied alien children. The Court has previously recognized that it is "undisputed" that such records are, indeed, created. *CREW I*, 387 F. Supp. 3d at 53 n.8. The Court therefore should reject Plaintiffs' invitation to micromanage every facet of DHS's records creation policy and, once again, dismiss Plaintiffs' claim.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    Federal Records Act

The FRA is "a collection of statutes governing the creation, management, and disposal of records by federal agencies." *Pub. Citizen v. Carlin*, 184 F.3d 900, 902 (D.C. Cir. 1999); *see* 44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314. These statutory provisions "establish a unified system for handling the 'life cycle' of federal records—covering their creation, maintenance and use, and eventually their disposal by either destruction or deposit for preservation." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 36 (D.C. Cir. 1983).

While most FRA litigation has involved attempts to enjoin the destruction of records, Plaintiffs here purport to focus their challenge on the FRA's records-creation provisions. The FRA addresses the creation and maintenance of records in general terms, reflecting Congress's intent to "strike a balance 'between developing efficient and effective records management, and the

substantive need for Federal records.'" *Armstrong I*, 924 F.2d at 292 (quoting S. Rep. 94-1326, 1976 U.S.C.C.A.N. 6150). Among the "goals" identified in the statute are the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," while establishing and maintaining control mechanisms that would both "prevent the creation of unnecessary records" and facilitate "the effective and economical operations of an agency." 44 U.S.C. § 2902(1), (3).

The FRA broadly requires agency heads to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101.[1] Agency heads must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency." *Id.* § 3102. At the same time, the FRA vests the Archivist of the United States ("the Archivist") with the responsibility to provide guidance and assistance to Federal agencies in carrying out these obligations. *Id.* § 2904(a)(1)–(2); *see also id.* § 3102(3) (requiring agency records management programs to cooperate with the Archivist). The FRA also directs the Archivist to "promulgate standards, procedures, and guidelines with respect to records management," *id.* § 2904(c)(1), while, in addition, authorizing the Archivist to inspect an agency's records or records management practices and programs "for the purpose of rendering recommendations for the improvement of

---

[1] The FRA defines "records" to include "all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A). The Archivist's decision on whether recorded information is a record under this definition is "binding on all Federal agencies." *Id.* § 3301(b).

records management practices and programs," *id.* § 2906; *see also id.* § 2904(c)(7). The Archivist must report at least annually to appropriate committees of Congress and to the Director of the Office of Management and Budget regarding the results of any inspections, and "on evaluations of responses by Federal agencies to any recommendations resulting from inspections." *Id.* § 2904(c)(8)(A)–(B). An agency's records management "program" as a whole must "provide for . . . compliance" with FRA requirements, and with implementing regulations. 44 U.S.C. § 3102(4).

## II.    NARA Regulations

Pursuant to Congress's direction in the FRA, the National Archives and Records Administration ("NARA") has promulgated regulations setting forth more detailed descriptions of the records that an agency must create and maintain. In particular, in order "[t]o meet their obligation for adequate and proper documentation, agencies must prescribe the creation and maintenance of records that:

(a) Document the persons, places, things, or matters dealt with by the agency.
(b) Facilitate action by agency officials and their successors in office.
(c) Make possible a proper scrutiny by the Congress or other duly authorized agencies of the Government.
(d) Protect the financial, legal, and other rights of the Government and of persons directly affected by the Government's actions.
(e) Document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitments reached orally (person-to-person, by telecommunications, or in conference) or electronically.
(f) Document important board, committee, or staff meetings."

36 C.F.R. § 1222.22. NARA regulations also provide examples of records "essential to protect the legal and financial rights of the Government and of the individuals directly affected by its activities," which "include accounts receivable records, social security records, payroll records, retirement records, and insurance records." *Id.* § 1223.2.

NARA regulations also address agencies' "recordkeeping requirements," which may be incorporated into agency "procedures, directives and other issuances; systems planning and

development documentation; and other relevant records." *Id.* § 1222.24. These "requirements," as a whole, must "[i]dentify and prescribe specific categories of records to be systematically created or received and maintained by agency personnel in the course of their official duties." *Id.* § 1222.24(a)(1). An agency's recordkeeping requirements, as a whole, must also "identify . . . [t]he record series and systems that must be created and maintained to document program policies, procedures, functions, activities, and transactions." *Id.* § 1222.26(a). In addition, the recordkeeping requirements specific to each program's record series and systems must identify "information and documentation that must be included in the series and/or system," *id.* § 1222.28(a), and must include "[p]olicies and procedures for maintaining the documentation of phone calls, meetings, instant messages, and electronic mail exchanges that include substantive information about agency policies and activities," *id.* § 1222.28(d). Nothing in the NARA regulations suggests that its requirements must be addressed in a single document setting forth every detail regarding the agency's recordkeeping policy.

## **PROCEDURAL HISTORY**

### I.    **Plaintiffs' First Amended Complaint and Defendants' Motion to Dismiss**

Plaintiff CREW initially filed suit on October 26, 2018. [ECF 1.] On December 14, 2018, Plaintiffs CREW and RAICES filed a First Amended Complaint ("FAC") [ECF 7], which was the operative complaint throughout the remainder of proceedings in the case up to and including the Court's final judgment. Claim One of the FAC asserted that DHS "has failed to establish and maintain a sufficient agency-wide records management program in compliance with the FRA and its implementing regulations." FAC ¶ 65. Claim Two asserted that "DHS has repeatedly failed, and continues to fail, to create records sufficient to link alien children with adult companions with whom they were apprehended at the border, including not only parents, but other adult family members and caretakers." *Id.* ¶ 74. Claim Three asserted that "DHS has failed to create adequate

6

records documenting 'the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitments reached orally (person-to-person, by telecommunications, or in conference) or electronically' in connection with its implementation and rollback of the Zero Tolerance Policy." *Id.* ¶ 84.

Defendants moved to dismiss all three claims. [ECF 19.] In support of their motion, Defendants cited publicly available information regarding electronic systems used by DHS component CBP when conducting inspections of individuals entering the United States through official ports of entry or when apprehending aliens who illegally enter the United States between ports of entry, and by DHS component ICE when taking custody of such individuals. *See* Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Motion to Dismiss ("Def. MTD Mem.") [ECF 19-1] at 8–9 & nn.2–5. Defendants also quoted and attached information that the Government had submitted in the *Ms. L.* litigation, describing the current procedures used by DHS and by the Department of Health and Human Services to gather and share information about alien parents and children. *See id.* at 11–14 & attachments at ECF 19-3.

Defendants also attached copies of two documents issued by DHS headquarters that set forth DHS's recordkeeping obligations: (1) DHS Directive No. 141-01, Revision 01 ("DHS Dir. No. 141-01"), issued on August 11, 2014, and (2) DHS Instruction No. 141-01-001 ("DHS Instr. No. 141-01-001"), issued on June 8, 2017. Declaration of Paul Johnson ("First Johnson Decl.") & exs. A–B [ECF 19-2]. As Defendants explained, DHS Directive No. 141-01 requires all DHS employees to "[c]reate, receive, and maintain official records providing adequate and proper documentation in support of DHS activities." DHS Dir. No. 141-01(V)(A); *see also* DHS Instr. No. 141-01-001(V)(J)(1) (directing DHS employees to "[p]roperly identify, capture, retain, file,

and dispose of or transfer records . . . in accordance with Title 44 U.S.C. Chapter 31; NARA regulations, 36 CFR Chapter XII, Subpart B; and DHS records policy"). Directive No. 141-01 further requires DHS employees to "[m]aintain records according to a designated DHS file plan, which allows for retrieval across the varied DHS missions." DHS Dir. No. 141-01(V)(D). In addition, it requires that employees receive training, when hired and annually thereafter, "to ensure awareness of their responsibilities to maintain and safeguard DHS records." *Id.* 141-01(V)(E). Defendants cited Directive No. 141-01 when arguing that, contrary to Plaintiffs' contention in Claim Three, DHS policy *does* require all DHS employees to "[c]reate, receive, and maintain official records providing adequate and proper documentation in support of DHS activities." DHS Dir. No. 141-01(V)(A).

In regard to Claim One, Defendants also pointed out that Plaintiffs' "agency-wide" challenge to DHS's records management program as a whole, asserting an array of deficiencies that had been identified in past NARA inspections, did not focus on a final agency action and therefore did not fall within the limits of the APA cause of action. Def. MTD Mem. at 38–39. Defendants contrasted Plaintiffs' impossibly broad challenge in Claim One with the well-established authority in *Armstrong I*, 924 F.2d at 292–93, allowing judicial review of "the adequacy of an agency's recordkeeping guidelines." Def. MTD Mem. at 38. In regard to Claim Two, Defendants also argued that Plaintiffs failed to assert a permissible APA claim because, rather than challenging a "final agency action," they asserted "isolated acts" of noncompliance with the FRA and requested the creation of specific records on an ongoing basis. *Id.* at 20.

## II.    The Court's Dismissal and Plaintiffs' Motion to Amend

In its decision granting Defendants' Motion to Dismiss, issued on May 24, 2019, the Court held that Plaintiffs lacked standing to assert Claim Three and that none of Plaintiffs' claims

identified a final agency action as the subject of their challenge, as would be required to state a claim under the APA. *CREW I*, 387 F. Supp. 3d at 37. In regard to Claim One, the Court agreed that that claim was "far broader than a challenge to 'the adequacy of an agency's record-keeping guidelines' that the D.C. Circuit allowed in *Armstrong*," and that the claim "fail[ed] to identify a reviewable agency action." *Id.* at 54. Rather, the Court held that, "[b]y its own terms," Claim One was "nothing more than a 'broad programmatic attack,' and attempt to direct 'wholesale improvement of [DHS's] program by court decree,'" which was "exactly what the Supreme Court has repeatedly identified as impermissible." *Id.*

The Court also dismissed Claim Two because it did not set forth a plausible challenge to a DHS policy, in accord with *Armstrong*, but instead sought to challenge "DHS's deficient compliance with § 3101 with regards to some of the records the agency creates." *Id.* at 53. Claim Two was thus an impermissible attempt to challenge "'isolated acts' of noncompliance" with the FRA, *see CREW v. Pruitt* ("*Pruitt*"), 319 F. Supp. 3d 252, 260 (D.D.C. 2018). The Court noted that Claim Two did not present the same "extreme circumstance" addressed in *Pruitt* because Plaintiffs "d[id] not contend that DHS is refusing or altogether failing to create any records." *CREW I*, 387 F. Supp. 3d at 54 n.8. Instead, "[i]t is undisputed that DHS creates records of aliens apprehended at the border—including, though [allegedly] 'incomplete and inconsistent,' records that have allowed the agency to match unaccompanied children with adults they were separated from at the border." *Id.* (citation omitted).

Following the Court's judgment of dismissal, Plaintiffs filed a motion to amend under Fed. R. Civ. P. 59(e) and 15(a). [ECF 26.] In particular, Plaintiffs sought to amend Claim One of the FAC, claiming that their amendment would bring their claim within the scope of a permissible FRA claim under *Armstrong*. *See* Pl. Mem. in Support of 59(e)/15(a) Mot. [ECF 26-1], at 2. The

Court granted that motion on July 22, 2019, and docketed Plaintiffs' Second Amended Complaint ("SAC") on the same day. Although acknowledging Defendants' contention that Plaintiffs' proposed amendment would be futile, the Court declined to make a final determination on that issue, indicating instead that "[t]he appropriate manner for Defendants to bring [their] arguments would be to file  . . . a motion [to dismiss] in response to the amended complaint." Mem. Op. & Order of July 22, 2019 [ECF 30], at 4 & n.1.

### III.    Plaintiffs' Second Amended Complaint

The SAC sets forth a single claim under the APA, 5 U.S.C. § 706(2)(A). SAC ¶ 81. Plaintiffs first allege that the two policies that Defendants attached to their original Motion to Dismiss, Directive No. 141-01 and Instruction No. 141-01-001 (the "DHS Policies") fail to comply with the FRA because "they lack adequate guidance regarding the FRA's records-creation requirements." SAC ¶ 77. In particular, Plaintiffs allege (a) that the DHS Policies do not "[p]rovide instructions on, or even make reference to," a specific FRA section and a specific NARA regulation that require agencies to make and preserve records containing adequate documentation, *id.* ¶ 77(a) (citing 44 U.S.C. § 3101; 36 C.F.R. § 1222.22); (b) that the DHS Policies fail to "[i]dentify and prescribe specific categories of records to be systematically created or received and maintained by agency personnel in the course of their official duties," even though an agency's recordkeeping requirements as a whole are supposed to identify and prescribe such categories, *id.* ¶ 77(b) (citing 36 C.F.R. § 1222.24(a)(1)); (c) that the DHS Policies fail to "[i]dentify" the record series and systems necessary to "document program policies, procedures, functions, activities, and transactions" even though an agency's recordkeeping requirements as a whole are supposed to identify such information, *id.* ¶ 77(c) (citing 36 C.F.R. § 1222.26(a)); (d) that the DHS Policies fail to "[i]dentify" the "information and documentation that must be included in" such series and

systems even though an agency's recordkeeping requirements for its records series and systems are supposed to include such information, *id.* ¶ 77(d) (citing 36 C.F.R. § 1222.28(a)); and (e) that the DHS Policies fail to include "[p]olicies and procedures for maintaining the documentation of phone calls, meetings, instant messages, and electronic mail exchanges that include substantive information about agency policies and activities" even though an agency's recordkeeping requirements as a whole are supposed to include such policies and procedures, *id.* ¶ 77(e) (citing 36 C.F.R. § 1222.28(d)).

The SAC also asserts more broadly that "the total guidance, . . . both formal and informal," that DHS provides to its employees "regarding their recordkeeping responsibilities" fails to comply with the FRA and NARA regulations. SAC ¶ 81.

Plaintiffs seek a declaratory judgement that DHS's "total" recordkeeping guidance "fail[s] to provide adequate guidance on the FRA's records-creation requirements in violation of the FRA." SAC at 30. They also request injunctive relief "compelling DHS to adopt and implement revised recordkeeping guidelines and directives that provide adequate guidance regarding FRA's records-creation requirements." *Id.*

## **STANDARD OF REVIEW**

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) asserts that the Court lacks subject matter jurisdiction. The Court is presumed to lack jurisdiction until the plaintiff establishes otherwise. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A plaintiff's claims of jurisdiction should be closely scrutinized because a court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). "Continued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected

but restrained Federal Judiciary." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). When evaluating a motion to dismiss for lack of subject matter jurisdiction, the Court may look to matters outside the complaint. *See Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) ("[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.").

A motion to dismiss under Federal Rule 12(b)(6) focuses on "the legal sufficiency of the complaint." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

In evaluating a motion under either Rule 12(b)(1) or Rule 12(b)(6), a court need not accept as true "'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set forth in the Complaint." *Shibeshi v. United States*, 920 F. Supp. 2d 105, 106 (D.D.C. 2013) (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006)). "A pleading

that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555, 557) (alterations in original).

## ARGUMENT

## I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIM

As this Court previously recognized, any claim alleging a FRA violation must be brought under the APA. *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016). Accordingly, any such claim is limited by the APA's "agency action" requirement, which ensures that a plaintiff does not "seek *wholesale* improvement of [a federal] program by court decree," but instead "direct[s] its attack against some particular 'agency action' that cause[d] it harm." *Lujan v. Nat'l Wildlife Fed'n*, 494 U.S. 871, 891 (1990). In other words, an APA claim alleging an FRA violation "must challenge a 'discrete agency action'" that allegedly caused the plaintiff harm "and cannot make 'a broad programmatic attack' on an agency's compliance with [the FRA]." *CREW I*, 387 F. Supp. 3d at 49 (quoting *Norton v. SUWA*, 542 U.S. 55, 64 (2004)).

Plaintiffs here identify a specific DHS directive and instruction as "fail[ing] to comply with the FRA because they lack adequate guidance regarding the FRA's records-creation requirements." SAC ¶ 77. At the same time, they allege that "DHS's recordkeeping guidelines and directives"—by which they mean to include "the total guidance given to agency employees regarding their recordkeeping responsibilities, both formal and informal"—are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* ¶ 81 (quoting 5 U.S.C. § 706(2)(A)). Neither of these formulations states a viable claim. First, to the extent Plaintiffs seek to challenge Directive 141-01 and Instruction 141-01-001, those policies are facially

compliant with FRA requirements. Second, Plaintiffs' claim otherwise is impermissibly broad and fails to adhere to the APA's "final agency action" requirement.

### A.    Under D.C. Circuit Authority, the Permissible Scope of an APA Challenge Alleging an FRA Violation Has Been Carefully Circumscribed

Plaintiffs set forth a list of supposed inadequacies of the DHS Policies, focusing on the fact that the DHS Policies omit specific language or information that Plaintiffs contend is required. *See* SAC ¶ 77(a)–(e). However, such assertions misunderstand the scope of a permissible APA challenge in this context. An agency guideline or directive cannot be deemed "inadequate," or in violation of the FRA, simply because it is too general or fails to quote language that is already set forth in a governing statute or regulation, or because the agency relies on other processes to meet certain FRA requirements or delegates responsibility for determining the specifics of what is required to lower-level components or officials. Rather, an agency guideline or directive can only be held inadequate if it plainly calls for recordkeeping that is insufficient or contrary to the FRA.

Prior cases addressing challenges to an agency's recordkeeping guideline or directive are instructive. In *Armstrong*, the plaintiffs brought suit when they learned that the outgoing Reagan administration was about to dispose of the contents of an intra-office e-mail system, called PROFS, that was used by National Security Council ("NSC") and other components of the Executive Office of the President. *Armstrong v. Bush*, 721 F. Supp. 343, 347 (D.D.C. 1989). The plaintiffs' FRA challenge alleged that NSC guidelines failed to require the preservation of records that were created or received on that particular system. *See Armstrong I*, 924 F.2d at 286. The D.C. Circuit emphasized that "the FRA understandably leaves the details of records management to the discretion of individual agency heads." *Id.* at 293. However, the court held that the plaintiffs' challenge was justiciable because "the only issue a court would be asked to consider" was whether the agency's guidelines were in "conformity" with statutory directives and "consistent with"

NARA regulations. *See id.* at 293–94. In later proceedings, the court focused on that very question, with respect to the plaintiffs' specific claim; it thus addressed whether NSC's recordkeeping guidelines required the preservation of PROFS records in conformity with the FRA. *See Armstrong v. EOP*, 1 F.3d 1274, 1280 (D.C. Cir. 1993) ("*Armstrong II*"). The court concluded that NSC's guidelines were inadequate with respect to PROFS records, insofar as they required preservation only of paper print-outs rather than of the original e-mails themselves, and insofar as they failed to provide for periodic oversight of employees' electronic recordkeeping practices. *See id.* at 1287, 1288 (affirming district court's conclusions).

In *Competitive Enterprise Institute v. EPA*, 67 F. Supp. 3d 23 (D.D.C. 2014), Judge Collyer considered a situation where the EPA's official policy required preservation of records, including those in the form of text messages, in compliance with the FRA, but the plaintiffs claimed that, despite that official policy, the EPA actually followed an unwritten "concealed" policy of destroying text message records. *See id.* at 32. The Court held that such an FRA claim was not cognizable because the plaintiffs were attempting to bootstrap a "compliance-based claim" (alleging that EPA employees failed to comply with EPA policy, which is impermissible under *Armstrong*) into a "guidelines-based claim." *Id.* at 33 (plaintiffs "cannot challenge EPA's decision to destroy text messages by casting its claim as a challenge to an illusory record-keeping policy"). In dismissing the claim, the Court emphasized that the plaintiffs' theory would require it to assume that agency employees were acting "in bad faith, i.e., in contravention of their stated policies and guidance," by adopting the unwritten policy that the plaintiffs alleged, but that the D.C. Circuit "requires courts to apply the *opposite* presumption, namely, that government officials discharge their duties in good faith." *Id.* (citing *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008)).

In contrast to *Competitive Enterprise*, Judge Boasberg in *Pruitt* faced a situation where the agency's operative written policy was silent regarding a specific FRA requirement—that agencies "create records for 'substantive decisions and commitments reached orally,'" *Pruitt*, 319 F. Supp. 3d at 261—while the plaintiffs plausibly alleged the existence of an unwritten policy of "refus[ing]" to create the required records, *id.* at 260. The Court in that case allowed plaintiffs' FRA claims to proceed. *See id.* at 260–61. However, after the agency revised its written policy to add the missing requirement, and the agency's head, whose alleged statements had leant plausibility to plaintiffs' claim of an unwritten noncompliant policy, had left, the Court determined that the plaintiffs' claims were moot. *CREW v. Wheeler*, 352 F. Supp. 3d 1, 5 (D.D.C. 2019).

These decisions illustrate that a viable challenge to an agency's recordkeeping guideline must raise a plausible assertion that the guideline *contradicts* a specific FRA requirement, such that the agency's implementation of the guideline will cause the destruction of a certain category of records that must be preserved, or the failure to create a certain category of records that must be created. Claims that can identify a specific failure in the guideline itself (as in *Armstrong*), or can plausibly assert the existence of an unwritten noncompliant policy where no written policy addresses the issue (as in *Pruitt*), may be permissible. Those that rely on supposedly noncompliant practices where the written policy on its face is consistent with the FRA (as in *Competitive Enterprise*) are not.

Moreover, the scope of a permissible challenge to an agency's records *creation* guidelines is particularly limited because the question of what records an agency must create in connection with any particular program or activity is in many respects committed to the agency's discretion. Significantly, the court in *Armstrong* emphasized that the plaintiffs there "d[id] *not* seek the creation of any new records, but rather ask[ed] only that the records already created be

appropriately classified and disposed of." *Armstrong II*, 1 F.3d at 1287 (quoting *Armstrong I*, 924 F.2d at 288). The court recognized that Congress's concern with "balanc[ing] complete documentation with efficient, streamlined recordkeeping" was at its apex when it comes to decision-making about what records must be created. *See id.*; *see also* S. Rep. 81-2140, 1950 U.S.C.C.A.N. 3547, 3550 (recognizing that "records come into existence, or should do so, not in order to . . . satisfy the archival needs of this and future generations, but first of all to serve the administrative and executive purposes of the organization that creates them," and that agencies have "primary responsibility" over such issues). Indeed, when Congress enacted the Federal Records Management Amendments of 1976, Pub. L. 94-575, 90 Stat. 2723, which set forth specific goals for agency recordkeeping and directed NARA to promulgate standards for records management, it did so out of a concern that agencies were getting bogged down by creating too many unnecessary records. *See* S. Rep. 94-1326, 8, 1976 U.S.C.C.A.N. 6150, 6157 (explaining that "[t]he emphasis on specific objectives in the new section 2902 is designed" to introduce "control with respect to records creation," where "80 percent of total costs are incurred").

The decision in *Pruitt* is not to the contrary. That case involved an allegation that EPA was following a policy that clearly violated an express FRA requirement—that "all substantive decisions and commitments reached orally" be documented in writing. *Pruitt*, 319 F. Supp. 3d at 260–61 (quoting 36 C.F.R. § 1222.22(e)). Judicial review of such a claim would only require examination of whether the agency had such a policy or not. However, other requirements in § 1222.22 by their own terms rely on an agency's judgment regarding what categories of information are necessary to "[d]ocument[s] the persons, places, things, or matters dealt with by the agency," to "[f]acilitate action by agency officials and their successors in office," or to "[p]rotect the financial, legal, and other rights of the Government and of persons directly affected

17

by the Government's actions." *See* 36 C.F.R. § 1222.22(a), (b), (d). This Court has already recognized the significant distinction between the "allegations of an outright refusal to comply with the FRA" at issue in *Pruitt*, and allegations that an agency's compliance is deficient because it fails to record *sufficient* information." *Cf. CREW I*, 387 F. Supp. 3d at 53 n.8 (distinguishing *Pruitt* from Plaintiffs' earlier allegations in this case and concluding that "[t]he claim recognized in [*Pruitt*] is therefore inapposite to the situation here"). And rightly so. The agencies involved in implementing government programs and carrying out their missions are best able to determine what categories of information must be recorded in order to meet these obligations. At the very least, a court should exercise caution in second-guessing such determinations. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("the scope of review under the [APA's] 'arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency").

**B.    The DHS Policies Are Adequate Because They Require Compliance with the FRA and NARA Regulations**

Plaintiffs' challenge to the DHS Policies necessarily fails because it falls entirely outside of the permissible framework for an APA challenge described above, largely because Plaintiffs fail to identify any specific category of records as the subject of their concern. Given that Plaintiffs' only claimed injuries are allegedly caused by Defendants' supposed failure to create records linking unaccompanied alien children to the adults with whom they entered the country, one might have expected them to assert that the Policies fail to require CBP or ICE to record such information. *Cf. Lujan*, 494 U.S. at 891 (plaintiffs must "direct" their attack "against some particular 'agency action' that cause[d] [them] harm"); *Armstrong I*, 924 F.2d at 291 (allowing challenge to agency "recordkeeping guidelines and directives" in order to determine whether they "are inadequate because they permit the destruction of 'records' that must be preserved under the FRA"). However,

their claim omits any mention of such records. *See* SAC ¶¶ 75–83. Nor does the claim identify any connection at all between the FRA deficiencies that it alleges and the factual allegations made earlier in the complaint—which seem to remain in this version merely as a remnant of claims set forth in the First Amended Complaint, which the Court dismissed. As they did before, Plaintiffs continue to assert that DHS's alleged "culture of non-compliance with its FRA obligations" became "manifest" in connection with its implementation of the Administration's Zero Tolerance Policy, yet, although they have now inserted the clause "recordkeeping guidelines and directives" in front of "culture of non-compliance," they fail to draw any clear connection to the DHS Policies that are supposedly the "final agency actions" of their APA challenge. *Compare* FAC ¶ 26 ("DHS's culture of non-compliance with its FRA obligations manifested acutely . . ."), *with* SAC ¶ 35 ("DHS's woefully deficient recordkeeping guidelines and directives, and overall culture of non-compliance with its FRA obligations, manifested acutely . . ."). Similarly, this version of the complaint continues to reference NARA inspection reports, SAC ¶¶ 31–34, but Plaintiffs do not suggest that those reports found fault with the DHS Policies that they challenge here.

Instead, Plaintiffs' current claim is oddly abstract and hypertechnical. For example, Plaintiffs assert that the DHS Policies do not "[p]rovide instructions on, or even make reference to, the records-creation requirements set forth in [4]4 U.S.C. § 3101 and 36 C.F.R. § 1222.22." SAC ¶ 77(a). In other words, their complaint is simply that the text of the DHS Policies omits explicit reference to these FRA and NARA provisions. Missing from this assertion is any claim that DHS follows a policy *contrary* to those requirements. The other supposed deficiencies that they assert similarly involve allegations that information is missing from the Policies with no attempt to identify a context where the agency follows a policy that results in the improper destruction of or failure to create records in violation of the FRA. *See id.* ¶ 77(b)–(e).

Indeed, the disconnect between Plaintiffs' asserted injuries and the deficiencies that they allege in the DHS Policies—the ostensible subject of their challenge—is such that Plaintiffs fail to establish their standing to raise their current claim. In order to establish standing, "the plaintiff must show (1) it has suffered a 'concrete and particularized' injury, (2) that it is 'fairly traceable to the challenged action of the defendant,' and (3) that it is 'likely' to be 'redressed by a favorable decision." *CREW I*, 387 F. Supp. 3d at 44 (quoting *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376-77 (D.C. Cir. 2017)). Although the Court previously held that Plaintiff RAICES's allegations were sufficient to accord it standing, at the pleading stage, to bring Plaintiffs' original Claims One and Two, the object of Plaintiffs' challenge now is not "DHS's alleged recordkeeping failures" as a whole, *see id.* at 45, but the lack of certain references and information in two specific policies issued by DHS headquarters. Plaintiffs fail to show that RAICES's asserted injuries are fairly traceable to the omitted citations and missing information that Plaintiffs allege in the DHS Policies, particularly when the Court has already recognized that, notwithstanding the alleged lack of any reference to 44 U.S.C. § 3101 in the Policies, "[i]t is undisputed that DHS creates records of aliens apprehended at the border." *Id.* at 53 n.8. Defendants therefore respectfully renew their argument that Plaintiffs lack standing.

In any event, Plaintiffs' claim fails on the merits. Even if Plaintiffs' assertions regarding these alleged omissions in the DHS Policies were true, they would not render the DHS Policies arbitrary or capricious or contrary to law. None of these alleged omissions is similar to the one in *Armstrong*, where the plaintiffs claimed that an entire category of records—those created or received on NSA's PROFS system—were inadequately preserved due to a gap in the guidelines. Unlike the claim there, Plaintiffs appear to suggest that the DHS Policies are inadequate *per se*

simply because they omit particular details, with no regard to whether those omissions have any impact on DHS's recordkeeping practices, or on Plaintiffs. *See* SAC ¶¶ 18–20, 78.

Plaintiffs' claim rests on an incorrect premise. Contrary to their assumption, the FRA does not include any freestanding requirement that an agency's recordkeeping guideline contain any particular language or level of detail. For example, the statutory source of the "adequate documentation" requirement that Plaintiffs seek to invoke is 44 U.S.C. § 3101. Importantly, that statute imposes obligations on an agency in regard to "mak[ing] and preserv[ing] records." 44 U.S.C. § 3101. It does not include any required wording for an agency's general records management guideline. In other words, the statute is aimed at an agency's recordkeeping conduct, not at the content of its guideline. NARA regulations similarly focus on the records that an agency must create and maintain, not on the wording of the agency's guideline. *See, e.g.*, 36 C.F.R. § 1222.22. A permissible challenge to an agency's guideline, as set forth in *Armstrong* and the other cases described above, thus alleges that the guideline is deficient *because* it results in a specific FRA violation in the agency's creation or preservation of records.  The APA challenge to the guideline is simply the vehicle—albeit a limited one—that courts have recognized as available for contesting an agency's allegedly flawed recordkeeping.

Rather than stating such a claim here, Plaintiffs try to resurrect their unsuccessful challenge to DHS's entire records management program by substituting the word "guideline" for "program," and baldly asserting that the DHS Policies are deficient merely because they omit express language covering all program requirements. *Compare* SAC ¶ 19(a) (citing 44 U.S.C. § 3102(4) as "impos[ing] detailed and mandatory requirements regarding what an agency must include in its recordkeeping *guidelines and directives*" with respect to "the records-creation requirements set forth in 44 U.S.C. § 3101" (emphasis added)), *with* 44 U.S.C. § 3102(4) (requiring that a records

management "*program*" provide for compliance with § 3101 (emphasis added)). Plaintiffs apparently hope to shift the burden onto Defendants to show that, despite the omission of express language in the DHS Policies, DHS does in fact comply with all of the various requirements that they identify. In this way, Plaintiffs would be able to circumvent the APA's "final agency action" requirement by transforming their challenge to the DHS Policies into a broad programmatic attack—which the APA does not allow. *See CREW I*, 387 F. Supp. 3d at 54. Plaintiffs' claim fails for that reason alone.

Plaintiffs' claim also fails because the DHS Policies unequivocally require compliance with the FRA and with NARA regulations, albeit at a general level. The Policies therefore cannot be deemed arbitrary or capricious. To the contrary, when viewed in the context of DHS's overall organizational structure, the Policies are entirely reasonable. After all, DHS was established in 2002, following the September 11, 2001 terrorist attacks, by "combining 22 different federal departments and agencies into a unified, integrated Cabinet agency." DHS, History, *available at* https://www.dhs.gov/history; *see* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002). The components that were gathered into DHS include not only CBP and ICE but also the Transportation Security Administration, the Federal Emergency Management Agency, the U.S. Coast Guard, and the U.S. Secret Service, while new offices, including the Office of Cybersecurity and Communications and the Office of Infrastructure Protection, were also added, in some cases by incorporating parts of offices from other agencies. *See* DHS, Chronology of Events, *available at* https://www.dhs.gov/who-joined-dhs. These components have distinct missions and perform a wide variety of unique functions in furtherance of those missions. Their recordkeeping needs are necessarily also different. DHS's overarching records guidelines reasonably reflect this reality by

providing only a general outline of recordkeeping roles and obligations while delegating significant records management responsibility to the various components.

DHS Directive No. 141-01 explains that while it applies "throughout DHS," each DHS component—such as CBP, ICE, the Secret Service, the Coast Guard, etc.—"may augment this Directive with more specific internal policies and procedures." DHS Dir. No. 141-01(II). The Directive broadly references the various authorities governing federal records management, including the FRA as a whole, the applicable NARA regulations in Title 36 of the Code of Federal Regulations ("CFR"), and the applicable General Services Administration regulations in Title 41 of the CFR. The Directive then lists the records management responsibilities of each level of DHS employee, with the highest-level official broadly responsible for ensuring that the Department "efficiently and appropriately complies with all applicable records management statutes, regulations, and NARA policies." *Id.* 141-01(IV)(A)(1). Again, component heads are responsible for implementing DHS's records management obligations within their components, including the establishment of component-specific records retention schedules. *Id.* 141-01(IV)(F). The Directive assigns primary responsibility for training to a Chief Human Capital Officer. *Id.* 141-01(IV)(C). Finally, the Directive announces DHS's policy that "all DHS employees" must "[c]reate, receive, and maintain official records providing adequate and proper documentation in support of DHS activities," *id.* 141-01(V)(A); that all employees receive "appropriate training" both when they are new and on an annual basis thereafter, *id.* 141-01(V)(E); and that the agency must "Create and/or Implement Record Schedules," *id.* 141-01(V)(G).

DHS Instruction No. 141-01-001 provides further detail on the implementation of Directive 141-01. As with the Directive, the Instruction applies "throughout DHS," but each component "is authorized to develop and implement more specific policies and procedures." DHS Instr. No. 141-

01-001(II). The Instruction explains the process that DHS and its components must follow in developing records schedules, which include Enterprise Records Schedules, which cover records "common to multiple DHS Components," as well as component-specific schedules. *Id.* 141-01-001(IV). The Instruction also identifies the records management responsibilities for various DHS officials in greater detail. *Id.* 141-01-001(V). These descriptions make clear that each component is assigned the responsibility to operate its own records management program, consistent with DHS policy and applicable FRA and NARA requirements, but tailored to the specific functions and mission of that component. *See id.* 141-01-001(V)(C), (E). Each component thus develops its own records schedules and provides records training to its own employees. *See id.* 141-01-001(V)(C)(4), (E)(4), (7), (9), (10), (13). At the same time, the Instruction assigns responsibility to every DHS employee to "[p]roperly identify, capture, retain, file, and dispose of or transfer records" in accord with the FRA and NARA regulations, "regardless of media or phase of creation stage (records lifecycle)." *Id.* 141-01-001(V)(J)(1). The obligation to "identify" and "capture" required records at the earliest stage of creation—that is, when the record is only a potential record and has not yet been created—is equivalent to the obligation to create required records in the first place.

While the original DHS Policies clearly require every DHS employee to comply with FRA and NARA regulations, DHS has now issued a revised version of Instruction 141-01-001 in order to remove any doubt that DHS mandates that the specific requirements of 44 U.S.C. § 3101 and 36 C.F.R. § 1222.22 apply throughout DHS. *See* Revised DHS Instr. No. 141-01-001(V)(E)(10), (J)(1); (VI)(A), (D); Declaration of Donna Roy ("Roy Decl.") ¶ 2 ("[I]n the interest of removing any doubt that these policies comport with the FRA, the Department has revised Instruction 141-01-001 in order to clarify that the requirements of 44 U.S.C. § 3101 and 36 C.F.R. § 1222.22 are

among the FRA requirements with which DHS employees must comply.") (attached hereto).

Nothing in the DHS Policies, including DHS's revised Instruction, suggests a *contradiction* between the FRA's statutory and regulatory requirements, on the one hand, and what the DHS Policies require, on the other. In contrast to *Armstrong*, there is no definition of records in the DHS Policies that is underinclusive and could thus lead to a failure to preserve records that fall within the omitted category. Nor are the DHS Policies silent, as the relevant guidelines were in *Pruitt*, on whether any aspect of the FRA applies, thus potentially opening the door to a claim that DHS actually follows an unwritten policy that is contrary to the FRA. Rather, the DHS Policies evince an affirmative intention that all FRA requirements be followed, and they impose affirmative obligations on all DHS employees to follow those requirements. Indeed, the Policies address records creation, records schedules, records training, and electronic records—encompassing the issues that Plaintiffs identify in their Second Amended Complaint. *See* SAC ¶ 27. And where they do not identify specific categories of records or records series, they delegate responsibility for doing so to DHS components and employees.[2]

The Policies are thus in conformity with the FRA. As the Court in *Competitive Enterprises* observed, the Court must presume that agency officials will follow DHS's stated policy in good faith. *Competitive Enter. Inst.*, 67 F. Supp. 3d at 33.  Moreover, any assertion that employees have failed to comply with the policy as written is beyond the scope of permissible judicial review. *See Pruitt*, 319 F. Supp. 3d at 260 (court cannot review "isolated acts" of noncompliance). Plaintiffs' challenge to the DHS Policies therefore should be dismissed.

---

[2] Plaintiffs' assertion that the DHS Policies "are the only formal policies designed to implement the FRA's recordkeeping requirements" is plainly false. Indeed, Defendants cited several component-level guidelines in their original Motion to Dismiss. *See* Def. MTD Mem. at 9 nn.2–4 (citing CBP and ICE systems of records notices ("SORNs")).

### C.    Plaintiffs' Attempt to Challenge the Totality of DHS Recordkeeping Guidance Should Be Rejected

Although Plaintiffs purport to challenge the specific DHS Policies discussed above, they also appear to challenge "the total guidance given to [DHS] employees regarding their recordkeeping responsibilities, both formal and informal." SAC ¶ 81. Again, Plaintiffs make no attempt to tie their claim to the injuries that they have asserted, or to any particular DHS component. Thus, as with their original challenge to DHS's entire records management program, this claim is breathtakingly broad, asking the Court to review the adequacy of every decision of every component within DHS, from the Coast Guard to the Science and Technology Directorate to the Countering Weapons of Mass Destruction Office, regarding what kinds of records to create and what kinds of information to document in connection with every program and activity in which they are engaged.

The Court should reject this effort because DHS's total recordkeeping guidance is not a discrete "final agency action" that can be subjected to an APA challenge. *See CREW I*, 387 F. Supp. 3d at 49. Rather, Plaintiffs' suggestion that their claim encompasses all DHS recordkeeping guidance is merely another indication that they are mounting a "broad programmatic attack" on DHS's entire records management program, *Norton*, 542 U.S. at 67, and are seeking "wholesale improvement" of the program, *see Lujan*, 497 U.S. at 891, without any plausible basis to assert that the program as a whole is in any way defective.

Indeed, even aside from their failure to limit their § 706(2) claim to a "final agency action," Plaintiffs fail to state a viable claim under Rule 12(b)(6) because they have not plausibly alleged that the records creation guidelines of any component are inadequate, much less that all of them are. As explained above, DHS's general records management directive and instruction require its components and employees to comply with the FRA and NARA regulations. The Court must

26

presume that the components and employees are following these requirements in good faith, and there is no plausible basis to assume that the opposite is true.

Moreover, even if the Court were to disregard the breadth of Plaintiffs' claim on its face and limit its consideration to Plaintiffs' allegations regarding CBP and ICE—the only DHS components involved in the creation of records regarding alien children and the adults accompanying them upon entry to the United States—any claim that those components' records creation guidelines do not conform to FRA requirements is also implausible, particularly in light of the publicly available information that Defendants described in earlier briefing, including CBP and ICE SORNs—which Plaintiffs have not challenged here—and public filings in the *Ms. L* litigation. *See* Def. MTD Mem. at 8–10 & nn.2–5 (CBP and ICE procedures); *id.* at 11–14 & attachments at ECF 19-3 (*Ms. L* filings). Undeniably, both components do create records documenting information about individuals encountered at the border. *See CREW I*, 387 F. Supp. 3d at 53 n.8 ("It is undisputed that DHS creates records of aliens apprehended at the border— including . . . records that have allowed the agency to match unaccompanied children with adults they were separated from at the border."). Moreover, as detailed in status reports submitted in the *Ms. L.* litigation, DHS has in place specific procedures for creating records that link alien children to their parents and that identify the reason for any separation of an alien child from his or her parent. *See* Def. MTD Mem. at 11–14. The adoption of such procedures reflects an affirmative decision by DHS to create such records and thus directly refutes any allegation that there exists an unwritten policy not to create them. The most recent joint status report filed by the parties in *Ms. L* shows that "the processes, procedures, tracking, and communication between the agencies" that are currently in place to record information about unaccompanied alien children and their parents continue to be discussed between the parties, and the court in that case is continuing to monitor

27

such issues. *See* Joint Status Report [ECF 444], *Ms. L. v. ICE*, No. 3:18-cv-428, at 10 (S.D. Cal. filed Aug. 14, 2019).

Plaintiffs' Second Amended Complaint thus suffers from many of the same problems as their prior complaint and should similarly be dismissed.

## II.    PLAINTIFFS' REQUESTED RELIEF EXCEEDS THE SCOPE OF RELIEF PERMISSIBLE FOR A § 706(2)(A) CLAIM

Like their claim, Plaintiffs' request for relief is impermissibly broad. Plaintiffs ask the Court to declare that DHS's "total" recordkeeping guidance "fail[s] to provide adequate guidance on the FRA's records-creation requirements," and to compel DHS to "adopt and implement revised recordkeeping guidelines and directives that provide adequate guidance regarding FRA's records-creation requirements." SAC at 30 (Prayer for Relief). In other words, Plaintiffs ask the Court to oversee a revision of all records-creation guidance in every DHS component throughout the entire agency, and then to oversee the components' implementation of that revised guidance.

Such a request exceeds the scope of relief available under the APA. As the D.C. Circuit has explained, the "ordinary" remedy when an agency action is deemed arbitrary, capricious, or contrary to law is to "set aside" that action. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, No. 18-5154, 2019 WL 3917605, at *16 (D.C. Cir. Aug. 20, 2019); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also* 5 U.S.C. § 706(2) (stating that a "reviewing court shall . . . set aside" unlawful agency action). In certain circumstances, a court might remand without setting aside the action so that the agency can "correct its errors." *Am. Bankers Ass'n*, 2019 WL 3917605, at *16 (quoting *United Steel*, 925 F.3d at 1287). But no such deviation is typically available in the other direction. Courts have thus rejected plaintiffs' requests for injunctive relief under 5 U.S.C. § 706(2) and instead have remanded the case to the agency "'to decide in the first instance how best to provide relief.'" *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d

1, 11 (D.D.C. 2019) (quoting *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013)). Indeed, an order compelling an agency "to take specific actions" can be "reversible error." *Id.* (quoting *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 57 (D.D.C. 2014)).

Here, Plaintiffs' theory is that DHS has violated the FRA by failing to identify every category of information that must be included in the records of each component, in connection with each program or activity in which the component is involved. Plaintiffs' requested relief would thus insert the Court into the role of micromanaging what kinds of records should be created throughout every facet of DHS activities. Such relief far exceeds the scope of what the APA allows. Plaintiffs' claim should be rejected for this reason as well.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice.

Dated:  September 10, 2019                     Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
KATHRYN L. WYER
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*