**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | : | | |
| ETHICS IN WASHINGTON, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-2473 (RC) |
| | : | | |
| v. | : | Re Document No.: | 33 |
| | : | | |
| U.S. DEPARTMENT OF HOMELAND | : | | |
| SECURITY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANTS' MOTION TO DISMISS**

## I.  INTRODUCTION

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW") and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") brought this suit after the Trump Administration's rollout of a so-called "zero tolerance policy" on unlawful immigration.  The policy, which lasted from April 6 to June 20, 2018, involved systematically detaining and criminally prosecuting undocumented aliens apprehended at the border for illegal entry.  One of the consequences of the zero tolerance policy was the separation of children and adults (usually family members) who tried to cross the border together.  Children could not be held in criminal custody with adults, so agencies within the Department of Homeland Security ("DHS") placed them into the custody of the Department of Health and Human Services ("HHS").  Poor documentation of the separation process meant that children were often separated from their adult companions—without communication—for weeks and months at a time.  The President ended the zero tolerance policy after widespread public outcry.

This lawsuit concerns DHS's recordkeeping practices, which Plaintiffs allege played a key role in the agency's inability to reunite migrant children with the adults that accompanied them across the border.  In their first amended complaint, Plaintiffs brought three claims against DHS and the Secretary of Homeland Security for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  The Court dismissed their claims. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec. (CREW I)*, 387 F. Supp. 3d 33 (D.D.C. 2019).  Plaintiffs amended their complaint and now bring a single claim: they assert, under the APA, that DHS's recordkeeping guidelines and directives violate several regulations implementing the Federal Records Act ("FRA"), 44 U.S.C. §§ 2101–2120, 2901– 2911, 3101–3107, 3301–3314.  Second Am. Compl. ("SAC") ¶¶ 74–83, ECF No. 31.  They ask the Court to set aside DHS's recordkeeping guidelines as inadequate under the FRA and request an injunction commanding DHS to adopt FRA-compliant recordkeeping policies.  *Id.* at 30. Defendants moved to dismiss Plaintiffs' claim for lack of subject matter jurisdiction and for failure to state a claim.  *See* Defs.' Mem. Supp. Defs.' Mot. Dismiss Pls.' Second Am. Compl. ("Defs.' Mot."), ECF No. 33-1.

The Court grants Defendants' motion.  Plaintiffs have standing to challenge DHS's recordkeeping policies and, as required by the APA, they attack a discrete agency action.  But when it comes to the merits of their claim, Plaintiffs have not alleged facts making it plausible that DHS's policies are arbitrary, capricious, an abuse of discretion, or contrary to the FRA.

## II.  BACKGROUND[1]

### A.  The Federal Records Act

The FRA is a set of statutes that "governs the creation, management and disposal of federal records."  *Armstrong v. Bush (Armstrong I)*, 924 F.2d 282, 284 (D.C. Cir. 1991).  It mandates that agency heads "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency . . . designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."  44 U.S.C. § 3101.  It also requires that agencies "establish and maintain an active, continuing program" for records management that "shall provide for," among other things, "effective controls" over records creation and maintenance and "compliance with" the FRA and its implementing regulations.  *Id.* § 3102.

Agencies are not the only ones responsible for making sure they properly preserve their records.  The FRA gives the Archivist of the United States—the head of the National Archives and Records Administration ("NARA")—several important duties too.  One of those duties is oversight: the Archivist must "conduct inspections or surveys of the records and the records management programs and practices within and between Federal agencies."  *Id.* § 2904(c)(7).  Another of the Archivist's duties is to "provide guidance and assistance" to agencies, *id.* § 2904(b), in part by "promulgat[ing] standards, procedures, and guidelines with respect to records management," *id.* § 2904(c)(1).  Pursuant to that authority, the Archivist has issued a

---

[1] The Court assumes familiarity with its previous opinion in this case.  *See CREW I*, 387 F. Supp. 3d 33.  Consequently, it will highlight only the background most relevant to the motion currently at issue.

series of regulations providing agencies guidance on what kinds of records they should create

and what their recordkeeping policies should include.  *See* 36 C.F.R. §§ 1222.22–.34.

### B.  Factual Background

Prior to the zero tolerance policy, NARA inspections of DHS and its component agency

U.S. Customs and Border Protection ("CBP") uncovered flaws in both entities' records

management practices.  *See* SAC ¶¶ 31–33.  A report on DHS's program found several

deficiencies, including that "DHS lacked a 'Department-wide strategy for retention scheduling

for email records' and that '[c]urrent DHS email use and storage strategies do not allow for

effective retention and retrieval of email.'"  *Id.* ¶ 31 (alteration in original) (quoting Nat'l

Archives & Records Admin., Department of Homeland Security Records Management Program:

Management Inspection Report, at ii–iii (2017), https://www.archives.gov/files/records-mgmt/

resources/dhs-2016-inspection.pdf).  A report on CBP detailed even more serious problems.  It

found, for example: that CBP's records management policies were "out of date or in draft form";

that CBP's records officers structure did not "ensure incorporation of recordkeeping

requirements . . . into agency programs, processes, systems, and procedures"; that CBP did not

"integrate records management and recordkeeping requirements into the design, development,

and implementation of its electronic systems"; that CBP did not "require records management

training for all CBP staff" and what training it did offer did not meet NARA requirements; that

CBP had "no strategic plan for records management"; and that CBP's plans for a records-

management system were "at risk of failure due to lack of basic records management

fundamentals."  *Id.* ¶ 32 (quoting Nat'l Archives & Records Admin., U.S. Customs and Border

Protection Records Management Program: Records Management Inspection Report ("NARA

CBP Inspection Report") 3–6, 9–10 (2018), https://www.archives.gov/files/records-mgmt/pdf/

cbp-2018-inspection.pdf).  The report observed, "[i]n its current state, the records management program at CBP is substantially non-compliant with Federal statutes and regulations, NARA policies, . . . and DHS Records and Information Management policies."  *Id.* (alteration in original) (emphasis omitted) (quoting at NARA CBP Inspection Report 2).

According to Plaintiffs, deficiencies in DHS's recordkeeping policies "manifested acutely with disastrous results in connection with" the zero tolerance policy.  SAC ¶ 35.  And to be sure, "DHS's implementation of the zero tolerance policy was, by all accounts, a disaster."  *CREW I*, 387 F. Supp. 3d at 40.  The policy's emphasis on criminally prosecuting illegal entry coupled with a prior Trump Administration decision not to release certain migrants pending immigration or criminal proceedings resulted in thousands of family separations.  *Id.*  "Faced with resource limitations and other challenges," DHS was caught unprepared.  Dep't of Homeland Sec. Off. of Inspector Gen., OIG-18-84, Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy ("DHS OIG Report") preface (2018), https://www.oig. dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf).  It "struggled to identify, track, and reunify families . . . due to limitations with its information technology systems."  *Id.*  "And because of DHS's communication and information failures, alien parents separated from their children were unable to communicate with their children after separation."  *CREW I*, 387 F. Supp. 3d at 40 (citing DHS OIG Report preface).

Government watchdogs conducted investigations and attributed much of the blame to inadequate recordkeeping.  The DHS Inspector General "observed that a lack of a fully integrated Federal immigration information technology system made it difficult for DHS to reliably track separated parents and children."  DHS OIG Report 4.  For example, "ICE's system did not display data from CBP's systems that would have indicated whether a detainee had been

separated from a child. . . . As a result, ICE officers at the Port Isabel Detention Center . . .
initially treated separated adults the same as other detainees and made no additional effort to
identify and reunite families prior to removal."  SAC ¶ 49 (first omission in original) (quoting
DHS OIG Report 9–10).

Similarly, CBP "did not have a uniform, reliable system for creating records documenting
family separations and transmitting them to HHS."  *Id.*; *see also* Gov't Accountability Off.,
GAO-19-163, Unaccompanied Children: Agency Efforts to Reunify Children Separated from
Parents at the Border 16 (2018), https://www.gao.gov/assets/700/694918.pdf.  CBP officials
instead "manually enter[ed] information into a Microsoft Word document, which they then sen[t]
to HHS as an email attachment."  SAC ¶ 49 (quoting DHS OIG Report 10).  "CBP d[id] not
create records documenting the information it transmit[ted] to HHS."  *Id.* ¶ 50 (citing DHS OIG
Report 10 n.21).  The DHS Inspector General condemned the practices: "Each step of this
manual process is vulnerable to human error, increasing the risk that a child could become lost in
the system."  *Id.* (quoting DHS OIG Report 10).

Finally, the Inspector General found that these systems failures led to data problems:

DHS could not fulfill the [Inspector General's] request for a "list of every alien
child separated from an adult since April 19, 2018, as well as basic information
about each child, including the child's date of birth; the child's date of
apprehension, separation, and (if applicable) reunification; and the location(s) in
which the child was held while in DHS custody."

*Id.* ¶ 54 (quoting DHS OIG Report 11).  DHS took "many weeks to provide the requested data,"
and the reported data "was incomplete and inconsistent, raising questions about its reliability."
DHS OIG Report 11.

## C.  Procedural Background

CREW filed suit on October 26, 2018.  Compl., ECF No. 1.  RAICES joined CREW in filing an amended complaint on December 14, 2018.  First Am. Compl., ECF No. 7.  They brought three claims under the APA asserting that DHS violated the FRA by: (1) failing to establish and maintain a sufficient records management program; (2) failing to create records that adequately linked migrant children with the adults who accompanied them across the border; and (3) failing to properly document its implementation and rollback of the zero tolerance policy. *Id.* ¶¶ 62–87.  Plaintiffs also sought a preliminary injunction on the second claim, requesting an order that DHS create records documenting the separation of migrant children and adults so they could be reunited.  Pls.' Mot. Prelim. Inj., ECF No. 14.

The Court dismissed Plaintiffs' claims and denied the preliminary injunction motion.  *See CREW I*, 387 F. Supp. 3d 33.  It first determined that, although at least RAICES had standing on the first two claims, neither plaintiff had standing on the third claim.  *Id.* at 44–48.  Then, the Court concluded that Plaintiffs' first two claims did not state a claim under the APA because they did not challenge a final agency action.  *Id.* at 48–55.  Plaintiffs' preliminary injunction motion fell along with their second claim.  *Id.* at 53.

With leave from the Court, Plaintiffs amended their complaint again.  *See* Mem. Op. and Order Granting Pls.' Mot. to Alter J. and for Leave to Amend, ECF No. 30.  They now assert a single claim: that DHS's two formal recordkeeping policies violate the FRA because they do not provide enough guidance on the statute's records-creation requirements.  SAC ¶ 77.  Those policies are DHS Directive No. 141-1, Records and Information Management (issued August 11, 2014), *see* SAC Ex. 1 ("Directive"), and DHS Instruction No. 141-01-001, Records and Information Management (issued June 6, 2017), *see* SAC Ex. 2 ("Instruction").  Specifically,

Plaintiffs allege that the policies suffer from the following deficiencies in violation of FRA-implementing regulations:

- The policies do not instruct officials on how to create records that satisfy the standards spelled out in 36 C.F.R. § 1222.22, which requires that records:

  o Document the persons, places, things, or matters dealt with by the agency;

  o Facilitate action by agency officials and their successors in office;

  o Make possible a proper scrutiny by the Congress or other duly authorized agencies of the Government;

  o Protect the financial, legal, and other rights of the Government and of persons directly affected by the Government's actions;

  o Document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all substantive decisions and commitments reached orally (person-to person, by telecommunications, or in conference) or electronically;

  o Document important board, committee, or staff meetings.

- The policies do not "[i]dentify and prescribe specific categories of records to be systematically created or received and maintained by agency personnel in the course of their duties" per 36 C.F.R. § 1222.24(a)(1).

- The policies do not identify "[t]he record series and systems that must be created and maintained to document program policies, procedures, functions, activities, and transactions" as required under 36 C.F.R. § 1222.26(a).

- The policies do not identify the specific "information and documentation that must be included in" those record series and systems under 36 C.F.R. § 1222.28(a).

- The policies do not include "[p]olicies and procedures for maintaining the documentation of phone calls, meetings, instant messages, and electronic mail exchanges that include substantive information about agency policies and activities," as required by 36 C.F.R. § 1222.28(d).

*See* SAC ¶ 77. Plaintiffs also allege that DHS does not satisfy the above requirements through any informal guidance, supplemental directives, or training. *Id.* ¶¶ 79–80.

Defendants filed a motion to dismiss Plaintiffs' new complaint for lack of jurisdiction and for failure to state a claim. *See* Defs.' Mot. Having received Plaintiffs' opposition and Defendants' reply, the Court is ready to rule on the motion. *See* Pls.' Mem. Opp'n Defs.' Mot Dismiss Second Am. Compl. ("Pls.' Opp'n"), ECF No. 35; Defs.' Reply Supp. Defs.' Mot. Dismiss Pls.' Second Am. Compl. ("Defs.' Reply"), ECF No. 36.

### III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a party may seek dismissal of a claim for lack of jurisdiction. Because federal courts are courts of limited jurisdiction, a court presumptively lacks jurisdiction until the plaintiff demonstrates otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In evaluating whether a plaintiff has met that burden, a court "accepts the allegations of the complaint as true," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), and grants the plaintiff "all *reasonable* inferences that can be drawn in her favor," *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998). Nevertheless, the importance of ensuring jurisdiction means that the court should more closely scrutinize a plaintiff's factual allegations than it would in resolving a Rule 12(b)(6) motion for failure to state a claim. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001). Although it "may in appropriate cases dispose of" such a motion "on the complaint standing alone[,] . . . where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

To overcome a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must provide "a short and plain statement of the claim showing

that [she] is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Because "[a] Rule 12(b)(6) motion is intended to test the legal sufficiency of the complaint," the court accepts a complaint's "factual allegations as true" and grants the plaintiff all reasonable inferences from those facts. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1039–40 (D.C. Cir. 2003). That said, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Finally, in assessing a motion to dismiss for failure to state a claim, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (citation omitted).

## IV.  ANALYSIS

### A.  RAICES Has Constitutional Standing

Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, "and there is no justiciable case or controversy unless the plaintiff has standing," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). "The plaintiff bears the burden of establishing all three elements of standing." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).

Those elements are: "(1) [the plaintiff] has suffered a concrete and particularized injury (2) that is fairly traceable to the challenged action of the defendant and (3) that is likely to be redressed by a favorable decision, i.e., a decision granting the plaintiff the relief it seeks." *Id.* (internal quotation marks omitted) (quoting *West*, 845 F.3d at 1230). All that is expected of the plaintiff at the pleading stage are "general factual allegations of injury resulting from the defendants' conduct." *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). And when there is more than one plaintiff, only one needs standing. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Finally, a court assessing standing assumes that the plaintiff will succeed on the merits and thus accepts the plaintiff's legal theory as correct—in this case, that the FRA requires DHS to have more robust recordkeeping policies. *See NB ex rel. Peacock*, 682 F.3d at 82.

Under those principles, RAICES has standing to challenge DHS's recordkeeping policies. To begin, RAICES has satisfied standing's injury-in-fact requirement. Plaintiffs allege that "when DHS separates migrant children from adult companions . . . and fails to create records sufficient to later identify and locate those adults, RAICES's representation of those children is frustrated" because adults often have necessary information or documentation that children lack. SAC ¶ 64. Without information from a migrant child's adult companion, RAICES has difficulty "prepar[ing] applications for relief and obtain[ing] evidence for the children it represents in removal proceedings." *Id.* In addition, Plaintiffs say that DHS's recordkeeping failures "delay" the release of unaccompanied children from HHS custody, which leads "to an increase in removal proceedings against detained migrant children." *Id.* ¶ 67. Representing detained children in removal proceedings is more challenging than representing released children in such proceedings, Plaintiffs explain, because "detained children undergo the proceeding without the

support of their family, and, since they are detained at government expense, the immigration

court process happens quickly, usually within just a few weeks." *Id.* According to Plaintiffs,

DHS's recordkeeping failures have "increased RAICES's workload and required it to reallocate

resources." *Id.* In fact, "in an attempt to fill the void left by DHS's noncompliance with the

FRA," RAICES created two tools designed to match migrant children with their adult

companions. *Id.* ¶ 68. Plaintiffs state that RAICES has diverted time, resources, and manpower

from other projects to operate these tools. *Id.* All in all, these are the same harms that the Court

found met the injury-in-fact element in its previous opinion. *See CREW I*, 387 F. Supp. 3d at

45–46. Because the Court stands by that assessment, it will not repeat its analysis here.

Those injuries are fairly traceable DHS's recordkeeping policies too. Plaintiffs argue that

RAICES's injuries would not have occurred if DHS had policies that complied with the FRA and

its implementing regulations. Their theory of traceability is as follows: (1) DHS does not have

FRA-compliant recordkeeping polices, which means (2) DHS and its component agencies lack

guidance on what records they should keep, what information they should put into records, and

how or where they should keep records, so (3) DHS and its component agencies failed to

produce and maintain records adequate to allow for the timely reunion of migrant children with

their adult companions, which (4) has injured RAICES because it is dependent on those records

to represent its clients. *See* SAC ¶¶ 63–68; Pls.' Opp'n at 15–16.

Defendants challenge the second link in that causal chain. They argue that RAICES's

injuries "allegedly stem from failures of CBP and ICE personnel when creating records of alien

children separated from adults at the border" yet Plaintiffs challenge policies "issued by DHS

Headquarters." Defs.' Reply at 12. The problem, according to Defendants, is that Plaintiffs

"assert no factual details in the SAC that connect CBP's or ICE's alleged failure to create

records . . . to the DHS Policies' alleged failure" to comply with the FRA and its implementing regulations. *Id.*[2]

But traceability is not proximate causation. *See Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (distinguishing between the "*legal cause*" of an injury and traceability, "which requires no more than *de facto* causality"). Instead, traceability requires only that a plaintiff "make a reasonable showing that 'but for' defendant's action the alleged injury would not have occurred." *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1247 (D.C. Cir. 1983) (citing *Duke Power Co. v. Carolina Env't. Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978)), *rev'd on other grounds*, 467 U.S. 340 (1984). It does not matter if there was more than one source of the plaintiff's injuries. *See CREW I*, 387 F. Supp. 3d at 46. So just because CBP and ICE's downstream recordkeeping errors contribute to RAICES's injuries does not mean that DHS's upstream failure to promulgate FRA-compliant recordkeeping policies cannot do so as well. *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (explaining that causation attributable to "the very last step in the chain of causation" does not negate causation attributable to another actor's "determinative or coercive" action earlier in the chain). And the Court rejects any suggestion

---

[2] Defendants also argue that Plaintiffs need to tie their injuries to each of the regulatory provisions they say DHS's policies violate. Defs.' Reply at 12–13. They do not. Traceability examines the connection between a plaintiff's injury and "the challenged action of the defendant." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). It ensures that the defendant's conduct is to blame as opposed to "the *independent* action of some third party not before the court." *Id.* at 169 (citation omitted). Traceability does not require a plaintiff to show that her injuries were "caused by the aspect of the defendant's behavior that made its actions unlawful." Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.5 (3d ed. 2020); *see also Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 78–82 (1978). Here, the challenged action is DHS's recordkeeping policies. Plaintiffs' sole claim is that the policies violate the FRA, and the relief they seek on that claim (setting aside the policies and enjoining DHS to adopt new, FRA-compliant policies, SAC at 30) would be the same if the policies violated any of the regulatory provisions at issue. *See* Wright et al., *supra*, § 3531.5 (explaining that, with causation, "[i]t is enough that there is an injury that will be redressed by a remedy the court is prepared to give").

that DHS's adoption of such policies would not affect the practices of its component agencies. *Cf. United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").[3]

Plaintiffs' complaint "contain[s] sufficient factual matter, accepted as true," to plausibly trace their injuries to DHS's recordkeeping policies. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). Courts in this district have commonsensically attributed an agency's inability to produce requested records to recordkeeping policies that allegedly violate the FRA. *See Judicial Watch, Inc. v. FBI (Judicial Watch I)*, No. 18-cv-2316, 2019 WL 4194501, at *8 (D.D.C. Sept. 4, 2019); *see also Citizens for Responsibility & Ethics in Wash. v. U.S. S.E.C.*, 858 F. Supp. 2d 51, 58–61 (D.D.C. 2012) (finding standing on such a theory, though not analyzing traceability explicitly because defendants did not challenge it). Similarly, it is fair to trace ICE's and CBP's failure to create adequate records on family separations to a lack of guidance from their parent agency on what records to keep, what information to include in records, and how or where to store records.

For instance, Plaintiffs claim that DHS's policies did not prescribe "[t]he record series and systems that must be created and maintained to document" agency activities or identify the specific "information and documentation that must be included in" those series and systems. SAC ¶ 77 (first quoting 36 C.F.R. § 1222.26(a); and then quoting 36 C.F.R. § 1222.28(a)).

---

[3] DHS suggests that the actions of CBP and ICE make it difficult to trace RAICES's injuries to DHS. To be sure, when "the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties," courts demand a heightened showing of traceability, *i.e.* that "the agency action is at least a substantial factor motivating the third parties' actions." *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) (quoting *Tozzi v. HHS*, 271 F.3d 301, 308 (D.C. Cir. 2001)). But here the "third parties" are not independent entities; they are components of DHS. DHS's policies are binding on them.

Seeing as the DHS Inspector General attributed DHS's "struggle[] to provide accurate, complete, reliable data on family separations and reunifications" to a "lack of integration between CBP's, ICE's, and HHS' respective information technology systems," DHS OIG Report 9; *see also* SAC ¶¶ 47, 49, 54, the policies' omissions with respect to records systems and series are a plausible cause of RAICES's injuries.  Indeed, to compensate for the lack of a central database at DHS, RAICES set up two matching programs on its own.  SAC ¶¶ 47, 53, 68.  As another example, Plaintiffs allege that DHS's policies do not specify "categories of records to be systematically created or received and maintained by agency personnel."  *Id.* ¶ 77 (quoting 36 C.F.C. § 1222.24(a)(1)).  If true, that would provide one likely reason for the DHS Inspector General's finding that the agency "could not feasibly identify children who were separated" from adult companions before April 19, 2018.  *See* DHS OIG Report 11 & n.23.  It could also explain why CBP did not "create records documenting the information it transmit[ted] to HHS regarding children transferred to its custody."  SAC ¶ 50.  Those recordkeeping failures impede RAICES's representation of migrant children because the organization cannot get necessary information from their clients' adult companions.  *See id.* ¶ 64.  In sum, Plaintiffs have shown that DHS's alleged lack of FRA-compliant recordkeeping policies is a plausible cause of RAICES's injuries.

Finally, Plaintiffs have shown redressability for the same reasons they have shown traceability.  "Typically, redressability and traceability overlap as two sides of a causation coin, and here too the concepts are closely related."  *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).  Because deficiencies in DHS's recordkeeping policies plausibly cause RAICES's injuries, a decision requiring DHS to implement FRA-compliant policies would likely redress those injuries.

Plaintiffs have thus established standing for RAICES.  Accordingly, the Court does not need to examine CREW's standing.  *See Mendoza*, 754 F.3d at 1010.

### B.  Plaintiffs' Claim Satisfies the APA's Agency Action Requirement

Plaintiffs bring an APA claim.  They assert that the DHS policies' noncompliance with the FRA makes them "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  SAC ¶ 81 (quoting 5 U.S.C. § 706(2)(A)).  The APA permits judicial review only when "[a] person suffer[s] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of the relevant statute."  5 U.S.C. § 702.  "[A]gency action," in turn, "includes . . . an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id.* § 551(13); *see also id.* § 701(b)(2).  The five categories of agency actions are "circumscribed" and "discrete."  *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 62 (2004).  Consequently, the APA does not permit "'broad programmatic attack[s]' on an agency's compliance with a statutory scheme."  *CREW I*, 387 F. Supp. 3d at 49 (quoting *SUWA*, 542 U.S. at 64).  Defendants argue that Plaintiffs' suit is such an attack.  Defs.' Mot. at 22, 26.

In *Armstrong v. Bush (Armstrong I)*, 924 F.2d 282 (D.C. Cir. 1991), the D.C. Circuit clarified what kinds of agency actions a plaintiff can challenge under the APA for failing to comply with the FRA.  The *Armstrong I* court distinguished between three agency actions: (1) an agency's failure to use adequate "recordkeeping guidelines and directives"; (2) agency officials' "destroying records in contravention of . . . recordkeeping guidelines and directives"; and (3) the agency head's or Archivist's failure "to notify Congress and ask the Attorney General to initiate legal action" when required by the FRA.  924 F.3d at 291, 295.  It held that the first and third types of agency action were judicially reviewable but the second was not.  *Id.*

16

The difference, the court explained, was that the FRA provides a specific administrative mechanism to address the unlawful destruction of agency records: it requires the agency head and the Archivist to ask the Attorney General to initiate a lawsuit.  *Id.* at 294; *see also* 44 U.S.C. §§ 2905(a), 3106.  That mechanism indicates a congressional intent to "preclud[e] private litigants from suing directly to enjoin agency actions in contravention of agency guidelines." *Armstrong I*, 924 F.3d at 294.  As to the other two kinds of agency action, however, the court "d[id] not find . . . the 'clear and convincing evidence' necessary to overcome the presumption of judicial review."  *See id.* at 291 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).  It thus held that the FRA does not "preclude judicial review of the adequacy of [an agency's] recordkeeping guidelines and directives."  *Id.* at 292.  Likewise, when an "agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action."  *Id.* at 295.

Plaintiffs' latest claim is the sort of challenge to an agency's recordkeeping guidelines that *Armstrong I* permits.  They assert that "DHS's operative recordkeeping policies, Directive 141-01 and Instruction 141-01-001, fail to comply with the FRA because they lack adequate guidance regarding the FRA's records-creation requirements."  SAC ¶ 77 (citation omitted).[4]

---

[4] Defendants misconstrue Plaintiffs' claim as asking the Court to "review the adequacy of every decision of every component within DHS . . . regarding what kinds of records to create and what kinds of information to document."  Defs.' Mot. at 26.  But as Plaintiffs explain, "[t]he SAC only challenges *DHS's* recordkeeping guidelines and directives—*i.e.*, the recordkeeping guidance provided by DHS headquarters to its staff and components."  Pls.' Opp'n at 36–37. Sure enough, the SAC repeatedly identifies as the object of its challenge "*DHS's* operative recordkeeping policies," SAC ¶ 77 (emphasis added), and "*DHS's* recordkeeping guidelines and directives," *id.* ¶ 81 (emphasis added).  If there was any doubt as to what policies it refers to, the SAC attaches the two DHS-issued guidance documents, which distinguish between "DHS

Plaintiffs do not second-guess the numerous decisions by officials at DHS and its components that carry out the policies, which is what *Armstrong I* prohibited. *See Armstrong I*, 924 F.2d at 293–94 ("[E]ven if a court may review the adequacy of an agency's guidelines, agency personnel will implement the guidelines on a daily basis."). Nor do they lump together a host of FRA-violative agency actions under one claim, which is what the "broad programmatic attack" bar is concerned with. *See CREW I*, 387 F. Supp. 3d at 49 ("[W]hen challenging the failure to take an agency action . . . , a plaintiff must challenge a 'discrete agency action' and cannot make 'a broad programmatic attack' on an agency's *compliance with a statutory scheme*." (emphasis added) (quoting *SUWA*, 524 U.S. at 64)).[5] Despite Plaintiffs alleging a variety of regulatory violations, all those violations stem from a discrete agency action: "the creation of recordkeeping guidelines and directives in the first instance." *See Judicial Watch I*, 2019 WL 4194501, at *5; *see also Citizens for Responsibility & Ethics in Wash. v. Pruitt*, 319 F. Supp. 3d 252, 257 (D.D.C. 2018) (citing *Armstrong I*, 924 F.2d at 291, 294–95). Plaintiffs' guidelines suit therefore satisfies the APA's agency action requirement. *See Judicial Watch I*, 2019 WL 4194501, at *6.

### C.  Plaintiffs Have Not Pleaded a Plausible Claim

Just because Plaintiffs have satisfied the APA's agency action requirement does not mean that they have pleaded a plausible claim. Evaluating whether Plaintiffs have met that burden

---

policy" and components' "more specific internal policies and procedures," Directive 1; *accord* Instruction 1. Plaintiffs say DHS has no other formal or informal recordkeeping policies in effect. *See* SAC ¶¶ 28–30, 78–80.

[5] *Lujan* illustrates the difference. There, the Supreme Court held that plaintiffs did not meet the agency action requirement because they brought a multifaceted attack on a "land withdrawal review program" comprised not of "a single . . . order or regulation" but rather "1250 or so individual classification terminations and withdrawal revocations." *Lujan*, 497 U.S. at 890 (citation omitted)). By contrast, Plaintiffs attack only DHS's recordkeeping policies.

requires discussing the boundaries of their asserted cause of action. Guidance from previous FRA cases indicate that Plaintiffs' claim is different than others that courts have found are justiciable under the APA. Even assuming their claim is justiciable, however, they have not alleged facts to make it plausible that DHS's recordkeeping policies are arbitrary, capricious, an abuse of discretion, or contrary to the FRA.

But first, an overview of DHS's policies is helpful. As mentioned, Plaintiffs identify two DHS policies as the target of their attack: DHS Directive No. 141-1 and DHS Instruction No. 141-01-001. Defendants argue that the Court should also take judicial notice of a revised version of the Instruction that DHS issued on September 9, 2019. Defs.' Mot. at 24–25; Defs.' Reply at 16 n.8; *see also* Defs.' Mot. Ex. A ("Revised Instruction"), ECF No. 33-3. The Court considers the Revised Instruction because there is no reason to doubt that it is one of DHS's operative recordkeeping policies and Plaintiffs do not question its authenticity. *See* Fed. R. Evid. 201(b)(2); *see also Judicial Watch I*, 2019 WL 4194501, at *3 n.4 (considering agency policy attached to defendant's motion to dismiss in part because the complaint necessarily relied on it and plaintiff did not object); *Citizens for Responsibility & Ethics in Wash. v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (taking judicial notice of memo because it "represent[ed] the White House's official position, it [was] publicly available on the National Archives' website, and CREW nowhere challenge[d] its authenticity").

The Directive is five pages long. It first explains that it "applies throughout DHS" but permits component agencies to adopt "more specific internal policies and procedures that are in alignment with DHS policy." Directive 1. The Directive then describes the responsibilities of various DHS officials. It entrusts the "Senior Agency Official" with "[e]nsur[ing] that the Department efficiently and appropriately complies with all applicable records management

statutes, regulations, and NARA policies." *Id.* at 2.  It tasks the Chief Information Officer with "oversee[ing]" DHS's records and information management program and providing for the storing of "electronic records . . . in DHS enterprise-wide systems." *Id.*  It also delegates to component heads the responsibility for "implement[ing]" DHS's records program and requires them to "[o]btain [c]omponent specific records retention schedules . . . for all records within the [c]omponent." *Id.* at 3.  Finally, the Directive lists a series of policies and requirements.  They require "all DHS employees" to: "[c]reate, receive, and maintain official records providing adequate and proper documentation in support of DHS activities"; "[p]rovide appropriate training to new employees and annual training to current employees" on their recordkeeping responsibilities; and "[c]reate and/or [i]mplement [r]ecord [s]chedules." *Id.* at 4–5.

The original Instruction is eleven pages long.  Like the Directive, it explains that it "applies throughout DHS" but components can supplement it.  Instruction 1.  It sets forth definitions of terms like "Records Schedules" and "Records." *Id.* at 2–4.  Then, it describes the duties of agency officials. *Id.* at 5–10.  For instance, the "Chief Records Officer" "[d]evelops enterprise schedules" and establishes "procedures for records and record systems/applications to be applied throughout DHS." *Id.* at 5.  Similarly, component heads have a variety of responsibilities, including to "[e]nsure the identification, retention, and management of electronic and paper records according to DHS Records policy" and to "[e]nsure [record information management] is included in information technology system that are [sic] acquired or developed within their Component." *Id.* at 6–7.  DHS employees are supposed to "properly identify, capture, retain, file, and dispose of or transfer records . . . in accordance with" the FRA and NARA regulations. *Id.* at 9.  The Instruction concludes by expressing the policy of DHS to maintain records in accordance with the FRA and NARA regulations. *Id.* at 10.

The Revised Instruction adds little to the original.  It alters the definition of "records" to match the language in 44 U.S.C. § 3301.  Revised Instruction 4–5, 12.  And, again drawing from section 3101's language, it gives all DHS employees the responsibility to "[a]dequately document the organization, functions, policies, decisions, procedures, and essential transactions of the agency."  *Id.* at 10.  Component chief records officers are required to ensure their employees comply with that obligation.  *Id.* at 8.  Finally, the Revised Instruction explains that agencies must comply with the FRA and quotes verbatim from several FRA-implementing regulations, including most of 36 C.F.R. § 1222.22.  *See id.* at 10–12.

With that factual background out of the way, the Court looks to caselaw for help in evaluating Plaintiffs' claim.  Plaintiffs argue that this case presents "precisely" the kind of guidelines-based attack that *Armstrong I* sanctioned.  Pls.' Opp'n at 24.  Not so.  This case differs from *Armstrong I* in that Plaintiffs challenge the DHS policies for not providing enough guidance on records *creation* as opposed to records *destruction*.  In *Armstrong I*, the plaintiffs challenged National Security Council policies that allegedly allowed the agency to destroy records in violation of the FRA.  *See* 924 F.2d at 286–87, 293.  The D.C. Circuit instructed the district court on remand that the agency's recordkeeping policies would violate the APA if "they permit[ted] the destruction of record material that should be maintained."  *Id.* at 297.  Tellingly, when later affirming the district court's ruling that the agency's policies violated the FRA, the same court emphasized that its decision did not require the agency to create any new records.  *See Armstrong v. Exec. Off. of the President (Armstrong II)*, 1 F.3d 1274, 1287 (D.C. Cir. 1993) (per curiam) ("Nor do we saddle agencies with any new obligations to make additional documents in order to satisfy the needs of researchers or investigators.").  Following *Armstrong I*'s lead, some cases in this district have characterized the FRA-based APA cause of action in

terms of records destruction. *See, e.g.*, *Judicial Watch I*, 2019 WL 4194501, at *9. One court explained, "[w]hile *Armstrong* squarely governs claims surrounding an agency's *destruction* of records, it was left to future courts to consider the decision's applicability to records-*creation* claims." *Citizens for Responsibility & Ethics in Wash. v. Pompeo (Pompeo I)*, No. 19-cv-3324, 2020 WL 1667638, at *4 (D.D.C. Apr. 3, 2020).

The distinction is important. "Because [the] FRA is primarily directed at the preservation of federal records, the crux of the statute lies in its disposal provisions." *Competitive Enter. Inst. v. EPA*, 67 F. Supp. 3d 23, 26 (D.D.C. 2014); *accord Pruitt*, 319 F. Supp. 3d at 256. Those provisions set out specific procedures that, generally speaking, require an agency to seek the Archivist's authorization before disposing of records. *Competitive Enter. Inst.*, 67 F. Supp. 3d at 27 (citing 44 U.S.C. §§ 3303, 3303a). The FRA also delineates a process for "the recurring disposal of certain categories of records." *Id.* (citing 44 U.S.C. § 3303(3); 36 C.F.R. §§ 1225.14, 1225.16). These procedures constitute the "exclusive" means of "alienat[ing] or destroy[ing]" records. 44 U.S.C. § 3314. By contrast, the FRA envisions that the "individual agency . . . should have the primary responsibility" for determining what records must be created to serve its purposes. S. Rep. No. 81-2140, at 3550 (1950). Its approach reflects the reality that different agencies have different missions and therefore different uses for records. Deference to agencies is evident in the broad mandates found in the statute and its implementing regulations, which direct agencies to enact policies without specifying exactly what those policies must say. *Cf. Judicial Watch, Inc. v. FBI (Judicial Watch II)*, No. 18-cv-2316, 2020 WL 5505347, at *4 (D.D.C. Sept. 11, 2020) ("Nothing in the FRA or NARA's regulations requires agencies to adopt the most advanced technologies for recordkeeping or technologies that will automatically preserve records, and the Court is in no position to dictate what technologies the FBI should

adopt.").[6]  On the whole, while the FRA "does contain several specific requirements," it

"understandably leaves the details of records management to the discretion of individual agency

heads." *Armstrong I*, 924 F.2d at 293.

District caselaw has thus recognized only limited circumstances permitting a challenge to

the adequacy of an agency's records-creation policies. *See Pruitt*, 319 F. Supp. 3d at 256–57

("The bulk of the admittedly scant precedent addressing judicial review of agency obligations

under the Act . . . unsurprisingly[] concerns the destruction of records.").  In *Pruitt*, plaintiffs

sued the Environmental Protection Agency ("EPA") after Administrator Scott Pruitt "ushered in

a culture of secrecy" by instructing staff not to create written records of substantive matters and

prohibiting staff from using phones or taking notes at meetings.  *Id.* at 255.  To avoid creating

records himself, Pruitt used phones other than his own, tried not to communicate via email, and

commissioned a soundproof "privacy booth."  *Id.*  The plaintiffs brought two FRA-based claims.

First, they argued that the EPA's practice violated the FRA's requirement that agencies

"make and preserve records containing adequate and proper documentation of the organization,

function, policies, decisions, procedures, and essential transactions of the agency."  *Id.* at 258

(quoting 44. U.S.C. § 3101).  The court permitted the challenge notwithstanding *Armstrong I*'s

bar on suits demanding compliance with agency recordkeeping policies because the EPA's

---

[6] *See, e.g.*, 44 U.S.C. § 3102(1) (instructing "[t]he head of each Federal agency" to
"establish and maintain" a records-management program that "shall provide for," among other
things, "effective controls over the creation[,] . . . maintenance[,] and use of records"); 36 C.F.R.
§ 1222.22(d) (requiring agencies to "prescribe the creation and maintenance of records that . . .
[p]rotect the financial, legal, and other rights of the Government and persons directly affected by
the Government's actions"); *id.* § 1222.24(a)(1) (requiring agency recordkeeping policies that
"[i]dentify and prescribe specific categories of records to be systematically created or received
and maintained by agency personnel in the course of their official duties"); *id.* § 1222.28(d)
(providing that agency recordkeeping requirements must include "[p]olicies and procedures for
maintaining the documentation of phone calls, meetings, instant messages, and electronic mail
exchanges that include substantive information about agency policies and activities").

practices amounted to an "unofficial policy of refusing to create records." *CREW I*, 387 F. Supp. 3d at 53; *see also Pruitt*, 319 F. Supp. 3d at 258–60; *Citizens for Responsibility & Ethics in Wash. v. Wheeler*, 352 F. Supp. 3d 1, 6, 9–10 (D.D.C. 2019). That kind of claim—alleging an agency's outright refusal to create records as the FRA requires—is not at issue here.

Second, the plaintiffs in *Pruitt* argued that the EPA's *official* recordkeeping policies did not comply with an FRA-implementing regulation's mandate that agencies must "prescribe the creation and maintenance of records that [d]ocument . . . the formulation and execution of all basic policies and decisions and . . . all substantive decisions and commitments reached orally." *Pruitt*, 319 F. Supp. 3d at 260–61 (alteration and omissions in original) (quoting 36 C.F.R. § 1222.22(e)). The court dealt with the claim in short order, finding that plaintiffs "pass[ed] the pleading hurdle with little effort" because the EPA's official policy "d[id] not mention any mandate to create records for 'substantive decisions and commitments reached orally.'" *Id.* Plaintiffs suggest that type of omission-based claim is what they assert here. *See* Pls.' Opp'n at 26.

Unfortunately for Plaintiffs, *Pruitt* is not the end of the story. After Pruitt stepped down from the EPA, the agency issued a new recordkeeping policy. *See Wheeler*, 352 F. Supp. 3d at 6–7. The new policy "[h]ighlight[ed] the obligation to document substantive decisions reached orally." *Id.* at 6 (first alteration in original). Observing that "the revised policy correct[ed] the fundamental defect in the old one," *id.* at 12, the court dismissed the claim as moot, *id.* at 13. In doing so, the court brushed aside the plaintiffs' objection that the change did not do enough. It reasoned that the plaintiffs "d[id] not point to any specific requirement" or "specify any 'effective controls'" the FRA required that the EPA's policy lacked. *Id.* at 12.

*Wheeler* indicates that, to the extent a plaintiff can challenge an agency policy for lacking records-creation guidance that the FRA requires, a court's review is very limited.  All the EPA's policy had to do to comply with the FRA was to "highlight" the requirement to document substantive decisions; the court did not inquire any further into the policy's substance.  *See id.* at 12–13.  That makes sense because, as discussed, the FRA grants significant discretion to agency recordkeepers in determining what records the agency should create.  And on top of that discretion, recall that the ultimate question in an APA suit to "set aside" a recordkeeping policy is whether the policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under" that "standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  It is one thing for a plaintiff to show that an agency completely lacks a policy addressing a particular FRA records-creation requirement (as *Pruitt* found)—that is clearly "not in accordance with law."  It is much more difficult for a plaintiff challenging a policy that is consistent with the FRA on its face to overcome two layers of discretion and show that, in fact, the policy does not go far enough in meeting the aim of a particular FRA requirement (as *Wheeler* tacitly acknowledged).

Plaintiffs' claim is a case in point.  They assert that DHS's policies do not provide "sufficient guidance" on the FRA's record-creation requirements.  Pls.' Opp'n at 24 (quoting *Armstrong I*, 924 F.2d at 291).  But as Defendants explain (and Plaintiffs agree), the policies "unequivocally require compliance with the FRA and with NARA regulations, albeit at a general level."  Defs.' Mot. at 22; *see also* Pls.' Opp'n at 29.  They say so expressly.  *E.g.*, Directive 4 ("It is DHS policy to preserve all records in accordance with applicable statutory requirements . . . .").  Some of their requirements repeat or paraphrase provisions from the FRA

and its implementing regulations.  *See, e.g.*, Revised Instruction 10–12 (explaining that the FRA requires creation and preservation of records as well as establishment of a records management program, then listing some of its requirements).  Other parts of the policies task officers and employees with carrying out various recordkeeping responsibilities in accordance with the FRA. *See, e.g.*, *id.* at 5–10.  The policies also instruct DHS components to create their own FRA-compliant records management programs.  *See* Directive 3–5; Revised Instruction 6–9.

Faced with policies that demand compliance with the FRA, the question becomes: How much guidance is enough?  That question is especially complicated here because DHS's policies delegate much of the responsibility for deciding what records to create and keep to the agency's components.  Even Plaintiffs recognize that, given the variety of missions served by DHS's twenty-two component agencies, "some" delegation is appropriate.  Pls.' Opp'n at 30.  But how much delegation is too much?  And how can the Court determine whether an agency's generally applicable policies are adequate when the policies properly delegate "some" decisions to components whose policies Plaintiffs do not challenge?  Plaintiffs offer no real answers to these questions.  The Court cannot answer them either.  As an institution, the Judiciary is ill-equipped to make the judgment calls inherent in decisions about what records an agency should create because the primary purpose of records is "to serve the administrative and executive purposes of the organization that creates them."  *See* S. Rep. No. 81-2140, at 3550; *cf. Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985) ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."); *In re Core Commc'ns, Inc.*, 531 F.3d 849, 859 (D.C. Cir. 2008) ("We are . . . 'acutely aware of the limits of our institutional competence in [a] highly technical area' and loath to 'interfere with the agency's internal processes.'" (alteration in original) (citations omitted)).  Indeed, the discretion the FRA's

records-creation provisions grant to agencies makes the Court wonder if claims alleging

violations of those provisions are justiciable at all.  *See* 5 U.S.C. § 701(a)(2) (precluding review

of "agency action . . . committed to agency discretion by law"); *cf. SUWA*, 542 U.S. at 67 ("The

prospect of pervasive oversight by federal courts over the manner and pace of agency

compliance with [broad] congressional directives is not contemplated by the APA.").  *But see*

*Pruitt*, 319 F. Supp. 3d at 258–60 (holding that judicial review is appropriate for records-creation

policies).[7]

In any case, the Court need not wade into the murky territory of justiciability because

Plaintiffs have not plausibly shown that DHS's recordkeeping policies are "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."  *See* 5 U.S.C. § 706(2)(A).

Their SAC merely lists ten regulatory provisions and states that DHS's policies "lack adequate

guidance" on them.  SAC ¶ 77.  They do not identify what portions of the policies are deficient

or explain how the policies fall short with respect to each regulatory provision.  *Cf. Judicial*

*Watch II*, 2020 WL 5505347, at *4 ("The amended complaint does not explain why not

---

[7] Other kinds of FRA-based claims against agency recordkeeping policies involve distinct questions that are more easily answerable.  First, there is the classic *Armstrong* claim where an agency's policy allegedly "permit[s] the destruction of record material that should be maintained."  *Armstrong I*, 924 F.2d at 297.  Such a claim requires the court to ask (1) whether material covered by a policy should be preserved as records under the FRA and (2) whether the policy allows the agency to destroy those materials without adhering to the FRA's records-destruction procedures.  *See Armstrong II*, 1 F.3d at 1282–87.  Second, there is the claim that *Pruitt* recognized in which the "plaintiffs challenge an 'agency policy—formal or otherwise— that refuses to make' or preserve 'records in accordance with the FRA.'"  *Wheeler*, 352 F. Supp. 3d at 11 (quoting *Pruitt*, 319 F. Supp. 3d at 260).  That type of claim requires the plaintiff to show that an agency "has established a policy or practice of violating the FRA's record-creation requirements."  *Citizens for Responsibility & Ethics in Wash. v. Pompeo (Pompeo II)*, No. 19-cv-3324, 2020 WL 5748105, at *5 (D.D.C. Sept. 25, 2020).  Finally, when the claim is that an agency policy completely lacks something the FRA specifically requires, review may be as straightforward as reading the policy to determine if it covers the FRA requirement at issue.  *See Armstrong II*, 1 F.3d at 1287–88; *Pruitt*, 319 F. Supp. 3d at 260–61.

automatically preserving text messages makes the FBI's policy inadequate."). And in neither the SAC nor their opposition do Plaintiffs explain what "adequate guidance" would look like. Apparently, Plaintiffs think the FRA violations are self-evident from the face of DHS's policies.[8]

The Court disagrees. DHS's policies require compliance with the FRA and all its implementing regulations. They may be general in substance, but the FRA gives agencies latitude to craft records-creation policies appropriate for their circumstances. Given that DHS consists of twenty-two different component agencies, it is reasonable that the parent agency's umbrella policy would speak in broad terms while instructing components to develop FRA-compliant policies tailored to their own unique missions and structures. The Court presumes agency personnel have done that. *Cf. Chem. Found.* 272 U.S. at 14–15; *Competitive Enter. Inst.*, 67 F. Supp. 3d at 33. As Defendants say, the FRA and its implementing regulations do not mandate that their requirements "must be addressed in a single document setting forth every detail regarding the agency's recordkeeping policy." Defs.' Mot. at 6. Absent "precise factual allegations" describing how DHS's policies are inadequate under the FRA despite purporting to demand compliance with the Act, Plaintiffs' listing of alleged regulatory violations are nothing more than conclusory legal conclusions that cannot make out a claim. *See Judicial Watch I*, 2019 WL 4194501, at *9 ("Plaintiff's claims amount to conclusory allegations that the FBI failed to 'establish and maintain a recordkeeping program that provides effective controls.' These sorts of legal conclusions, standing alone, will not suffice to withstand a motion to dismiss." (citations omitted)); *see also Iqbal*, 556 U.S. at 678–79.

---

[8] In their opposition, Plaintiffs point to DHS and its components' recordkeeping failures as "[b]olstering the plausibility" that DHS's records-creation guidelines are inadequate. Pls.' Opp'n at 23. But their argument "drifts . . . into the territory" that *Armstrong I* prohibits. *See Wheeler*, 352 F. Supp. 3d at 12. The Court will not entertain their attempt to bootstrap allegations of noncompliance with agency policies into an attack on the policies themselves.

Plaintiffs have not shown that DHS's recordkeeping policies are arbitrary, capricious, or an abuse of the discretion the FRA grants the agency, nor have they shown that the policies are inconsistent with the FRA.  As a result, their claim is dismissed.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 30, 2020                                    RUDOLPH CONTRERAS
                                                            United States District Judge